IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VICTOR GALAN

        *Petitioner*

Versus

TIM HOOPER, Warden
Louisiana State Prison

        *Respondent*

Civil Action

Case No.: _____

Section: _____

Judge: _____

EXHIBITS AND APPENDICES

| Exhibit AA | 09/07/22 | Writ Application Denied in Louisiana Supreme Court |
| Exhibit BB | 03/29/22 | Application for Writ of Certiorari or Review |

Appendices and Exhibits within Exhibit BB:

| Appendix 1 | 03/14/22 | First Circuit Denied Supervisory Writs |
| Appendix 2 | 01/03/22 | Application for Supervisory Writs (with attached Exhibits) |

Exhibits within Appendix 2:

| Exhibit A | 12/10/21 | District Court Denied PCR Application |
| Exhibit B | 04/05/21 | Original PCR Application (with attached Appendices) |

Appendices within Exhibit B:

| Appendix A | 01/22/20 | La Supreme Court Denied Writs on Direct Appeal |
| Appendix B | 04/05/15 | Commitment Order and Court Minutes |
| Appendix C | 05/02/17 | Superseding Indictment |
| Appendix D | 06/25/15 | Original Bill of Information |
| Appendix E | | Record pages 236 - 246 |
| Appendix F | | Trial Transcript pages 265 - 327 |
| Appendix G | | Trial Transcript pages 345 - 346 |
| Appendix H | | Record pages 146 - 196 |

SCANNED at LSP and Emailed
9-19-22 by DB . 286 pages
date        initials   No.

RECEIVED

SEP 19 2022

# The Supreme Court of the State of Louisiana
Legal Programs Department

**STATE OF LOUISIANA**

No. 2022-KH-00544

**VS.**

**VICTOR GALAN**

— — — — — —

IN RE: Victor Galan - Applicant Defendant; Applying For Supervisory Writ, Parish of St. Tammany, 22nd Judicial District Court Number(s) 563468, Court of Appeal, First Circuit, Number(s) 2022 KW 0021;

— — — — — —

**September 07, 2022**

Writ application denied. See per curiam.

JDH

JLW

SJC

JTG

JBM

PDG

Crain, J., recused.

Supreme Court of Louisiana
September 07, 2022

Katie Maranoluc

Chief Deputy Clerk of Court
For the Court


EXHIBIT
AA

September 7, 2022

## SUPREME COURT OF LOUISIANA

### No. 22-KH-0544

### STATE OF LOUISIANA

**v.**

### VICTOR GALAN

## ON SUPERVISORY WRITS TO THE TWENTY-SECOND JUDICIAL DISTRICT COURT, PARISH OF BOSSIER

 **PER CURIAM:**

Denied. Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to his remaining claims, applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2.

Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, *see* 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

SCANNED at LSP and Emailed
3-29-22 by _VB_, _234_ pages
date        initials   No.

RECEIVED

MAR 29 2022

Legal Programs Department

IN THE
SUPREME COURT OF LOUISIANA
STATE OF LOUISIANA

DOCKET NO.: _____

VICTOR GALAN
*Petitioner*

Versus

DARREL VANNOY, Warden
Louisiana State Prison
*Respondent*

APPLICATION FOR WRIT OF CERTIORARI OR REVIEW

From the Denial of Supervisory Writs in the
First Circuit Court of Appeal, Docket No. 2022-KW-0021
Before: Guidry, Holdridge, and Chutz, JJ.;
From the Denial of Post Conviction Relief
in the 22nd Judicial District Court,
Criminal Docket No. 563468, Div. "B"
Honorable August J. Hand, Judge Presiding.

Respectfully submitted, *pro se*, this 29th day of March, 2022.

Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

CRIMINAL POST CONVICTION PROCEEDING

EXHIBIT
BB

## APPENDIX C. SUPREME COURT OF LOUISIANA
## WRIT APPLICATION FILING SHEET

No. _____

### TO BE COMPLETED BY COUNSEL
### or PRO SE LITIGANT FILING APPLICATION

TITLE

**VICTOR GALAN**

VS.

**DARREL VANNOY, Warden**

Petitioner: _Victor Galan, DOC # 732647_
Have there been any other filings in this
Court in this matter?  [ ] Yes  [X] No

Are you seeking a Stay Order?__NO__
Priority Treatment?___NO___
**If so you MUST complete & attach a
Priority Form**

### LEAD COUNSEL PRO SE LITIGANT INFORMATION

**Petitioner**: _VICTOR GALAN_
Name:____Victor Galan____
Address: DOC No. 732647, Spruce 1
    Angola, Louisiana 70712
Phone: N/A Bar Roll No. N/A

**Respondent**: DARREL VANNOY, Warden
Name: _Warren Montgomery, District Attorney_
Address: 701 N. Columbia St.
    Covington, LA 70433
Phone: ___ Bar Roll No.___

**Pleading being filed:   [X] In Proper Person   [X] In Forma Pauperis**

**Attach a list of additional counsel/pro se litigants, their addresses, phone numbers and the parties
they represent.**

### TYPE OF PLEADING
[ ] Civil,  [X] Criminal,  [ ] Bar,  [ ] Civil Juvenile,  [ ] Criminal Juvenile,  [ ] Other

### ADMINISTRATIVE OR MUNICIPAL COURT INFORMATION
Tribunal/Court:___N/A_____ Docket No.___N/A___
Judge/Commissioner/Hearing Officer:___N/A____Ruling Date: N/A___

### DISTRICT COURT INFORMATION
Parish and Judicial District Court: 22nd JDC, St. Tammany Parish Docket No. 563468 Div. "B"
Judge and Section: August J. Hand  Date of Ruling/Judgement: December 10, 2021

### APPELLATE COURT INFORMATION
Circuit: 1st Circuit Court of Appeal  Filing Date: January 03, 2022  Docket No. 2022-KW-0021
Petitioner in Appellate Court: __Victor Galan___
Ruling Date: March 14, 2022  Panel of Judges: Guidry, Holdridge and Chutz, JJ.    En Banc: [ ]

### REHEARING INFORMATION
Petitioner:__N/A__ Date Filed: N/A__ Action on Rehearing: N/A_
Ruling Date:_N/A___ Panel of Judges:___N/A____    En Banc: [ ]

### PRESENT STATUS
[ ] Pre-Trial, Hearing/Trial Scheduled Date:___,  [ ] Trial in Progress,  [X] Post Trial
Is there a stay now in effect? NO_
Has this pleading been filed simultaneously in any other court? NO_
If so, explain briefly: _____

### VERIFICATION
I certify that the above information and all of the information contained in this application is true and
correct to the best of my knowledge and that all relevant pleadings and rulings, as required by Supreme
Court Rule X, are attached to this filing. I further certify that a copy of this application has been mailed
or delivered to the appropriate court of appeal (if required), to the respondent judge in the case of a
remedial writ, and to all other counsel and unrepresented parties.

_3-29-22_
DATE

_Victor Galan_
SIGNATURE

TABLE OF CONTENTS

page

COVER

SUPREME COURT FILING SHEET

TABLE OF CONTENTS........................................................................................................i

TABLE OF AUTHORITIES................................................................................................ii

APPLICATION FOR WRIT OF CERTIORARI OR REVIEW..........................................1

STATEMENT OF JURISDICTION....................................................................................1

STATEMENT OF THE CASE.............................................................................................2

STATEMENT OF THE FACTS..........................................................................................3

WRIT GRANT CONSIDERATIONS - RULE X................................................................4

ISSUES PRESENTED..........................................................................................................5

STANDARD OF REVIEW...................................................................................................6

ARGUMENT.........................................................................................................................7

    1.................................................................................................................................7

    2.................................................................................................................................8

    3...............................................................................................................................11

    4...............................................................................................................................13

    5...............................................................................................................................16

    6...............................................................................................................................18

    7...............................................................................................................................18

CONCLUSION...................................................................................................................19

CERTIFICATE OF SERVICE..........................................................................................20

APPENDICES AND EXHIBITS

# TABLE OF AUTHORITIES

page

CONSTITUTION

Louisiana Constitution, Article 1, § 2 ..................................................................... 8, 13, 16, 19

Louisiana Constitution, Article 1, § 13 ....................................................................... 8, 16, 19

Louisiana Constitution, Article 1, § 16 ............................................................................. 8, 13

Louisiana Constitution, Article 1, § 17 .................................................................................. 16

Louisiana Constitution, Article 5, § 5 ...................................................................................... 1

United States Constitution, Amendment 5 ............................................................... 8, 13, 16, 19

United States Constitution, Amendment 6 .................................................................. 8, 16-19

United States Constitution, Amendment 14 ............................................................ 8, 13, 16, 19


CODE

La. C. Evid. Art. 801 ............................................................................................................... 9

La. C. Evid. Art. 802 ............................................................................................................... 9

La. C. Evid. Art. 803 ............................................................................................................... 8

La. C.Cr.P. Art. 926 ............................................................................................................... 4

La. C.Cr.P. Art. 929 ............................................................................................................... 4

La. R.S. 14:42 ......................................................................................................................... 2

La. R.S. 14:89.1 ...................................................................................................................... 2


FEDERAL CASES

Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) .................................. 12

Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971) ......................... 12

Burge v. St. Tammany Parish, 187 F.3d 452 (5th Cir. 1999) ................................................. 15

Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) ......................... 4

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ............... 9

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005) ................................................................ 12

Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ...................................... 3

Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ............................. 17

Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) ................................ 17

Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) ..................................... 3

Hernandez v. Thaler, 630 F.3d 420 (5th Cir. 2011) ................................................................. 3

Johnson v. Quarterman, 479 F.3d 358 (5th Cir. 2007) ............................................................. 3

Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ................................. 17

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ................................ 6

Latiolais v. Whitley, 93 F.3d 205 (5th Cir. 1996) ................................................................... 6

Lindstadt v. Keane, 239 F.3d 191 (2nd Cir. 2001) ................................................................. 12

Loyd v. Whitley, 977 F.2d 149 (5th Cir. 1992) ....................................................................... 15

ii

McNeil v. United States, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)......................................3

Medina v. California, 505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)...................................17

Melancon v. Kaylo, 259 F.3d 401 (5th Cir. 2001).......................................................................................3

Mellon v. United States, 170 F.2d 583 (5th Cir. 1948)..............................................................................10

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999)...............................................................................12, 15

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979).....................................................................................18

Pavel v. Hollins, 261 F.3d 210 (2nd Cir. 2001)........................................................................................12

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)............................6, 12

United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)....................................13

United States v. Kayode, 777 F.3d 719 (5th Cir. 2014)...............................................................................3

United States v. Lueben, 812 F.2d 179 (5th Cir. 1987).............................................................................12

United States v. Riddle, 103 F.3d 423 (5th Cir. 1997)..............................................................................12

## STATE CASES

State v. Bennett, 345 So. 2d 1129 (La. 1977)............................................................................................17

State v. Chism, 591 So.2d 383 (La.App. 2 Cir. 1991)...............................................................................15

State v. Foret, 628 So.2d 1116 (La.1993)....................................................................................................9

State v. Horn, 2016-0559, 251 So.3d 1069 (La. 2018).............................................................................17

State v. Kennedy, 803 So.2d 916 (La. 2001).............................................................................................16

State v. Laprime, 437 So.2d 1124 (La. 1983)............................................................................................15

State v. Lott, 535 So.2d 963 (La.App. 2 Cir. 1988)...................................................................................15

State v. Matthis, 07-0691, 970 So.2d 505 (La. 11/2/07).............................................................................6

State v. Mitchell, 412 So.2d 1042 (La. 1982)..............................................................................................7

State v. Ste. Marie, 801 So.2d 424 (La. App. 3 Cir. 2001).........................................................................9

State v. Tucker, 619 So.2d 1076 (La. App. 1 Cir. 1993).........................................................................8-9

State v. Victor Galan, 277 So.3d 365 (La. App. 1 Cir. 2019)..................................................................2-3

State v. Victor Galan, 291 So.3d 1042 (La. 1/22/20)..................................................................................2

State v. Washington, 491 So.2d 1337 (La. 1986)........................................................................................6

## OTHER

Rehabilitation Act of 1973.........................................................................................................................18

Americans with Disabilities Act................................................................................................................18

IN THE
SUPREME COURT OF LOUISIANA
STATE OF LOUISIANA

VICTOR GALAN

*Petitioner*

Versus

DARREL VANNOY, Warden
Louisiana State Prison
*Respondent*

Docket No: _____

Date Filed: _____

_____
Clerk of Court

## APPLICATION FOR WRIT OF CERTIORARI OR REVIEW

From the Denial of Supervisory Writs in the
First Circuit Court of Appeal, Docket No. 2022-KW-0021
Before: Guidry, Holdridge, and Chutz, JJ.;
From the Denial of Post Conviction Relief
in the 22nd Judicial District Court,
Criminal Docket No. 563468, Div. "B"
Honorable August J. Hand, Judge Presiding.

MAY IT PLEASE THE COURT:

NOW COMES Victor Galan, *pro se* Petitioner herein, who respectfully submits the instant

Application for Writ of Certiorari or Review, pursuant to the denial of Supervisory Writs in the First

Circuit Court of Appeal, from the denial of Post Conviction Relief in the 22nd Judicial District Court,

Parish of St. Tammany, Louisiana. In support, Petitioner respectfully presents the following:

## STATEMENT OF JURISDICTION

The Louisiana Constitution, Article 5, §§ 5 (A) and 5 (C), provides the Louisiana Supreme

Court with supervisory jurisdiction over all other state courts, and appellate jurisdiction in criminal

matters as to questions of law.

1

## STATEMENT OF THE CASE

On June 25, 2015, Victor Galan, *pro se* Petitioner herein, was charged by Felony Bill of Information with 1 count of aggravated crime against nature, La. R.S. 14:89.1(A)(2)(b) with a person under the age of thirteen. (Appendix D)[1]. Petitioner was arraigned on this charge July 16, 2015, and pled not guilty.

On May 02, 2017, a superseding Bill of Indictment was filed charging Petitioner with 1 count of aggravated rape, La. R.S. 14:42. (Docket No. 563468 Div. "B") (Appendix C). Petitioner was arraigned on this charge on May 16, 2017, and pled not guilty.

Petitioner went to a bench trial, Honorable August J. Hand, Judge Presiding, which started on April 02, 2018, and ended on April 05, 2018, at which time the trial court found Petitioner guilty as charged. (Appendix B). Defense counsel moved for a new trial which was denied by the court. After waiving sentencing delays, Petitioner was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. (Appendix B).

Petitioner appealed his conviction and sentence to the Louisiana First Circuit Court of Appeal. On November 12, 2018, Lieu T. Vo Clark with the Louisiana Appellate Project filed a direct appeal brief on behalf of Petitioner. On December 25, 2018, Petitioner filed a *pro se* Supplemental brief. (Docket No. 2018-KA-1481).

On May 14, 2019 the First Circuit Court of Appeal affirmed Petitioner's conviction and sentence. (before McDonald, Crain, and Holdridge, JJ.). *State v. Victor Galan*, 277 So.3d 365 (La. App. 1 Cir. 2019).

Petitioner then filed a *pro se* Application for Writ of Certiorari in the Louisiana Supreme Court on June 05, 2019. Petitioner's writ application was denied on January 22, 2020. *State v. Victor Galan*, 291 So.3d 1042 (La. 1/22/20). (Appendix A).

On April 04, 2021, a timely filed Application for Post Conviction Relief was filed in the District Court. (Exhibit B)[2]. On December 10, 2021, the District Court denied post conviction relief. (Exhibit A).

On January 03, 2022, Petitioner filed an Application for Supervisory Writs in the Louisiana First Circuit Court of Appeal, (Appendix 1), which was denied on March 14, 2022. (Docket No. 2022-KW-0021) (before Guidry, Holdridge, and Chutz, JJ.) (Appendix 2).

The instant Application for Certiorari or Review timely follows.

---

1   Appendices A - H are contained within Exhibit B, Petitioner's Original PCR Application.
2   Exhibits A and B are contained within Appendix 2.

Petitioner states that he has remained in continued custody since his arrest, and is currently being held in custody at the Louisiana State Prison at Angola, Louisiana, Tim Hooper, Warden.[3]

Further, Petitioner is a *pro se* litigant. Therefore, he asks that his efforts herein be liberally construed as he has made a good faith effort to follow form. *United States v. Kayode*, 777 F.3d 719, 741, n. 5[4] (5th Cir. 2014).

## STATEMENT OF THE FACTS

The Louisiana First Circuit Court of Appeal summarized the facts of the case on direct appeal in the following manner:

> The victim, E.B.R.M., is the biological daughter of the defendant, and in 2014 lived with the defendant, her mother (who was married to the defendant), and her two younger sisters (also children of the defendant and the victim's mother). At trial, E.B.R.M. testified that following her eleventh birthday, the defendant began touching her breasts and buttocks, then began masturbating on her and sodomizing her, sometimes while she was in bed with her sisters. The abuse continued over a six month period and stopped when E.B.R.M.'s mother reported the abuse to the police. The defendant denied raping or inappropriately touching E.B.R.M., claiming the daughters are illegal immigrants and were coerced into making these accusations against him to obtain a "U-visa," which is available to certain crime victims and their families.

*State v. Victor Galan*, 277 So.3d 365, 367-368 (La. App. 1 Cir. 2019).

---

3 Darrel Vannoy was the Warden and custodian of Mr. Galan at the time the case was originally filed. That heading has been maintained in this document.

4 [FN 5] See, e.g., *McNeil v. United States*, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (acknowledging that the Supreme Court has "insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed") (citing *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and See also *Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) ("The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction.") *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007) (Briefs by *pro se* litigants are afforded liberal construction....."); *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001) (reasoning that the *pro se* habeas petitioner's argument that he should not be punished for the improper setting of the return date should be construed as a request for equitable tolling, despite his failure to "explicitly raise the issue of equitable tolling").

## WRIT GRANT CONSIDERATIONS - RULE X

The ruling of the District Court (Exhibit A) is an erroneous interpretation and unreasonable application of established State and Federal laws, and departs from the legal precedents set by the United States Supreme Court and the Louisiana Supreme Court. The ruling improperly "confronts the set of facts that were before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011).

Further, Petitioner has properly invoked the post conviction articles, and has met the initial requirements of identifying with factual specificity, constitutional claims which would entitle him to post conviction relief. He is therefore entitled to an evidentiary hearing, with discovery and appointment of counsel, to properly present his claims to the court.

The District Court erred by erroneously requiring Petitioner to fully prove his claims in his PCR application, and summarily dismissing the PCR without an evidentiary hearing. This is sanctioned by the Louisiana First Circuit Court of Appeal by their denial of Supervisory Writs. Petitioner has stated valid claims which, if proven, would entitle him to post conviction relief. He is therefore entitled to an evidentiary hearing in order to do just that.

Additionally, Petitioner has shown sharply contested facts between the State and Applicant. La. C.Cr.P. Art. 929. The District Court judge failed to follow the Louisiana Statutes, specifically Articles 926(E) and 929, and failed to grant Petitioner the opportunity to prove his claims. The State's Answer clearly delineates sharply contested facts as between the State and the Petitioner. The District Court judge simply adopted the State's position, and denied Petitioner due process and access to the courts. This is sanctioned by the Louisiana First Circuit Court of Appeal by their denial of Supervisory Writs.

This Honorable Court should use its supervisory powers to intervene on behalf of Petitioner and grant his PCR. Alternatively, Petitioner should be granted an evidentiary hearing, with discovery and appointment of counsel, to aid Petitioner to fairly and properly present his claims.

ISSUES PRESENTED

1.     TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO RE-URGE MOTION FOR MISTRIAL WHEN TRIAL RESUMED AFTER 2-DAY STAY TO REVIEW LATE DISCLOSURE OF DISCOVERY DOCUMENTS BY THE STATE.

2.     TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO INADMISSIBLE HEARSAY AND CSAAS TESTIMONY  BY  EARNEISHA  LOTT AND NURSE ANN TROY AT TRIAL.

3.     TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO SECURE EXPERT TESTIMONY TO AID DEFENSE AT TRIAL, AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

4.     TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT AND REQUIRE THE TRIAL COURT TO CONSIDER ISSUE OF IMPEACHED TESTIMONY, STANDING ALONE, BEING UNCONSTITUTIONALLY USED TO OBTAIN CONVICTION.

5.     TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR   FAILING   TO CONSULT PETITIONER ON HIS RIGHT TO A JURY TRIAL AND FORCED PETITIONER TO GO TO TRIAL WITH A JUDGE INSTEAD OF A JURY.

6.     PETITIONER'S TRIAL COUNSEL WAS MADE AWARE THAT PETITIONER HAD HEARING PROBLEMS AND USED A HEARING AID, AND COUNSEL FAILED TO MAKE ACCOMMODATIONS AT TRIAL.

7.     TRIAL COUNSEL FAILED TO ASK FOR A REPLACEMENT TRANSLATOR, EVEN THOUGH COUNSEL SPOKE SPANISH AND COULD NOT UNDERSTAND THE TRANSLATOR AT TRIAL.

## STANDARD OF REVIEW

The standard of review for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by the Louisiana Supreme Court in *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986), requires a defendant to show not only that his trial attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, but also that counsel's inadequate performance prejudiced him to the extent that the trial was rendered unfair and the verdict suspect, *i.e.*, that counsel's errors undermined the proper functioning of the adversary process. *State v. Matthis*, 07-0691, 970 So.2d 505 (La. 11/2/07).

Further, the question of ineffective assistance of counsel is a cumulative one. It is improper to divide each issue up in an effort to "conquer" them. A reviewing court is required to review the totality of the circumstances and the cumulative effect of counsel's lapses. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (when reviewing counsel's effectiveness, court must look to "all the circumstances" of the trial.); *Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996) (Accumulation of errors is grounds for a new trial).

Additionally, a reviewing court must look at the case as a whole in order to review it for errors and omissions of counsel that would undermine confidence in the verdict, as well as to reassess the "prejudice" prong of the *Strickland* test because of the "reasonable probability of a reasonable doubt" standard set in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

ARGUMENT

1.     TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO
RE-URGE MOTION FOR MISTRIAL WHEN TRIAL RESUMED AFTER 2-DAY STAY TO
REVIEW LATE DISCLOSURE OF DISCOVERY DOCUMENTS BY THE STATE.

Trial counsel clearly requested a mistrial, and it should have been granted due to the prejudice

to the defense because of the State's failure to disclose evidence until after the State's witnesses had

testified. (Appendix F)[5]. *State v. Mitchell*, 412 So.2d 1042 (La. 1982). Trial counsel failed to take writs

to the appellate court in this important matter concerning prejudice to Petitioner at his trial.

This denial of a mistrial 1) violated Petitioner's right to prepare a defense; 2) precluded

impeachment of the State's witnesses based on the belated disclosure; and 3) allowed the State to get a

second bite at the apple by either recalling the witnesses to introduce the evidence, or cross-

examination if the defense called the witnesses in its case. There is also the fact that, in either case, the

State had access to its witnesses and could discuss their testimony before they got back on the stand.

Again, trial counsel objected to the prejudicial evidence and continued the motion for mistrial.

The judge again denied a mistrial, even though he acknowledged that the defense was prejudiced. The

judge stated that had this been a jury trial, a mistrial would be granted immediately. (Appendix F, p.

305).

There is no difference in the prejudice to the Petitioner under the law in whether there is a jury

or a judge trial. If a mistrial would have been granted without question in a jury trial, a mistrial should

have been declared in this judge trial.

At the very least, the appellate court would have precluded the belated evidence from trial, and

there is a reasonable probability the appellate court would have ordered the asked for mistrial.

Failure of trial counsel to take writs to the appellate court clearly prejudiced Petitioner at trial.

Petitioner has been denied his constitutional rights to due process, to present a defense, and effective

assistance of counsel, which is clear on the face of the record.

Further, trial counsel complained to the court that he was from out of state and did not have the

resources, did not have time because he had a federal sentencing scheduled, and that this was his last

case as an attorney and he was supposed to already have started his new job as the CEO of a

construction company. In other words, it was far too inconvenient for trial counsel to actually do his

job, it was his last case, and he needed to move on quickly. (Appendix F, p. 323).

Petitioner was deprived of his rights to due process, to present a defense, and effective

_____
5    Appendices A - H are contained within Exhibit B, Petitioner's Original PCR Application.

assistance of counsel guaranteed him by both the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2, 13 and 16. Therefore, Petitioner is entitled to Post Conviction Relief.

2.    TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO INADMISSIBLE HEARSAY AND CSAAS TESTIMONY BY EARNEISHA LOTT AND NURSE ANN TROY AT TRIAL.

While statements for purposes of medical treatment and medical diagnosis in connection with treatment are exceptions to the hearsay rule, La. Code Evid. Art. 803(4), when not working under the direction of a physician, such statements are not an exception to the hearsay rule. No physician testified at trial. There is no indication that either Earniesha Lott, or Nurse Ann Troy was working under the direction of a physician in this case, and their testimony as to what the alleged victim said, was inadmissible hearsay not objected to by Petitioner's trial counsel. It was also improper use of "delayed disclosure" in order to bolster the credibility of the alleged victim.

La. Code Evid. art. 803(4) provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
>
> The 1999 Author's Notes regarding the Rule 803(4) exception to the hearsay rule state:
>
> Without considering whether a statement by a child molestation victim to a therapist-certified social worker might qualify as a statement for "purposes of medical treatment and medical diagnosis in connection with treatment," the court in *State v. Tucker*, 619 So.2d 1076 (La. App. 1 Cir. 1993), held the admission of such testimony was inadmissible hearsay and was reversible error. The Authors agree with the result reached. The "statements for purposes of medical treatment and medical diagnosis in connection with treatment" should be given a narrow rather than expansive interpretation, and a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception.
>
> La. Code Evid. 803(4), 1999 Author's Notes (8).
>
> In *Tucker*, the victim's therapist/certified social worker testified that the victim had told her about sexual abuse by the defendant. She specifically stated

what the child had told her during the therapy sessions. She also testified that the victim's conduct with the anatomically correct dolls indicated sexual abuse. The defendant denied all charges and objected to the introduction of the hearsay evidence regarding disclosures made to the therapist by the victim. The court found that without the hearsay testimony from the victim, the social worker could not have testified as to her conclusions. The court also found there was not enough evidence to sustain the defendant's conviction for molestation of a juvenile without reliance on the improperly admitted hearsay. It was the State's burden to prove beyond a reasonable doubt that the therapist's hearsay testimony did not contribute to the jury's finding of guilt, and the State did not meet that burden; therefore, the defendant's conviction was reversed, the sentence was vacated and the case was remanded for a new trial. . . .

However, as cited above, the 1999 Author's Notes to that article clearly state that "a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception." There is no evidence in this case that the social worker was working under the direction of a physician, Thus, Ms. Hayes' statements as to what the victims told her regarding the abuse should be inadmissible hearsay.

*State v. Ste. Marie*, 801 So.2d 424, 431-432 (La. App. 3 Cir. 2001), citing *State v. Tucker*, 619 So.2d 1076 (La. App. 1 Cir. 1993).

Clearly, neither Earniesha Lott, nor Nurse Ann Troy were working under the direction of a physician, and their reiteration of what the alleged victim told Earniesha Lott, (Appendix E), and Nurse Ann Troy, (Appendix G), is inadmissible hearsay prejudicial to Petitioner at his trial. La. C. Evid. Arts. 801(C) and 802.

Further, trial counsel should have objected to testimony regarding psychiatric phenomena called Child Sexual Abuse Accommodation Syndrome (CSAAS). The "delayed disclosure" and other CSAAS psychiatric phenomena testified to by Earniesha Lott, (Appendix E), and Nurse Troy, (Appendix G), only served to bolster the credibility of the alleged victim, in violation of *State v. Foret*, 628 So.2d 1116 (La.1993). The *Foret* Court found that opinions based on CSAAS were of dubious reliability, even by trained psychologists; it is a clinical opinion, not a scientific instrument, and it is not intended as a diagnostic devise. Rather, it **assumes** abuse in order to explain a child's reaction to it. Further, the *Foret* Court found the "known or potential rate of error" quoted in the literature to be far too high to meet the *Daubert* criteria: "While Dr. Faller might have been content with a 32% margin of error, we are not so comfortable, especially remembering that '[t]he integrity of the criminal trial process is too important to permit it to be compromised by the admission of dynamic speculations.'" *Id.* at 1126.

Additionally, credibility testimony has the effect of, "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony." *Foret*, at 1129. This also goes for witnesses other than

9

the accusing witnesses, by bolstering their credibility before it is attacked and before they ever get on the stand.

In fact, on the last question asked on direct examination, the prosecutor point blank asked Earniesha Lott at trial:

> Q.   Has she ever given you any reason to think she's lying?
> A.   No.

(R.p. 244) (Appendix E).

Both Ms. Lott and Nurse Troy testified regarding the psychological phenomenon of "delayed disclosure," and neither of them is a doctor, a psychiatrist, or a psychologist. Indeed, there is no psychologists or psychiatrists that ever actually diagnosed the alleged victim as having any of the CSAAS psychological phenomena at any time. Moreover, since this was a judge trial, there was no reason to introduce this inadmissible testimony in order to "educate" a jury.

Ms. Lott and Nurse Troy's testimony was introduced at trial by the prosecutor solely to "doubly emphasize his evidence before the jury as against that of the accused." *Mellon v. United States*, 170 F.2d 583 (5th Cir. 1948).

The *Mellon* court also stated,

> We are of the opinion the trial court erred in permitting the witness Edgar to testify that on the day after the alleged offense he told his superior, Bennett, the details of the alleged bribe attempt, and thereafter to permit Bennett in his testimony to bolster Edgar's version of the incident, as reported to him.

(*Id.* at 585).

Ms. Lott and Nurse Troy's testimony only served to bolster the alleged victim's "version of the incident, as reported to him." Since the State's case relied entirely on the credibility of the complaining witness, this testimony was highly prejudicial to the Petitioner, as it impermissibly enhanced the alleged victim's credibility.

Further, the *Mellon* court held, "The general rule is that a witness may not be corroborated or have his testimony reinforced by proof that on previous occasions he has made the same statements as those made in his testimony." (*Id.* at 585-586).

Trial counsel failed to object to this irrelevant, immaterial, and highly prejudicial testimony when it was introduced, and further allowed its prejudicial impact at trial by not objecting when it was reiterated in closing arguments.

**3.** TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO SECURE EXPERT TESTIMONY TO AID DEFENSE AT TRIAL, AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

Trial counsel filed a motion for funds to hire an expert for the defense, and the trial judge denied the motion. However, trial counsel failed to pursue the issue to the higher courts by making a writ application to the appellate court. Trial counsel's failure to ensure the defense had an expert to rebut the State's expert resulted in prejudice to the Petitioner at trial.

This prejudice is shown by the fact that the State introduced belated exculpatory evidence, and the fact that the defense had no expert to rebut the State's evidence. Further, the fact that trial counsel stated to the court that if he would have known of this evidence he would have been more adamant about securing an expert for the defense, and then still failed at this point to properly motion the court for funds for an expert, and take writs to the appellate court if necessary, shows ineffective assistance of counsel.

Petitioner contends that his trial counsel, Ramiro Orozco, was ineffective assistance of counsel at trial for failing to secure expert testimony to aid the defense. An expert would have given trial counsel the opportunity to fully develop and address all issues raised at trial concerning: 1) expert opinion on the issue of lack of injury or physical evidence; 2) expert opinion on belated discovery evidence; 3) inadmissible expert opinion on psychological evidence given at trial; and 4) expert opinion on other reasonable hypotheses of the incident.

Trial counsel, Mr. Orozco, told the court:

> I'm traveling, Your Honor. I don't have time to sit here - - unlike the State, Your Honor, I don't have the luxury of staff personnel having had this one case. I'm a private practice attorney from out of state coming and handling several cases. I have a federal sentencing on Thursday that I was expecting to be able to go to.

(Appendix F, p. 323).

Trial counsel further told the court:

> Mr. Orozco:  Your Honor, I have a federal sentencing at 10:00, I believe 9:00 or 10:00 a.m. on Thursday. I could be here by 1:00 and that would probably give my associate and I more time to review and then at that point I don't have that issue pending and this is my last trial and court case that I'll be practicing.
>
> The Court:  What? Are you retiring?
>
> Mr. Orozco:  I'm not. I'm going to be a CEO construction - - I was

11

supposed to be a CEO of a construction company on Thursday ay 11:00. Now
it's getting pushed possibly later.
(Appendix F, p. 323).

An expert to testify for the defense at trial would have effectively rebutted the prejudicial assumptions erroneously elicited by the State through their expert. The State's theory of the case was only that — a theory. This theory should have been subjected to rebuttal, especially through the use of defense expert testimony, which is Petitioner's right that was neither utilized, nor honored by his trial counsel. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), quoting *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971).

Where the prosecution experts were given leeway to testify, the Petitioner's expert would have been allowed to testify as well, had Petitioner's attorney called for one. See, *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997); *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001). And see, *United States v. Lueben*, 812 F.2d 179 (5th Cir. 1987), where the *Lueben* Court held it to be reversible error for the trial court to disallow a defendant's rights to due process, and to offer witnesses / rebuttal evidence. Clearly, Petitioner's counsel was ineffective assistance of counsel for failing to do so.

Petitioner asserts that it cannot be a "trial strategy" to completely disregard this area of defense, especially in light of the fact that expert testimony encompassed several areas of expertise throughout the trial as enumerated above. A "strategic" decision is a decision "that . . . is expected . . . to yield some benefit or avoid some harm to the defense." *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999).

Petitioner contends that the only harm avoided by his trial counsel's failure to utilize expert testimony was to the prosecution. The prosecution also received the benefit of prejudice to the Petitioner caused by his trial counsel's errors.

Under the Sixth Amendment, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Lindstadt v. Keane*, 239 F.3d 191, 200 (2nd Cir. 2001), quoting *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. 2052.

An expert was essential to the defense in order to relate the Petitioner's version of events at trial as the more probable scenario. Viewing the evidence in light of both the State's theory versus the Petitioner's may have caused a reasonable finder of fact to believe that Petitioner's version of events was the most probable, and realistic version according to the facts and evidence. *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005).

Of course, an expert to further impeach the alleged victim's inconsistent story would have called into question her veracity, as well as effectively rebutting the State's experts. Plus, exposing a

12

more logical scenario - a more reasonable hypothesis - to the judge would have undermined the State's theory, as well as the State's whole case-in-chief.

Obviously, expert testimony in this regard was a necessary defense, and trial counsel was completely inert regarding these critical issues. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

4.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT AND REQUIRE THE TRIAL COURT TO CONSIDER ISSUE OF IMPEACHED TESTIMONY, STANDING ALONE, BEING UNCONSTITUTIONALLY USED TO OBTAIN CONVICTION.

Since this case received a judge only trial, the finder of fact in this case was a trained jurist. Therefore, considerations of constitutional due process and a fair trial were not honored by the judge in this case, and prejudiced Petitioner at his trial. United States Constitution, Amendments 5 and 14; Louisiana Constitution, Article 1, §§ 2 and 16.

While the credibility of a witness is a matter for the finder of fact, once impeached, that witness's testimony becomes suspect under the law and must be corroborated in order to be convincing evidence of guilt or innocence. This is especially true in a swearing contest, where the credibility of the witnesses on both sides is paramount to the outcome of the case.

This case was first reported on April 06, 2015 to the police who were told that Petitioner masturbated and ejaculated on the alleged victim's buttocks. (Appendix H). Between April 06, 2015 and April 15, 2015, the alleged victim was taken to a clinic for physical examination by nurse Ann Troy, and had video taken at the CAC by Jo Beth Rickels. (Appendix H, p. 161). Nurse Ann Troy admitted at trial that the alleged victim told her that;

> Q.   And actually when she spoke to you, she stated that there was anal touching but there was not penetration, correct?
> A.   It is correct that she did not give me the word in. She told me it was between her buttocks and it was wet.

(Appendix G).

As to CAC video, the alleged victim stated that she told the truth in the video.

> Q.   Was it accurate from what you told Jo Beth Rickels?
> A.   Yes.

(Appendix H, pp. 163-164).

The alleged victim then stated that as to the CAC video, "I told them everything." (Appendix H, p. 164).

13

The alleged victim testified that Petitioner held her mostly with one hand, but would sometimes use both if he moved her where he wanted her. She then stated, "Oh, I knew it was his penis because I could feel him moving with his hand." (Appendix H, p. 186). She testified that in her taped video interview she never mentioned being anally penetrated, (Appendix H, p. 187), and previously testified at trial that:

> Q.   What do you mean by that?
> A.   He masturbated.
> Q.   What was the icky?
> A.   Cum.
> Q.   I'm sorry. I couldn't hear you.
> A.   Cum.
> Q.   Would he ejaculate on you?
> A.   Yes.
> Q.   And where would he ejaculate?
> A.   On my butt.
> Q.   On your butt, you said?
> A.   Yes.

(Appendix H, p. 167).

\* \* \* \* \* \* \* \* \* \* \* \* \*

> Q.   What would he do?
> A.   He would do the same thing. Touch me with his hand. Breast, and my butt. Touch me with his penis.

(Appendix H, p. 169).

This shows that the case was originally reported as Petitioner masturbating on the alleged victims buttocks. However, some 3 years later, the allegations were changed to include there was penetration of the alleged victim's anus. The State originally filed a Bill of Information charging aggravated crime against nature. (Appendix D). After the subsequent addition of penetration, the State filed a superseding Indictment charging aggravated rape. (Appendix C).

Petitioner contends that the alleged victim was coached into adding the penetration allegations, and that the change in alleged conduct is impeached by the fact that Ms. Earniesha Lott, who the alleged victim went to for counseling, "helped" the alleged victim to write about the incidents and would "jot down" notes for her. (Appendix H, p. 174).

At trial, Ms. Lott testified that the new allegation of penetration was reported to her, and said the alleged victim's words were "put his thing in her butt," and explained that "thing" was his penis. (Appendix E, p. 242). Ms. Lott also testified that the sessions were not recorded:

> Q.   So there's no, nothing we can review to see if there was any suggestive terminology used, correct?

A.     When you say recorded, audio?

Q.     Audio.

A.     No. I don't have any audio.

Q.     They were just personal notes?

A.     Yes.

Q.     And it was just you and her dialoging together?

A.     Yes.

Q.     Using a certain methodology process, correct?

A.     Yes.

(Appendix E, p. 245).

Ms. Lott was working at the Hope House, but is now in private practice in St. Tammany Parish. (Appendix E, p. 237).

Prosecutors in St. Tammany Parish are known to do a "little brainwashing" to win a case. Lt. Hermann of the St. Tammany Parish Sheriff's Office told the story of one St. Tammany Parish prosecutor, Mr. Hale, doing just that. *Burge v. St. Tammany Parish*, 187 F.3d 452, 461 (5th Cir. 1999): "According to Lt. Hermann, when he asked Hale how he had gotten Glenda Frierson to lie on the witness stand, Hale told him, 'over a period of time there is a little brainwashing, you tell them the story of what happened, and what you need to win a case in court and they begin to believe it.'"

This would be consistent with the changed story shown in this case. Trial counsel should have objected and pointed to the irreconcilable contradictions and impeachment of the alleged victim's credibility, which should have included the argument that her testimony, standing alone, cannot sustain a conviction. Impeached testimony, as a general rule, cannot stand alone to convict. *State v. Chism*, 591 So.2d 383, 386 (La.App. 2 Cir. 1991), citing *State v. Laprime*, 437 So.2d 1124 (La. 1983); *State v. Lott*, 535 So.2d 963 (La.App. 2 Cir. 1988).

The U.S. Fifth Circuit Court of Appeals recognizes the distinction between strategic judgment calls and plain omissions; *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992), and has further stated that the court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

Getting someone to believe a story is not the same thing as bringing supporting evidence to prove the truth of the story. Simply put, it does not boil down to what you can get the judge or jury to believe, unless that belief is based upon proof beyond a reasonable doubt.

The record shows that the trial testimony of the State's eyewitnesses is impeached testimony, therefore, it is clearly insufficient, standing alone, to sustain this conviction. The record also shows that Petitioner's trial counsel failed to raise the issue that impeached testimony, standing alone, is

insufficient to uphold a conviction.

In *State v. Kennedy*, 803 So.2d 916 (La. 2001), in Justice Traylor's dissenting opinion, it is stated that the Louisiana Supreme Court has found that, "The victim's testimony, standing alone, can prove that the act occurred, . . ." but is qualified in FN9, "However, we have also ruled post-trial that impeached testimony of a witness, standing alone, cannot prove the offense."

In the instant case, the judge's decision to convict was based "primarily" on the issue of credibility, and the judge used impeached testimony of the alleged victim, standing alone, in order to convict without objection from trial counsel.

Petitioner was deprived of his right to the effective assistance of counsel guaranteed him by both the United States Constitution, Amendments 6 and 14; and the Louisiana Constitution, Article 1, § 13. Therefore, Petitioner is entitled to Post Conviction Relief.

5.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO CONSULT PETITIONER ON HIS RIGHT TO A JURY TRIAL AND FORCED PETITIONER TO GO TO TRIAL WITH A JUDGE INSTEAD OF A JURY.

Petitioner contends that his trial counsel took away his choice to assert his right to a jury trial, and told him that he had to go to a judge trial or else he would pick up his stuff and go back home to Mississippi, and leave the Petitioner on his own. Therefore, Petitioner was coerced into accepting a judge trial, and did not give a knowing and intelligent waiver of his right to a jury trial. This violated Petitioner's rights under the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2, 13, and 17.

Petitioner's trial counsel simply told Petitioner what to do and when to do it, and if Petitioner did not go along with this then his counsel would leave him to the wolves. Petitioner did not make any decisions in his case, and was told by trial counsel that he was incompetent to do so because of the language barrier, his defective hearing, and Petitioner's ignorance of the law and court procedure (which trial counsel never attempted to explained to him). Petitioner's trial counsel never explained any of his rights to him, and only told him "This is what you must do, or I can not help you." Petitioner was not given the option to decide anything. This is especially true concerning his right to a jury trial.

It was not until trial counsel spoke to the judge at trial that Petitioner found out that this trial was trial counsel's last case, as he was changing professions. This goes to show why trial counsel would want to have a nice and quick judge trial, and refused to take writs to the appellate court when

that action became appropriate and necessary.

The instant Petitioner does not read, write, or speak the English language. There was a Spanish interpreter at trial, but the interpreter's translations were often incorrect or not understandable, especially to a person with hearing problems. Even trial counsel complained about the interpreter, but did not bring the problem to the attention of the court, or otherwise attempt to get a competent interpreter.

Further, since trial counsel felt that Petitioner was incompetent to assist him in the defense, then trial counsel also rendered ineffective assistance of counsel for failing to inform the court that Petitioner was incompetent to aid in his own defense.

The Louisiana Supreme Court has made clear that "an accused's ability to assist in his defense" is a primary concern in a competency determination. *State v. Bennett*, 345 So. 2d 1129, 1138 (La. 1977). Such factors as whether the defendant is able "to recall and relate facts pertaining to his actions" and "whether he has the ability to make simple decisions in response to well-explained strategy" were set out by the Court as particularly important. *Id*.

The United States Supreme Court has also stated that "an inability to assist counsel can, in and of itself, constitute probative evidence of incompetence." *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 2580, 120 L. Ed. 2d 353 (1992).

> The Sixth Amendment guarantees the accused in a criminal proceeding the right to have "the Assistance of Counsel for his defence." U.S. Const. amend. VI. It "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." 422 U.S. at 819-20, 95 S.Ct. 2525 (footnote omitted). Implicit in this right is the accused's authority "to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983).

*State v. Horn*, 2016-0559, 251 So.3d 1069, 1073 (La. 2018); see also *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004).

Petitioner's trial counsel was ineffective assistance of counsel for failing to give him a choice of whether to assert his right to a jury trial. Instead, Petitioner was coerced into a judge trial, or else. Therefore, Petitioner did not give a knowing and intelligent waiver of his right to a jury trial. Further, trial counsel's failure to "consult" with Petitioner because of his "language barrier, hearing problem, and complete ignorance of the law and court procedure" so that he was incompetent to assist counsel in

his defense, rather than counsel making all decisions about the defense, constitutes ineffective assistance of counsel, as well as informing the court.

6.     PETITIONER'S TRIAL COUNSEL WAS MADE AWARE THAT PETITIONER HAD HEARING PROBLEMS AND USED A HEARING AID, AND COUNSEL FAILED TO MAKE ACCOMMODATIONS AT TRIAL.

Along with the preceding argument, where counsel was aware of Petitioner's hearing problem and use of a hearing aid, but counsel only considered these problems to be a form of incompetence on Petitioner's part, failure to ask the court for accommodations is ineffective assistance of counsel. Had counsel asked for such accommodations to his hearing impaired client, the court would have done so in accordance with the Americans with Disabilities Act.

Discrimination in this area goes along with Disability Discrimination due to Petitioner's inability to speak, read, or understand the English language, in violation of federal law, (specifically the Rehabilitation Act of 1973 and the Americans with Disabilities Act).

Petitioner's trial counsel clearly rendered ineffective assistance of counsel regarding Petitioner's disabilities.

7.     TRIAL COUNSEL FAILED TO ASK FOR A REPLACEMENT TRANSLATOR, EVEN THOUGH COUNSEL SPOKE SPANISH AND COULD NOT UNDERSTAND THE TRANSLATOR AT TRIAL.

As previously stated, the instant Petitioner does not read, write, or speak the English language. There was a Spanish interpreter at trial, but the interpreter's translations were often incorrect or not understandable, especially to a person with hearing problems. Even trial counsel complained about the interpreter, but did not bring the problem to the attention of the court, or otherwise attempt to get a competent interpreter.

Petitioner contends that this is itself an instance of ineffective assistance of counsel. "While this Court must look to the totality of the trial to assess counsel's performance, 'Sometimes a single error is so substantial that it alone causes the attorney's performance to fall below the Sixth Amendment standard.'" *Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979).

## CONCLUSION

Wherefore, Petitioner avers that his trial counsel, and his appellate counsel's actions and inactions deprived Petitioner of his rights to due process and effective assistance of counsel, as guaranteed by the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2 and 13.

Further, Petitioner asserts that he has brought forth viable claims, of which he has pointed to sufficient record evidence, and is entitled to Post Conviction Relief. Petitioner's conviction(s) should be reversed and the charges dismissed with prejudice, or, at least reversed and remanded for a new trial.

Alternatively, Petitioner should be granted an evidentiary hearing, with discovery and appointment of counsel, to aid Petitioner to fairly, and properly present his claims.

Respectfully submitted, *pro se*, this _29th_ day of March, 2022.

_____
Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

VERIFICATION / CERTIFICATE OF SERVICE

I, Victor Galan, the aforementioned Petitioner, do hereby attest and affirm that the information contained herein is true to the best of my knowledge and belief. Further, I verify that all allegations in the foregoing are those of Victor Galan.

Additionally, I hereby certify that a copy of the foregoing has this date been placed in the designated mailbox at this institution to be scanned and electronically filed in this Court, and a copy has been sent, via U.S. Mail, postage prepaid and properly addressed to:

Warren Montgomery, District Attorney
22nd Judicial District, Justice Center
701 N. Columbia St.
Covington, LA 70433

Done and signed this 29th day of March, 2022, at Angola, Louisiana.

Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

IN THE
SUPREME COURT OF LOUISIANA
STATE OF LOUISIANA

**VICTOR GALAN**
                    *Petitioner*

Versus

**DARREL VANNOY, Warden**
**Louisiana State Prison**
                    *Respondent*

Docket No: _____

Date Filed:_____

_____
Clerk of Court

APPENDICES AND EXHIBITS

Appendix 1    03/14/22    First Circuit Denied Supervisory Writs

Appendix 2    01/03/22    Application for Supervisory Writs (with attached Exhibits)

Exhibits within Appendix 2:

Exhibit A        12/10/21    District Court Denied PCR Application

Exhibit B        04/05/21    Original PCR Application (with attached Appendices)

Appendices within Exhibit B:

Appendix A        01/22/20    La Supreme Court Denied Writs on Direct Appeal

Appendix B        04/05/15    Commitment Order and Court Minutes

Appendix C        05/02/17    Superseding Indictment

Appendix D        06/25/15    Original Bill of Information

Appendix E                    Record pages 236 - 246

Appendix F                    Trial Transcript pages 265 - 327

Appendix G                    Trial Transcript pages 345 - 346

Appendix H                    Record pages 146 - 196

# STATE OF LOUISIANA

# COURT OF APPEAL, FIRST CIRCUIT

STATE OF LOUISIANA                          NO. 2022 KW 0021

VERSUS

VICTOR GALAN                          **MARCH 14, 2022**

---

In Re:    Victor Galan, applying for supervisory writs, 22nd
          Judicial District Court, Parish of St. Tammany, No.
          563,468.

---

**BEFORE:  GUIDRY, HOLDRIDGE, AND CHUTZ, JJ.**

        **WRIT DENIED.**

                        **JMG**
                        **GH**
                        **WRC**

COURT OF APPEAL, FIRST CIRCUIT

*Peggy J. Landry*

DEPUTY CLERK OF COURT
        FOR THE COURT

APPENDIX

1

IN THE
FIRST CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA

Docket No: _____

VICTOR GALAN
*Petitioner*
Versus

DARREL VANNOY, Warden
Louisiana State Prison
*Respondent*

APPLICATION FOR SUPERVISORY WRIT OF REVIEW

_____

From the Denial of Post Conviction Relief
in the 22nd Judicial District Court,
Criminal Docket No. 563468  Div. "B"
Judge August J. Hand, Presiding.

_____

Respectfully submitted, *pro se*, this 4th day of January, 2022.

_____
Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA  70712

APPENDIX
2

## TABLE OF CONTENTS

page

COVER

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES.........................................................................ii

APPLICATION FOR SUPERVISORY WRIT OF REVIEW...........................................1

JURISDICTION............................................................................................1

STATEMENT OF THE CASE.........................................................................2

STATEMENT OF THE FACTS.......................................................................3

WRIT GRANT CONSIDERATIONS..............................................................4

ISSUES PRESENTED...................................................................................5

STANDARD OF REVIEW.............................................................................6

ARGUMENT...............................................................................................7

    1...............................................................................................................7

    2...............................................................................................................8

    3.............................................................................................................12

    4.............................................................................................................15

    5.............................................................................................................19

    6.............................................................................................................21

    7.............................................................................................................22

CONCLUSION...........................................................................................23

CERTIFICATE OF SERVICE.......................................................................24

EXHIBITS AND APPENDICES

# TABLE OF AUTHORITIES

page

## CONSTITUTION

Louisiana Constitution, Article 1, § 2...........................................................8, 15, 19, 23

Louisiana Constitution, Article 1, § 13...............................................................8, 19, 23

Louisiana Constitution, Article 1, § 16.....................................................................8, 15

Louisiana Constitution, Article 1, § 17............................................................................19

Louisiana Constitution, Article 5, § 10..............................................................................1

Louisiana Constitution, Article 5, § 16..............................................................................1

United States Constitution, Amendment 5.......................................................8,15, 19, 23

United States Constitution, Amendment 6.........................................................8, 19, 23

United States Constitution, Amendment 14......................................................8, 15, 19, 23

## CODE

La. C. Evid. Art. 801..........................................................................................................10

La. C. Evid. Art. 802..........................................................................................................10

La. C. Evid. Art. 803.........................................................................................................8-9

La. C.Cr.P., Art. 926............................................................................................................4

La. C.Cr.P., Art. 929............................................................................................................4

La. R.S. 14:42......................................................................................................................2

La. R.S. 14:89.1....................................................................................................................2

## FEDERAL CASES

Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 (1985)....................................................13

Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431 (1971)............................................13

Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).................4

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005)..........................................................14

Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).............................3

Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)...................20

Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004)......................20

Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)............................3

Hernandez v. Thaler, 630 F.3d 420 (5th Cir. 2011)............................................................3

Johnson v. Quarterman, 479 F.3d 358 (5th Cir. 2007).......................................................3

Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)........................20

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995)......................................................6

ii

Latiolais v. Whitley, 93 F.3d 205 (5th Cir. 1996)..............................................6

Lindstadt v. Keane, 239 F.3d 191 (2nd Cir. 2001)..........................................14

Loyd v. Whitley, 977 F.2d 149 (5th Cir. 1992)................................................18

McNeil v. United States, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)..............3

Medina v. California, 505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)............20

Melancon v. Kaylo, 259 F.3d 401 (5th Cir. 2001)...............................................3

Mellon v. United States, 170 F.2d 583 (5th Cir. 1948)......................................11

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999)..........................................14, 18

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979)..............................................22

Pavel v. Hollins, 261 F.3d 210 (2nd Cir. 2001)................................................13

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)......6, 14

United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).............14

United States v. Kayode, 777 F.3d 719 (5th Cir. 2014)........................................3

United States v. Lueben, 812 F.2d 179 (5th Cir. 1987)......................................13

United States v. Riddle, 103 F.3d 423 (5th Cir. 1997)......................................13

## STATE CASES

Burge v. St. Tammany Parish, 187 F.3d 452 (5th Cir. 1999)...............................17

State v. Bennett, 345 So. 2d 1129 (La. 1977)..............................................20

State v. Chism, 591 So.2d 383 (La.App. 2 Cir. 1991)......................................18

State v. Foret, 628 So.2d 1116 (La.1993)..................................................10

State v. Horn, 2016-0559, 251 So.3d 1069 (La. 2018)....................................20

State v. Kennedy, 803 So.2d 916 (La. 2001)..............................................18

State v. Laprime, 437 So.2d 1124 (La. 1983).............................................18

State v. Lott, 535 So.2d 963 (La.App. 2 Cir. 1988)......................................18

State v. Matthis, 07-0691 (La. 11/2/07), 970 So.2d 505...................................6

State v. Mitchell, 412 So.2d 1042 (La. 1982)..............................................7

State v. Ste. Marie, 801 So.2d 424 (La. App. 3 Cir. 2001)...............................10

State v. Tucker, 619 So.2d 1076 (La. App. 1 Cir. 1993)................................9-10

State v. Victor Galan, 277 So.3d 365 (La. App. 1 Cir. 2019)............................2-3

State v. Victor Galan, 291 So.3d 1042 (La. 1/22/20).......................................2

State v. Washington, 491 So.2d 1337 (La. 1986)...........................................6

## OTHER

Rehabilitation Act of 1973.................................................................21

Americans with Disabilities Act...........................................................21

IN THE
FIRST CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA

VICTOR GALAN

*Petitioner*

versus

DARREL VANNOY, Warden
Louisiana State Prison

*Respondent*

Docket No: _____

Date Filed:_____

_____

Clerk of Court

APPLICATION FOR SUPERVISORY WRIT OF REVIEW

---

From the Denial of Post Conviction Relief
in the 22nd Judicial District Court,
Criminal Docket No. 563468  Div. "B"
Judge August J. Hand, Presiding.

---

MAY IT PLEASE THE COURT:

NOW INTO COURT COMES Victor Galan, *pro se* Petitioner herein, who respectfully files the instant Application for Supervisory Writ of Review pursuant to the denial of Post Conviction Relief in the 22nd Judicial District Court, Parish of St. Tammany, Louisiana. In support, Petitioner respectfully presents this Honorable Court with the following:

JURISDICTION

The Louisiana Constitution, Article 5, §§ 10(A) and 16(B), provides each of the Courts of Appeal with appellate and supervisory jurisdiction over cases which arise within its circuit.

1

STATEMENT OF THE CASE

On June 25, 2015, Victor Galan, *pro se* Petitioner herein, was charged by Felony Bill of Information with 1 count of aggravated crime against nature, La. R.S. 14:89.1(A)(2)(b) with a person under the age of thirteen. (Appendix D)[1]. Petitioner was arraigned on this charge July 16, 2015, and pled not guilty.

On May 02, 2017, a superseding Bill of Indictment was filed charging Petitioner with 1 count of aggravated rape, La. R.S. 14:42. (Docket No. 563468 Div. "B") (Appendix C). Petitioner was arraigned on this charge on May 16, 2017, and pled not guilty.

Petitioner went to a bench trial, Honorable August J. Hand, Judge Presiding, which started on April 02, 2018, and ended on April 05, 2018, at which time the trail court found Petitioner guilty as charged.(Appendix B). Defense counsel moved for a new trial which was denied by the court. After waiving sentencing delays, Petitioner was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. (Appendix B).

Petitioner appealed his conviction and sentence to the Louisiana First Circuit Court of Appeal. On November 12, 2018, Lieu T. Vo Clark with the Louisiana Appellate Project filed a direct appeal brief on behalf of Petitioner. On December 25, 2018, Petitioner filed a *pro se* Supplemental brief. (Docket No. 2018-KA-1481).

On May 14, 2019 the First Circuit Court of Appeal affirmed Petitioner's conviction and sentence. (before McDonald, Crain, and Holdridge, JJ.). *State v. Victor Galan*, 277 So.3d 365 (La. App. 1 Cir. 2019).

Petitioner then filed a *pro se* Application for Writ of Certiorari in the Louisiana Supreme Court on June 05, 2019. Petitioner's writ application was denied on January 22, 2020. *State v. Victor Galan*, 291 So.3d 1042 (La. 1/22/20). (Appendix A).

On April 04, 2021, a timely filed Application for Post Conviction Relief was filed

---

1   All Appendices cited are contained within Exhibit B, Petitioner's Original PCR Application.

in the District Court. (Exhibit B). On December 10, 2021, the District Court denied post conviction relief. (Exhibit A).

This timely filed Application for Supervisory Writs follows. Petitioner states that he has remained in continued custody since his arrest, and is currently being held in custody in the Louisiana State Prison at Angola, Louisiana, Tim Hooper, Warden.[2]

Further, Petitioner is a *pro se* litigant. Therefore, he asks that his efforts herein be liberally construed as he has made a good faith effort to follow form. *United States v. Kayode*, 777 F.3d 719, 741, n. 5[3] (5th Cir. 2014).

## STATEMENT OF THE FACTS

The Louisiana First Circuit Court of Appeal summarized the facts of the case on direct appeal in the following manner:

> The victim, E.B.R.M., is the biological daughter of the defendant, and in 2014 lived with the defendant, her mother (who was married to the defendant), and her two younger sisters (also children of the defendant and the victim's mother). At trial, E.B.R.M. testified that following her eleventh birthday, the defendant began touching her breasts and buttocks, then began masturbating on her and sodomizing her, sometimes while she was in bed with her sisters. The abuse continued over a six month period and stopped when E.B.R.M.'s mother reported the abuse to the police. The defendant denied raping or inappropriately touching E.B.R.M., claiming the daughters are illegal immigrants and were coerced into making these accusations against him to obtain a "U-visa," which is available to certain crime victims and their families.

*State v. Victor Galan*, 277 So.3d 365, 367-368 (La. App. 1 Cir. 2019).

---

2 Darrel Vannoy was the Warden and custodian of Mr. Galan at the time the case was originally filed. That heading has been maintained in this document.

3 [FN 5] See, e.g., *McNeil v. United States*, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (acknowledging that the Supreme Court has "insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed") (citing *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and See also *Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) ("The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction.") *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007) (Briefs by *pro se* litigants are afforded liberal construction....."); *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001) (reasoning that the *pro se* habeas petitioner's argument that he should not be punished for the improper setting of the return date should be construed as a request for equitable tolling, despite his failure to "explicitly raise the issue of equitable tolling").

WRIT GRANT CONSIDERATIONS

The ruling of the District Court (Exhibit A) is an erroneous interpretation and unreasonable application of established State and Federal laws, and departs from the legal precedents set by the United States Supreme Court and the Louisiana Supreme Court. The ruling improperly "confronts the set of facts that were before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011).

Further, Petitioner has properly invoked the post conviction articles, and has met the initial requirements of identifying with factual specificity, constitutional claims which would entitle him to post conviction relief. He is therefore entitled to an evidentiary hearing, with discovery and appointment of counsel, to properly present his claims to the court.

The District Court erred by erroneously requiring Petitioner to fully prove his claims in his PCR application, and summarily dismissing the PCR without an evidentiary hearing. Petitioner has stated valid claims which, if proven, would entitle him to post conviction relief. He is therefore entitled to an evidentiary hearing in order to do just that.

Additionally, Petitioner has shown sharply contested facts between the State and Applicant. La. C.Cr.P., Article 929. The District Court judge failed to follow the Louisiana Statutes, specifically Articles 926(E) and 929, and failed to grant Petitioner the opportunity to prove his claims. The State's Answer clearly delineates sharply contested facts as between the State and the Petitioner. The District Court judge simply adopted the State's position, and denied Petitioner due process and access to the courts.

This Honorable Court should use its supervisory powers to intervene on behalf of Petitioner and grant his PCR. Alternatively, Petitioner should be granted an evidentiary hearing, with discovery and appointment of counsel, to aid Petitioner to fairly and properly present his claims.

## ISSUES PRESENTED

1. TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO RE-URGE MOTION FOR MISTRIAL WHEN TRIAL RESUMED AFTER 2-DAY STAY TO REVIEW LATE DISCLOSURE OF DISCOVERY DOCUMENTS BY THE STATE.

2. TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO INADMISSIBLE HEARSAY AND CSAAS TESTIMONY BY EARNEISHA LOTT AND NURSE ANN TROY AT TRIAL.

3. TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO SECURE EXPERT TESTIMONY TO AID DEFENSE AT TRIAL, AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

4. TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT AND REQUIRE THE TRIAL COURT TO CONSIDER ISSUE OF IMPEACHED TESTIMONY, STANDING ALONE, BEING UNCONSTITUTIONALLY USED TO OBTAIN CONVICTION.

5. TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO CONSULT PETITIONER ON HIS RIGHT TO A JURY TRIAL AND FORCED PETITIONER TO GO TO TRIAL WITH A JUDGE INSTEAD OF A JURY.

6. PETITIONER'S TRIAL COUNSEL WAS MADE AWARE THAT PETITIONER HAD HEARING PROBLEMS AND USED A HEARING AID, AND COUNSEL FAILED TO MAKE ACCOMMODATIONS AT TRIAL.

7. TRIAL COUNSEL FAILED TO ASK FOR A REPLACEMENT TRANSLATOR, EVEN THOUGH COUNSEL SPOKE SPANISH AND COULD NOT UNDERSTAND THE TRANSLATOR AT TRIAL.

## STANDARD OF REVIEW

The standard of review for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by the Louisiana Supreme Court in *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986), requires a defendant to show not only that his trial attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, but also that counsel's inadequate performance prejudiced him to the extent that the trial was rendered unfair and the verdict suspect, *i.e.*, that counsel's errors undermined the proper functioning of the adversary process. *State v. Matthis*, 07-0691 (La. 11/2/07), 970 So.2d 505.

Further, the question of ineffective assistance of counsel is a cumulative one. It is improper to divide each issue up in an effort to "conquer" them. A reviewing court is required to review the totality of the circumstances and the cumulative effect of counsel's lapses. *Strickland v. Washington*, 466 U.S. 688, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (when reviewing counsel's effectiveness, court must look to "all the circumstances" of the trial.); *Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996) (Accumulation of errors is grounds for a new trial).

Additionally, a reviewing court must look at the case as a whole in order to review it for errors and omissions of counsel that would undermine confidence in the verdict, as well as to reassess the "prejudice" prong of the *Strickland* test because of the "reasonable probability of a reasonable doubt" standard set in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995).

6

ARGUMENT

1.  TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR
    FAILING TO RE-URGE MOTION FOR MISTRIAL WHEN TRIAL RESUMED
    AFTER 2-DAY STAY TO REVIEW LATE DISCLOSURE OF DISCOVERY
    DOCUMENTS BY THE STATE.

Trial counsel clearly requested a mistrial, and it should have been granted due to the prejudice to the defense because of the State's failure to disclose evidence until after the State's witnesses had testified. (Appendix F)[4]. *State v. Mitchell*, 412 So.2d 1042 (La. 1982). Trial counsel failed to take writs to the appellate court in this important matter concerning prejudice to Petitioner at his trial.

This denial of a mistrial 1) violated Petitioner's right to prepare a defense; 2) precluded impeachment of the State's witnesses based on the belated disclosure; and 3) allowed the State to get a second bite at the apple by either recalling the witnesses to introduce the evidence, or cross-examination if the defense called the witnesses in its case. There is also the fact that, in either case, the State had access to its witnesses and could discuss their testimony before they got back on the stand.

Again, trial counsel objected to the prejudicial evidence and continued the motion for mistrial. The judge again denied a mistrial, even though he acknowledged that the defense was prejudiced. The judge stated that had this been a jury trial, a mistrial would be granted immediately. (Appendix F, p. 305).

There is no difference in the prejudice to the Petitioner under the law in whether there is a jury or a judge trial. If a mistrial would have been granted without question in a jury trial, a mistrial should have been declared in this judge trial.

At the very least, the appellate court would have precluded the belated evidence from trial, and there is a reasonable probability the appellate court would have ordered the asked for mistrial.

Failure of trial counsel to take writs to the appellate court clearly prejudiced

---

4   All Appendices cited are contained within Exhibit B, Petitioner's Original PCR Application.

Petitioner at trial. Petitioner has been denied his constitutional rights to due process, to present a defense, and effective assistance of counsel, which is clear on the face of the record.

Further, trial counsel complained to the court that he was from out of state and did not have the resources, did not have time because he had a federal sentencing scheduled, and that this was his last case as an attorney and he was supposed to already have started his new job as the CEO of a construction company. In other words, it was far too inconvenient for trial counsel to actually do his job, it was his last case, and he needed to move on quickly. (Appendix F, p. 323).

Petitioner was deprived of his rights to due process, to present a defense, and effective assistance of counsel guaranteed him by both the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2, 13 and 16. Therefore, Petitioner is entitled to Post Conviction Relief.


2.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO INADMISSIBLE HEARSAY AND CSAAS TESTIMONY BY EARNEISHA LOTT AND NURSE ANN TROY AT TRIAL.

While statements for purposes of medical treatment and medical diagnosis in connection with treatment are exceptions to the hearsay rule, La. Code Evid. Art. 803(4), when not working under the direction of a physician, such statements are not an exception to the hearsay rule. No physician testified at trial. There is no indication that either Earniesha Lott, or Nurse Ann Troy was working under the direction of a physician in this case, and their testimony as to what the alleged victim said, was inadmissible hearsay not objected to by Petitioner's trial counsel. It was also improper use of "delayed disclosure" in order to bolster the credibility of the alleged victim.

La. Code Evid. art. 803(4) provides, in pertinent part:

8

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.

The 1999 Author's Notes regarding the Rule 803(4) exception to the hearsay rule state:

Without considering whether a statement by a child molestation victim to a therapist-certified social worker might qualify as a statement for "purposes of medical treatment and medical diagnosis in connection with treatment," the court in *State v. Tucker*, 619 So.2d 1076 (La. App. 1 Cir. 1993), held the admission of such testimony was inadmissible hearsay and was reversible error. The Authors agree with the result reached. The "statements for purposes of medical treatment and medical diagnosis in connection with treatment" should be given a narrow rather than expansive interpretation, and a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception.

La. Code Evid. 803(4), 1999 Author's Notes (8).

In *Tucker*, the victim's therapist/certified social worker testified that the victim had told her about sexual abuse by the defendant. She specifically stated what the child had told her during the therapy sessions. She also testified that the victim's conduct with the anatomically correct dolls indicated sexual abuse. The defendant denied all charges and objected to the introduction of the hearsay evidence regarding disclosures made to the therapist by the victim. The court found that without the hearsay testimony from the victim, the social worker could not have testified as to her conclusions. The court also found there was not enough evidence to sustain the defendant's conviction for molestation of a juvenile without reliance on the improperly admitted hearsay. It was the State's burden to prove beyond a reasonable doubt that the therapist's hearsay testimony did not contribute to the jury's finding of guilt, and the State did not meet that burden; therefore, the defendant's conviction was reversed, the sentence was vacated and

the case was remanded for a new trial. . . .

However, as cited above, the 1999 Author's Notes to that article clearly state that "a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception." There is no evidence in this case that the social worker was working under the direction of a physician, Thus, Ms. Hayes' statements as to what the victims told her regarding the abuse should be inadmissible hearsay.

*State v. Ste. Marie*, 801 So.2d 424, 431-432 (La. App. 3 Cir. 2001), citing *State v. Tucker*, 619 So.2d 1076 (La. App. 1 Cir. 1993).

Clearly, neither Earniesha Lott, nor Nurse Ann Troy were working under the direction of a physician, and their reiteration of what the alleged victim told Earniesha Lott, (Appendix E), and Nurse Ann Troy, (Appendix G), is inadmissible hearsay prejudicial to Petitioner at his trial. La. C. Evid. Arts. 801(C) and 802.

Further, trial counsel should have objected to testimony regarding psychiatric phenomena called Child Sexual Abuse Accommodation Syndrome (CSAAS). The "delayed disclosure" and other CSAAS psychiatric phenomena testified to by Earniesha Lott, (Appendix E), and Nurse Troy, (Appendix G), only served to bolster the credibility of the alleged victim, in violation of *State v. Foret*, 628 So.2d 1116 (La.1993). The *Foret* Court found that opinions based on CSAAS were of dubious reliability, even by trained psychologists; it is a clinical opinion, not a scientific instrument, and it is not intended as a diagnostic devise. Rather, it **assumes** abuse in order to explain a child's reaction to it. Further, the *Foret* Court found the "known or potential rate of error" quoted in the literature to be far too high to meet the *Daubert* criteria: "While Dr. Faller might have been content with a 32% margin of error, we are not so comfortable, especially remembering that '[t]he integrity of the criminal trial process is too important to permit it to be compromised by the admission of dynamic speculations.'" *Id.* at 1126.

Additionally, credibility testimony has the effect of, "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony." *Foret*, at 1129. This

also goes for witnesses other than the accusing witnesses, by bolstering their credibility before it is attacked and before they ever get on the stand.

In fact, on the last question asked on direct examination, the prosecutor point blank asked Earniesha Lott at trial:

> Q.   Has she ever given you any reason to think she's lying?
> A.   No.

(R.p. 244) (Appendix E).

Both Ms. Lott and Nurse Troy testified regarding the psychological phenomenon of "delayed disclosure," and neither of them is a doctor, a psychiatrist, or a psychologist. Indeed, there is no psychologists or psychiatrists that ever actually diagnosed the alleged victim as having any of the CSAAS psychological phenomena at any time. Moreover, since this was a judge trial, there was no reason to introduce this inadmissible testimony in order to "educate" a jury.

Ms. Lott and Nurse Troy's testimony was introduced at trial by the prosecutor solely to "doubly emphasize his evidence before the jury as against that of the accused." *Mellon v. United States*, 170 F.2d 583 (5th Cir. 1948).

The *Mellon* court also stated,

> We are of the opinion the trial court erred in permitting the witness Edgar to testify that on the day after the alleged offense he told his superior, Bennett, the details of the alleged bribe attempt, and thereafter to permit Bennett in his testimony to bolster Edgar's version of the incident, as reported to him.

(*Id.* at 585).

Ms. Lott and Nurse Troy's testimony only served to bolster the alleged victim's "version of the incident, as reported to him." Since the State's case relied entirely on the credibility of the complaining witness, this testimony was highly prejudicial to the Petitioner, as it impermissibly enhanced the alleged victim's credibility.

Further, the *Mellon* court held, "The general rule is that a witness may not be corroborated or have his testimony reinforced by proof that on previous occasions he has made the same statements as those made in his testimony." (*Id.* at 585-586).

Trial counsel failed to object to this irrelevant, immaterial, and highly prejudicial testimony when it was introduced, and further allowed its prejudicial impact at trial by not objecting when it was reiterated in closing arguments.

3.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO SECURE EXPERT TESTIMONY TO AID DEFENSE AT TRIAL, AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

Trial counsel filed a motion for funds to hire an expert for the defense, and the trial judge denied the motion. However, trial counsel failed to pursue the issue to the higher courts by making a writ application to the appellate court. Trial counsel's failure to ensure the defense had an expert to rebut the State's expert resulted in prejudice to the Petitioner at trial.

This prejudice is shown by the fact that the State introduced belated exculpatory evidence, and the fact that the defense had no expert to rebut the State's evidence. Further, the fact that trial counsel stated to the court that if he would have known of this evidence he would have been more adamant about securing an expert for the defense, and then still failed at this point to properly motion the court for funds for an expert, and take writs to the appellate court if necessary, shows ineffective assistance of counsel.

Petitioner contends that his trial counsel, Ramiro Orozco, was ineffective assistance of counsel at trial for failing to secure expert testimony to aid the defense. An expert would have given trial counsel the opportunity to fully develop and address all issues raised at trial concerning: 1) expert opinion on the issue of lack of injury or physical evidence; 2) expert opinion on belated discovery evidence; 3) inadmissible expert opinion on psychological evidence given at trial; and 4) expert opinion on other reasonable hypotheses of the incident.

Trial counsel, Mr. Orozco, told the court:

> I'm traveling, Your Honor. I don't have time to sit here - - unlike the
> State, Your Honor, I don't have the luxury of staff personnel having

12

had this one case. I'm a private practice attorney from out of state coming and handling several cases. I have a federal sentencing on Thursday that I was expecting to be able to go to.

(Appendix F, p. 323).

Trial counsel further told the court:

Mr. Orozco:    Your Honor, I have a federal sentencing at 10:00, I believe 9:00 or 10:00 a.m. on Thursday. I could be here by 1:00 and that would probably give my associate and I more time to review and then at that point I don't have that issue pending and this is my last trial and court case that I'll be practicing.

The Court:    What? Are you retiring?

Mr. Orozco:    I'm not. I'm going to be a CEO construction - - I was supposed to be a CEO of a construction company on Thursday ay 11:00. Now it's getting pushed possibly later.

(Appendix F, p. 323).

An expert to testify for the defense at trial would have effectively rebutted the prejudicial assumptions erroneously elicited by the State through their expert. The State's theory of the case was only that — a theory. This theory should have been subjected to rebuttal, especially through the use of defense expert testimony, which is Petitioner's right that was neither utilized, nor honored by his trial counsel. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087 (1985), quoting *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431 (1971).

Where the prosecution experts were given leeway to testify, the Petitioner's expert would have been allowed to testify as well, had Petitioner's attorney called for one. See, *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997); *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001). And see, *United States v. Lueben*, 812 F.2d 179 (5th Cir. 1987), where the *Lueben* Court held it to be reversible error for the trial court to disallow a defendant's rights to due process, and to offer witnesses / rebuttal evidence. Clearly, Petitioner's counsel was ineffective assistance of counsel for failing to do so.

Petitioner asserts that it cannot be a "trial strategy" to completely disregard this

area of defense, especially in light of the fact that expert testimony encompassed several areas of expertise throughout the trial as enumerated above. A "strategic" decision is a decision "that . . . is expected . . . to yield some benefit or avoid some harm to the defense." *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999).

Petitioner contends that the only harm avoided by his trial counsel's failure to utilize expert testimony was to the prosecution. The prosecution also received the benefit of prejudice to the Petitioner caused by his trial counsel's errors.

Under the Sixth Amendment, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Lindstadt v. Keane*, 239 F.3d 191, 200 (2nd Cir. 2001), quoting *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. 2052.

An expert was essential to the defense in order to relate the Petitioner's version of events at trial as the more probable scenario. Viewing the evidence in light of both the State's theory versus the Petitioner's may have caused a reasonable finder of fact to believe that Petitioner's version of events was the most probable, and realistic version according to the facts and evidence. *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005).

Of course, an expert to further impeach the alleged victim's inconsistent story would have called into question her veracity, as well as effectively rebutting the State's experts. Plus, exposing a more logical scenario - a more reasonable hypothesis - to the judge would have undermined the State's theory, as well as the State's whole case-in-chief.

Obviously, expert testimony in this regard was a necessary defense, and trial counsel was completely inert regarding these critical issues. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

4.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT AND REQUIRE THE TRIAL COURT TO CONSIDER ISSUE OF IMPEACHED TESTIMONY, STANDING ALONE, BEING UNCONSTITUTIONALLY USED TO OBTAIN CONVICTION.

Since this case received a judge only trial, the finder of fact in this case was a trained jurist. Therefore, considerations of constitutional due process and a fair trial were not honored by the judge in this case, and prejudiced Petitioner at his trial. United States Constitution, Amendments 5 and 14; Louisiana Constitution, Article 1, §§ 2 and 16.

While the credibility of a witness is a matter for the finder of fact, once impeached, that witness's testimony becomes suspect under the law and must be corroborated in order to be convincing evidence of guilt or innocence. This is especially true in a swearing contest, where the credibility of the witnesses on both sides is paramount to the outcome of the case.

This case was first reported on April 06, 2015 to the police who were told that Petitioner masturbated and ejaculated on the alleged victim's buttocks. (Appendix H). Between April 06, 2015 and April 15, 2015, the alleged victim was taken to a clinic for physical examination by nurse Ann Troy, and had video taken at the CAC by Jo Beth Rickels. (Appendix H, p. 161). Nurse Ann Troy admitted at trial that the alleged victim told her that;

> Q.   And actually when she spoke to you, she stated that there was anal touching but there was not penetration, correct?
> A.   It is correct that she did not give me the word in. She told me it was between her buttocks and it was wet.

(Appendix G).

As to CAC video, the alleged victim stated that she told the truth in the video.

> Q.   Was it accurate from what you told Jo Beth Rickels?
> A.   Yes.

(Appendix H, pp. 163-164).

The alleged victim then stated that as to the CAC video, "I told them everything."

(Appendix H, p. 164).

The alleged victim testified that Petitioner held her mostly with one hand, but would sometimes use both if he moved her where he wanted her. She then stated, "Oh, I knew it was his penis because I could feel him moving with his hand." (Appendix H, p. 186). She testified that in her taped video interview she never mentioned being anally penetrated, (Appendix H, p. 187), and previously testified at trial that:

> Q.   What do you mean by that?
> A.   He masturbated.
> Q.   What was the icky?
> A.   Cum.
> Q.   I'm sorry. I couldn't hear you.
> A.   Cum.
> Q.   Would he ejaculate on you?
> A.   Yes.
> Q.   And where would he ejaculate?
> A.   On my butt.
> Q.   On your butt, you said?
> A.   Yes.

(Appendix H, p. 167).

\* \* \* \* \* \* \* \* \* \* \* \*

> Q.   What would he do?
> A.   He would do the same thing. Touch me with his hand.
> Breast, and my butt. Touch me with his penis.

(Appendix H, p. 169).

This shows that the case was originally reported as Petitioner masturbating on the alleged victims buttocks. However, some 3 years later, the allegations were changed to include there was penetration of the alleged victim's anus. The State originally filed a Bill of Information charging aggravated crime against nature. (Appendix D). After the subsequent addition of penetration, the State filed a superseding Indictment charging aggravated rape. (Appendix C).

Petitioner contends that the alleged victim was coached into adding the penetration allegations, and that the change in alleged conduct is impeached by the fact that Ms. Earniesha Lott, who the alleged victim went to for counseling, "helped" the

alleged victim to write about the incidents and would "jot down" notes for her. (Appendix H, p. 174).

At trial, Ms. Lott testified that the new allegation of penetration was reported to her, and said the alleged victim's words were "put his thing in her butt," and explained that "thing" was his penis. (Appendix E, p. 242). Ms. Lott also testified that the sessions were not recorded:

> Q.     So there's no, nothing we can review to see if there was any suggestive terminology used, correct?
> A.     When you say recorded, audio?
> Q.     Audio.
> A.     No. I don't have any audio.
> Q.     They were just personal notes?
> A.     Yes.
> Q.     And it was just you and her dialoging together?
> A.     Yes.
> Q.     Using a certain methodology process, correct?
> A.     Yes.

(Appendix E, p. 245).

Ms. Lott was working at the Hope House, but is now in private practice in St. Tammany Parish. (Appendix E, p. 237).

Prosecutors in St. Tammany Parish are known to do a "little brainwashing" to win a case. Lt. Hermann of the St. Tammany Parish Sheriff's Office told the story of one St. Tammany Parish prosecutor, Mr. Hale, doing just that. *Burge v. St. Tammany Parish*, 187 F.3d 452, 461 (5th Cir. 1999): "According to Lt. Hermann, when he asked Hale how he had gotten Glenda Frierson to lie on the witness stand, Hale told him, ' over a period of time there is a little brainwashing, you tell them the story of what happened, and what you need to win a case in court and they begin to believe it.'"

This would be consistent with the changed story shown in this case. Trial counsel should have objected and pointed to the irreconcilable contradictions and impeachment of the alleged victim's credibility, which should have included the argument that her testimony, standing alone, cannot sustain a conviction. Impeached testimony, as a

17

general rule, cannot stand alone to convict. *State v. Chism*, 591 So.2d 383, 386 (La.App. 2 Cir. 1991), citing *State v. Laprime*, 437 So.2d 1124 (La. 1983); *State v. Lott*, 535 So.2d 963 (La.App. 2 Cir. 1988).

The U.S. Fifth Circuit Court of Appeals recognizes the distinction between strategic judgment calls and plain omissions; *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992), and has further stated that the court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

Getting someone to believe a story is not the same thing as bringing supporting evidence to prove the truth of the story. Simply put, it does not boil down to what you can get the judge or jury to believe, unless that belief is based upon proof beyond a reasonable doubt.

The record shows that the trial testimony of the State's eyewitnesses is impeached testimony, therefore, it is clearly insufficient, standing alone, to sustain this conviction. The record also shows that Petitioner's trial counsel failed to raise the issue that impeached testimony, standing alone, is insufficient to uphold a conviction.

In *State v. Kennedy*, 803 So.2d 916 (La. 2001), in Justice Traylor's dissenting opinion, it is stated that the Louisiana Supreme Court has found that, "The victim's testimony, standing alone, can prove that the act occurred, . . ." but is qualified in FN9, "However, we have also ruled post-trial that impeached testimony of a witness, standing alone, cannot prove the offense."

In the instant case, the judge's decision to convict was based "primarily" on the issue of credibility, and the judge used impeached testimony of the alleged victim, standing alone, in order to convict without objection from trial counsel.

Petitioner was deprived of his right to the effective assistance of counsel guaranteed him by both the United States Constitution and the Louisiana Constitution.

Therefore, Petitioner is entitled to Post Conviction Relief.

5.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR
     FAILING TO CONSULT PETITIONER ON HIS RIGHT TO A JURY TRIAL
     AND FORCED PETITIONER TO GO TO TRIAL WITH A JUDGE INSTEAD
     OF A JURY.

Petitioner contends that his trial counsel took away his choice to assert his right to
a jury trial, and told him that he had to go to a judge trial or else he would pick up his
stuff and go back home to Mississippi, and leave the Petitioner on his own. Therefore,
Petitioner was coerced into accepting a judge trial, and did not give a knowing and
intelligent waiver of his right to a jury trial. This violated Petitioner's rights under the
United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution,
Article 1, §§ 2, 13, and 17.

Petitioner's trial counsel simply told Petitioner what to do and when to do it, and
if Petitioner did not go along with this then his counsel would leave him to the wolves.
Petitioner did not make any decisions in his case, and was told by trial counsel that he
was incompetent to do so because of the language barrier, his defective hearing, and
Petitioner's ignorance of the law and court procedure (which trial counsel never
attempted to explained to him). Petitioner's trial counsel never explained any of his
rights to him, and only told him "This is what you must do, or I can not help you."
Petitioner was not given the option to decide anything. This is especially true concerning
his right to a jury trial.

It was not until trial counsel spoke to the judge at trial that Petitioner found out
that this trial was trial counsel's last case, as he was changing professions. This goes to
show why trial counsel would want to have a nice and quick judge trial, and refused to
take writs to the appellate court when that action became appropriate and nesessary.

The instant Petitioner does not read, write, or speak the English language. There
was a Spanish interpreter at trial, but the interpreter's translations were often incorrect or

not understandable, especially to a person with hearing problems. Even trial counsel complained about the interpreter, but did not bring the problem to the attention of the court, or otherwise attempt to get a competent interpreter.

Further, since trial counsel felt that Petitioner was incompetent to assist him in the defense, then trial counsel also rendered ineffective assistance of counsel for failing to inform the court that Petitioner was incompetent to aid in his own defense.

The Louisiana Supreme Court has made clear that "an accused's ability to assist in his defense" is a primary concern in a competency determination. *State v. Bennett*, 345 So. 2d 1129, 1138 (La. 1977). Such factors as whether the defendant is able "to recall and relate facts pertaining to his actions" and "whether he has the ability to make simple decisions in response to well-explained strategy" were set out by the Court as particularly important. *Id.*

The United States Supreme Court has also stated that "an inability to assist counsel can, in and of itself, constitute probative evidence of incompetence." *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 2580, 120 L. Ed. 2d 353 (1992).

> The Sixth Amendment guarantees the accused in a criminal proceeding the right to have "the Assistance of Counsel for his defence." U.S. Const. amend. VI. It "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." 422 U.S. at 819-20, 95 S.Ct. 2525 (footnote omitted). Implicit in this right is the accused's authority "to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983).

*State v. Horn*, 2016-0559, 251 So.3d 1069, 1073 (La. 2018); see also *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004).

Petitioner's trial counsel was ineffective assistance of counsel for failing to give him a choice of whether to assert his right to a jury trial. Instead, Petitioner was coerced

into a judge trial, or else. Therefore, Petitioner did not give a knowing and intelligent waiver of his right to a jury trial. Further, trial counsel's failure to "consult" with Petitioner because of his "language barrier, hearing problem, and complete ignorance of the law and court procedure" so that he was incompetent to assist counsel in his defense, rather than counsel making all decisions about the defense, constitutes ineffective assistance of counsel, as well as informing the court.

6.   PETITIONER'S TRIAL COUNSEL WAS MADE AWARE THAT PETITIONER HAD HEARING PROBLEMS AND USED A HEARING AID, AND COUNSEL FAILED TO MAKE ACCOMMODATIONS AT TRIAL.

Along with the preceding argument, where counsel was aware of Petitioner's hearing problem and use of a hearing aid, but counsel only considered these problems to be a form of incompetence on Petitioner's part, failure to ask the court for accommodations is ineffective assistance of counsel. Had counsel asked for such accommodations to his hearing impaired client, the court would have done so in accordance with the Americans with Disabilities Act.

Discrimination in this area goes along with Disability Discrimination due to Petitioner's inability to speak, read, or understand the English language, in violation of federal law, (specifically the Rehabilitation Act of 1973 and the Americans with Disabilities Act).

Petitioner's trial counsel clearly rendered ineffective assistance of counsel regarding Petitioner's disabilities.

7.   TRIAL COUNSEL FAILED TO ASK FOR A REPLACEMENT TRANSLATOR, EVEN THOUGH COUNSEL SPOKE SPANISH AND COULD NOT UNDERSTAND THE TRANSLATOR AT TRIAL.

As previously stated, the instant Petitioner does not read, write, or speak the English language. There was a Spanish interpreter at trial, but the interpreter's translations were often incorrect or not understandable, especially to a person with hearing problems. Even trial counsel complained about the interpreter, but did not bring the problem to the attention of the court, or otherwise attempt to get a competent interpreter.

Petitioner contends that this is itself an instance of ineffective assistance of counsel. "While this Court must look to the totality of the trial to assess counsel's performance, 'Sometimes a single error is so substantial that it alone causes the attorney's performance to fall below the Sixth Amendment standard.'" *Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979).

## CONCLUSION

Wherefore, Petitioner avers that his trial counsel, and his appellate counsel's actions and inactions deprived Petitioner of his rights to due process and effective assistance of counsel, as guaranteed by the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2 and 13.

Further, Petitioner asserts that he has brought forth viable claims, of which he has pointed to sufficient record evidence, and is entitled to Post Conviction Relief. Petitioner's conviction(s) should be reversed and the charges dismissed with prejudice, or, at least reversed and remanded for a new trial.

Alternatively, Petitioner should be granted an evidentiary hearing, with discovery and appointment of counsel, to aid Petitioner to fairly, and properly present his claims.

Respectfully submitted, *pro se*, this _4th_ day of January, 2022.

_Victor Galan_
Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

## AFFIDAVIT / CERTIFICATE OF SERVICE

I, Victor Galan, the aforementioned Petitioner, do hereby attest and affirm that the information contained herein is true to the best of my knowledge and belief. Further, that all allegations in the foregoing are those of Victor Galan.

Additionally, I hereby certify that a copy of the foregoing has been sent, via U.S. Mail, postage prepaid and properly addressed to:

Warren Montgomery, District Attorney
22nd Judicial District
701 N. Columbia St.
Covington, LA 70433

Done and signed this _4th_ day of January, 2022, at Angola, Louisiana.

Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

IN THE
FIRST CIRCUIT COURT OF APPEAL
STATE OF LOUISIANA

VICTOR GALAN                                    Docket No: _____
          *Petitioner*
                                                Date Filed:_____
versus

DARREL VANNOY, Warden
Louisiana State Prison
          *Respondent*                          _____
                                                Clerk of Court

EXHIBITS AND APPENDICES

Exhibit A          12/10/21      District Court Denied PCR Application

Exhibit B          04/05/21      Original PCR Application

<u>Appendices within Exhibit B</u>:

Appendix A         01/22/20      La Supreme Court Denied Writs on Direct Appeal

Appendix B         04/05/15      Commitment Order and Court Minutes

Appendix C         05/02/17      Superseding Indictment

Appendix D         06/25/15      Original Bill of Information

Appendix E                       Record pages 236 - 246

Appendix F                       Trial Transcript pages 265 - 327

Appendix G                       Trial Transcript pages 345 - 346

Appendix H                       Record pages 146 - 196

VICTOR GALAN

VERSUS

DARREL VANNOY, WARDEN
LOUISIANA STATE PRISON

FILED: December 10, 2021

NO. 563468 "B"

22ND JUDICIAL DISTRICT COURT

PARISH OF ST. TAMMANY

STATE OF LOUISIANA

_Stari Saini_
DEPUTY CLERK

## JUDGMENT ON POST-CONVICTION
## WITH INCORPORATED REASONS

On April 9, 2021, a *pro se* Application for Post-Conviction Relief was filed on behalf of the petitioner Alfred J. Simmons. After considering the application and the applicable law, the Court finds the application may be dismissed upon the pleadings pursuant to La. C.Cr.P. art. 928, for the following reasons.

The record shows that Galan was initially charged by Bill of Information on June 25, 2015 with one count of aggravated crime against nature of a person under the age of thirteen, a violation of La. R.S. 14:89(1)(A) and (2)(b). Galan pleaded not guilty to the charge. On May 2, 2017, the state filed a superseding Bill of Indictment against Galan, charging him with one count of aggravated rape of a person under the age of thirteen years, a violation of La. R.S. 14:42(A)(4). Galan pleaded not guilty to the amended charge.

Galan proceeded to trial by judge on April 2, 2018. After the bench trial ended on April 5, 2018, the Court found Galan to be guilty as charged. A motion for new trial was denied. After waiving sentencing delays, Galan was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Galan's conviction and sentence were affirmed on direct appeal; the Louisiana Supreme Court denied a writ of review. *State v. Galan*, 2018-1481 (La. App. 1 Cir. 5/14/19), 277 So.3d 365; *writ denied*, 2019-1027 (La. 1/22/20), 291 So.3d 1042.

In his timely Application for Post-Conviction Relief, Galan raises seven instances of ineffective assistance of counsel. He asserts trial counsel was ineffective in the following respects: (1) for failing to re-urge a motion for mistrial when trial resumed after a 2-day stay to review late disclosure of discovery documents by the state: (2) for failing to object to inadmissible hearsay and CSAAS testimony by Earneisha Lott and Nurse Ann Troy at trial; (3) for failing to secure expert testimony; (4) for failing to object and require the trial court to consider the issue of impeached testimony, standing alone, being unconstitutionally used to obtain conviction; (5) for

1

**EXHIBIT**
**A**

failing to consult the petitioner on his right to a jury trial and forcing petitioner to go to trial with a judge instead of a jury; (6) for failing to make accommodations at trial for petitioner's hearing problems; and (7) for failing to ask for a replacement translator.

## Ineffective Assistance of Counsel

The petitioner asserts seven claims of ineffective assistance of counsel. Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming ineffective assistance of counsel must show that (1) counsel's performance was deficient, falling below an "effective standard of reasonableness," and (2) the deficient performance prejudiced the defendant. *Id.*, 466 U.S. at 687-688, 104 S.Ct. at 2065. In order to show prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, 466 U.S. at 694, 104 S.Ct. at 2068.

With this analysis in mind, the Court will now address the seven instances of ineffective assistance of counsel raised by the petitioner.

### *Issue #1*

The record shows that the state provided late discovery of some records after trial had already started. Specifically, the discovery pertained to two of the victim's siblings, one who had already testified, and the other whom the state did not plan to call as a witness. The defense moved for a mistrial and, after much argument, the Court denied the motion. However, the Court recessed the trial for two days to allow defense counsel to either take a writ of review to the court of appeal, if he chose to do so, or to familiarize himself with the late-provided discovery. The Court expressly stated that defense counsel could re-urge the motion for mistrial when trial resumed. Defense counsel did not choose to re-urge the motion for mistrial, and Galan now argues that counsel's failure to re-urge the mistrial motion was ineffective assistance of counsel.

The record shows that the trial court's denial of the motion for mistrial was raised as an issue on direct appeal. After a discussion of the issue, the court of appeal concluded that the claim was without merit, as follows:

...the trial court did not abuse its discretion in denying the motion for mistrial. The trial court allowed defense counsel time to review the evidence, indicating it would recess the trial for months if necessary. Thereafter, the defendant had the opportunity to recall the state's witnesses and impeach their testimony with the new evidence. Considering this, the defendant was not deprived of the opportunity to attempt to use the evidence. The defendant has not shown he was prejudiced by the trial court's election to handle the tardy disclosure of the evidence by an alternative other than granting a mistrial.

2

*Galan*, 2018-1481, p. 7, 277 So.3d at 370.  In a footnote, the court of appeal added: "The trial court additionally stated that when the trial resumed the defendant could re-urge the motion for mistrial and attempt to articulate the prejudice suffered by the late disclosure; however, the defendant did not re-urge the motion when the trial resumed." *Id.*, p. 7, fn. 4; 277 So.3d at 370 fn. 4.

The Court finds the petitioner fails to state with particularity the factual basis for relief on this issue. La. C.Cr.P. art. 926(B)(3).  General statements and conclusory charges will not suffice. *State ex rel. Sterling v. State*, 2015-1895, p. 2 (La. 12/16/16), 207 So.3d 1048, 1052.  Galan fails to show that there were specific grounds for prejudice which his trial counsel should have re-urged when trial resumed.  Instead, the Court finds that the substantive issue underlying the claim of ineffective assistance of counsel was considered and rejected on direct appeal.  "If the substantive issue an attorney failed to raise has no merit, then the claim the attorney was ineffective for failing to raise the issue also has no merit." *State v. Magee*, 2017-0326 (La. App. 1 Cir. 5/25/17) (unpub'd); *citing State ex rel. Roper v. Cain*, 99-2173 (La. App. 1 Cir. 10/26/99), 763 So.2d 1, 5 (*per curiam*), *writ denied*, 2000-0975 (La. 11/17/00), 773 So.2d 733.  In this case, the court of appeal already found the petitioner has not shown how he was prejudiced by the trial court's election to handle the late disclosure of state evidence by an alternative other than granting a mistrial.

Galan fails to show either that trial counsel's performance was deficient or that he was prejudiced by counsel's actions.  This issue has no merit.

*Issue #2*

Galan complains that his counsel failed to object to inadmissible hearsay evidence presented by the state through the testimonies of Earneisha Lott and Nurse Ann Troy.  Specifically, Galan asserts both witnesses should not have been allowed to testify about the victim's statements to them about the sexual abuse which the victim experienced or the identity of her abuser.  The petitioner contends that trial counsel should have objected to testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), such as "delayed disclosure," arguing that such testimony only served to bolster the credibility of the alleged victim.  Galan relies upon the exception to the hearsay rule found at La. C.E. art. 803(4) and the 1999 Comments to the rule.

The record shows that Earneisha Lott is a licensed professional counselor who worked at

3

the Children's Advocacy Center, Hope House at the time of the incident and rendered professional counseling to the victim for almost three years. The record shows that defense counsel objected to Ms. Lott's testimony when she began to discuss the process of a trauma narrative. *See* R. Vol. 2, p. 240.[1] The trial court overruled the objection, allowing Ms. Lott to describe the process, but cautioning her that she could not give an opinion, as she was not an expert witness. On cross-examination, the Court allowed similar latitude to defense counsel in questioning Ms. Lott about false memory syndrome and overruled a state objection. *See* R. Vol. 2, p. 244-245.

With regard to Nurse Troy's testimony, the record shows she is a forensic nurse practitioner. R. Vol. 2, p. 335. Nurse Troy was offered by the state as an expert in the field of child maltreatment specializing in sexual abuse and delayed disclosure. Defense counsel stated the defense had no objection to the state's proffer of Nurse Troy as an expert, and the Court accepted her as an expert witness. R. Vol. 2, p. 336-337.

The petitioner is correct that "Louisiana subscribes to the general rule that the hearsay exception in La. C.E. art. 803(4) ordinarily does not encompass statements ascribing fault in the cause of the injuries treated." *State v. Koederitz*, 2014-1526, p. 4 (La. 3/17/15), 166 So.3d 981, 984. However, the hearsay exception provided by Art. 803(4) has "received particular application in cases of child sexual abuse, including statements of fault, because the legislature has expressed an overriding interest in protecting child victims of sexual abuse by encouraging the admission of reliable hearsay evidence for the trial court to weigh." *Id.*, 2014-1526, p. 5, 166 So.3d at 985 (internal citations omitted). Specifically, this hearsay exception "may encompass other instances in which the identity of a perpetrator plays an integral role in medical treatment and diagnosis in connection with that treatment." *Id.*

In *Koederitz*, the Louisiana Supreme Court cited with approval jurisprudence from other jurisdictions which "reflects the *current* integrated approach to the treatment of domestic violence cases in the medical community." *Id.*, 2014-1526, p. 7, 166 So.3d at 985. This integrated approach recognizes that "[i]n domestic violence and sexual abuse situations, a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under [Evidence Rule] 803(a)(4) because part of reasonable treatment and therapy is to prevent recurrence and future

---

[1] The record on appeal consisted of two volumes. Reference is made to the Record, the appropriate volume number, and the appropriate page number.

4

injury." *Id.*, 2014-1526, p. 6, 166 So.3d at 985, *citing with approval State v. Williams*, 137 Wash. App. 736, 154 P.3d 322, 328.

A review of Ms. Lott's testimony shows the state asked her questions of a factual nature only, as to her treatment of the victim. Moreover, Ms. Lott was the person to whom the victim first disclosed the actions which resulted in the superseding indictment of a more serious charge. The Court finds that her testimony fell within the hearsay exception of Art. 803(4).

Nurse Troy testified as an expert witness. In fact, the agreed nature of her expertise was child sex abuse and delayed disclosure. Having accepted her expertise, defense counsel could not object to her testimony consistent with that type of information.

Even if inadmissible hearsay was improperly introduced into evidence and defense counsel was deficient in failing to object, which arguments are specifically rejected by the Court, the petitioner would be unable to satisfy the second prejudice prong of the *Strickland* analysis. "When hearsay testimony is improperly introduced into evidence, it will be considered harmless error if it is found to be cumulative and corroborative of other properly admitted evidence and did not contribute to the verdict." *State v. Hilton*, 1999-1239, p. 11-12 (La. App. 1 Cir. 3/31/00), 764 So.2d 1027, 1035. "In order to establish that error was harmless in this case, the state must prove that the admission of improper hearsay did not contribute to defendant's conviction." *Id.*

The record indicates that, not only did the state present the videotaped statement of the victim, but the victim testified in person in open court, subject to cross-examination by defense counsel. This direct evidence was sufficient in its own right, if believed by the finder of fact, to support the conviction. However, the state additionally presented the testimony of one of the victim's siblings, who gave an eyewitness account of the sexual abuse perpetrated by the petitioner on the victim. The Court finds the testimonies of Ms. Lott and Nurse Troy were not hearsay, and were additionally cumulative and corroborative of the properly admitted direct evidence.

Galan fails to show either that trial counsel's performance was deficient or that he was prejudiced by counsel's actions. This issue has no merit.

*Issue #3*

Defense counsel filed a pretrial motion for funds to hire an expert for the defense, which was denied by the Court. Galan argues defense counsel rendered ineffective assistance of counsel by failing to take a writ from the Court's ruling. Galan claims that counsel's failure to ensure the

5

defense had an expert to rebut the state's expert resulted in prejudice to the defense.

Galan's defense was that the offense charged did not happen. He testified to a feeling of estrangement from his oldest daughter, due to the fact that they lived apart for the first three years of her life, and that the relationship between him and his oldest daughter was the basis for constant fights with his wife. While Galan would not characterize his daughters' testimonies as lies, he maintained their testimonies were not correct. He believed they had been made to testify the way they did. He posited the theory that his wife, who is herself an illegal alien, was attempting to use the victim's status as a crime victim in order to secure a U-Visa for the victim and herself. Such a visa could ultimately lead to citizenship for the victim and her mother, Galan's wife.

The Court finds the petitioner fails to state with particularity the factual basis for relief on this claim. La. C.Cr.P. art. 926(B)(3). The record shows that the only expert witness to testify at trial was Nurse Troy. Nurse Troy's expertise was in the field of child sex abuse and delayed disclosure. Defense counsel cross-examined Nurse Troy to emphasize the lack of physical evidence present in this case, and introduced an exhibit through her to bolster the defense. Galan does not state with reasonable particularity what information a defense expert would have testified about and how it would have altered the outcome of the trial. Galan's general statements and conclusory charges will not suffice. *See State ex rel. Sterling*, 2015-1895, p. 2, 207 So.3d at 1052.

The Court holds that the petitioner is unable to satisfy the deficient performance prong of the *Strickland* analysis. The Court finds nothing in the record to indicate that counsel's conduct fell below the range of reasonable professional assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

*Issue #4*

Galan believes the testimony of the victim was impeached. He argues that her impeached testimony, standing alone, could not be used to obtain a conviction and that his counsel was constitutionally ineffective for failing to object to the Court's judgment of guilty as charged.

The trial judge was the finder of fact in this matter. After the close of the evidence and argument, the trial judge retired to review the evidence and testimony. Thereafter, the trial judge reconvened the trial and entered his judgment on the record. R. Vol. 2, p. 397-400. In his oral reasons for his decision, the trial judge noted that there were small discrepancies between the testimonies of the victim and her younger sister. However, the trial court noted that these

6

discrepancies had the effect of increasing his belief in their veracity and negated any argument that their testimonies were coached. Simply put, the trial judge stated that the decision came down to a credibility call, and he believed the victim and her sister. Moreover, the trial judge indicated he saw no evidence that would support the defense theory that the victim and her family concocted a story so that the victim and her mother could apply for a visa.

The Court, in post-conviction review, finds that there may have been slight discrepancies between the testimonies of the victim and her younger sister, but that these discrepancies did not rise to the level of impeachment of her testimony. Additionally, the victim's testimony did not stand alone. The state also presented the eyewitness testimony of the victim's younger sister, who was present and saw the petitioner anally raping her older sister.

The petitioner claims his counsel was ineffective for his failure to object to the trial judge's credibility determination based on a false premise, i.e. that the victim's testimony had been impeached and stood alone. The record shows the victim's testimony was not impeached in any substantive regard, and her testimony was not the only direct evidence against the petitioner. Counsel is not "deficient" for failing to perform a vain and useless act. *See State v. Wolfe*, 630 So.2d 872, 883 (La. App. 4 Cir. 1993).

The Court holds that the petitioner is unable to satisfy the deficient performance prong of the *Strickland* analysis. The Court finds nothing in the record to indicate that counsel's conduct fell below the range of reasonable professional assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

*Issue #5*

Galan contends that he was provided with ineffective assistance of counsel when defense counsel failed to consult with him about his right to trial by jury. Galan claims instead that he was coerced into accepting a judge trial by his defense counsel. He claims defense counsel told him he was incompetent to make any decisions in his case because of the language barrier, petitioner's defective hearing, and petitioner's ignorance of the law and court procedure.

The record fails to support Galan's contentions. Galan, who professes not to be able to read, write or speak the English language, was represented by a Spanish speaking attorney and was additionally provided with a Spanish interpreter for court hearings.[2] The decision to waive his

---

[2] The allegations of Galan's hearing impairment will be addressed in Issue #6.

right to a jury trial and to proceed with a bench trial was made at a pretrial hearing held on February 26, 2018. *See* R. Vol. 1, p. 138-145. On that date, defense counsel stated that he had thoroughly discussed the decision to waive the jury with the petitioner. Galan personally participated in a colloquy with the Court, through his interpreter, to ensure that he fully understood the right to jury trial that he was waiving and how the trial would be conducted by the judge alone.

Before trial began on April 2, 2018, the state asked the petitioner to confirm that he wanted to proceed as a judge trial. Defense counsel offered that proffer, but the Court personally addressed Galan, asking if he wished to proceed by bench trial and to waive his right to trial by jury. Galan responded that he "agree[d] to continue." R. Vol. 2, p. 149-150.

The Court finds that the record does not support Galan's assertions in this regard. The election to proceed by bench trial was not made by counsel alone. Instead, the record shows that Galan personally indicated on two separate occasions on the record that he wished to proceed by judge trial. Galan had the aid of Spanish speaking interpreters on both occasions to communicate with the Court.

The Court holds that the petitioner is unable to satisfy the deficient performance prong of the *Strickland* analysis. The Court finds nothing in the record to indicate that counsel's conduct fell below the range of reasonable professional assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. This issue has no merit.

*Issue #6*

Galan has hearing problems and wears a hearing aid. He claims his counsel failed to ask the Court for accommodations and that this failure was ineffective assistance of counsel. The Court rejects this argument as factually inaccurate.

The Court was made aware of Galan's hearing difficulties through defense counsel. To help Galan understand the proceedings, the trial judge presented Galan with the judge's own set of noise cancelling headphones for him to wear in court during hearings to help him concentrate on his interpreter's speaking only. The record reflects this in the transcript of the hearing held on February 26, 2018, when the headset was not needed because there was no one else in the courtroom. R. Vol. 1, p. 139. The record also reflects that defense counsel asked the victim's sister on cross-examination to speak louder, reminding her that her father was deaf in one ear and that the defendant was using a translator. R. Vol. 2, p. 209. Galan's trial counsel, Ramiro Orozco,

8

speaks Spanish. Additionally, the Court made sure there was a Spanish speaking interpreter for each court proceeding. R. Vol. 1, pp. 132-134, 138-140; R. Vol. 2, p. 147-149, 264-265, 328-330. Finally, at the trial of the matter, two interpreters were present to help translate for Galan.

The Court holds that the petitioner is unable to satisfy the deficient performance prong of the *Strickland* analysis. The Court finds nothing in the record to indicate that counsel's conduct fell below the range of reasonable professional assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Instead, the Court finds that every effort was made to ensure that Galan fully heard and understood the court proceedings. This issue has no merit.

*Issue #7*

Galan contends his trial counsel rendered ineffective assistance of counsel for failing to ask the Court for a replacement translator. He claims the translator at trial made translations which were often incorrect or not understandable to a person with hearing problems. He asserts his counsel complained about the interpreter, but did not bring the problem to the Court's attention.

Under the Louisiana Code of Evidence, an interpreter is subject to the provisions of the Code relating to qualification as an expert and the administration of an oath or affirmation that he or she will make a true translation. La. C.E. art. 604. La. C.E. art. 702 in turn provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." The jurisprudence has stated the following general standards: "An interpreter of foreign-language testimony must be competent and qualified by virtue of knowledge, skill, experience, training, or education, have no substantial interest in the proceedings, and be sworn to give a true bilateral translation of the questions and answers given during testimony." *Thongsavanh v. Schexnayder*, 2009-1462, p. 11 (La. App. 1 Cir. 5/7/10), 40 So.3d 989, 997, *writ denied*, 2010-1295 (La. 9/24/10), 45 So.3d 1074.

The record contains a stipulation by defense counsel as to the competence of the interpreter, Dolores Garcia. R. Vol. 1, p. 133-134 ("We also have the interpreter and we have no objection to the skills of the interpreter."). The same interpreter was present at all of the hearings of record. She was joined at the trial by two other interpreters, Reyna Croft (April 2, 2018) and Andrea Freitas (April 3 and 5, 2018). Although there is no indication of the qualifications of the additional two interpreters on record, it is clear that Dolores Garcia, whose competence was stipulated to by the defense, was present at all court hearings. If there had been a question about or inaccuracy in a

9

translation, she would have been there to address the issue. Moreover, since defense counsel spoke Spanish, he would have been able to correct an inaccuracy or omission. *See* R. Vol. 2, p. 183 (the witness stated something in Spanish and trial counsel interpreted).

The Court finds that Galan does not point to any specific instances in which the Spanish translation was inept during trial or otherwise or that an objection was lodged. The record fails to show that any problems arose during the translations. Instead, Galan had a Spanish speaking counsel, who stipulated on the record to the competence of the main interpreter. *Compare State v. Gonzalez*, 2007-0532, p. 4-5 (La. App. 4 Cir. 11/28/07), 973 So.2d 115, 117.

The Court holds that the petitioner is unable to satisfy the deficient performance prong of the *Strickland* analysis. The Court finds nothing in the record to indicate that counsel's conduct fell below the range of reasonable professional assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Instead, the Court finds that every effort was made to ensure that Galan understood the court proceedings in his native language. This issue has no merit.

The Court concludes that Galan has failed to bear his statutory burden of proving that post-conviction relief should be granted. None of the seven grounds of alleged ineffective assistance of counsel raised by petitioner have merit.

Accordingly, the Court denies and dismisses petitioner Victor Galan's Application for Post-Conviction Relief in its entirety.

Covington, Louisiana, this _5_ day of _December_, 2021.

 

Hon. August J. Hand, Judge
22nd Judicial District Court, Division B

10

A TRUE COPY
DY. CLERK 22nd JUD. DIST. COURT
ST. TAMMANY PARISH, LA
Staci Garic, Deputy Clerk

## FIRST UNIFORM APPLICATION FOR POST CONVICTION RELIEF

Please review La. C.Cr.P. Arts. 924 - 930.9 for the correct procedure for filing an application for post conviction relief. This form does not modify the law or requirements as stated in those articles.

For the **Time Limitations** for filing this application, please see Louisiana Code of Criminal Procedure (La. C.Cr.P.) Art. 930.8(A), which states in part that "No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922 ..."

See remainder of La. C.Cr.P. Art. 930.8 for the **Limited Exceptions** relating to the extension of this time period

### WHEN NOT TO USE THIS FORM

If you are trying to file **a motion to correct an illegal sentence** pursuant to La. C.Cr.P. Art. 881.5 or 882, **you must use the Uniform Motion to Correct an Illegal Sentence.** A motion to correct an illegal sentence must point to an illegal term or condition of your sentence, otherwise it will be construed as an application for post conviction relief subject to the time limits established in La. C.Cr.P. Art. 930.8.

If your complaint involves the **computation of time** you are serving or have served, **you must first file for administrative relief** with the Department of Corrections in accordance with R.S. 15:1172. Review of any unfavorable decision must be filed in the 19th Judicial District Court in East Baton Rouge Parish.

### GENERAL INSTRUCTIONS — READ CAREFULLY

If this is your **First Application** for post conviction relief, please carefully review all of the following instructions:

1. **You must use this form or the District Court will not consider your application.** This could affect your ability to seek relief in accordance with the time limits established in La. C.Cr.P. Art. 930.8. Therefore, you must use this form or justify your failure to do within the post conviction time limits.

2. This application must be clearly written or typed, signed by you or your attorney, and sworn to before a notary public or institutional officer authorized to administer an oath. Any false statement of a material fact may serve as the basis for criminal prosecution. Answer questions concisely in the proper space on the form. You may attach additional pages stating the facts that support your claims for relief. No lengthy citations of authorities or legal arguments are necessary.

3. When the application is completed, **you must file the original application in the District Court for the Parish in which you were convicted and sentenced,** and you must also send a copy to the State.

4. You must raise all claims for relief arising out of a single trial or guilty plea in one application.

5. You are only entitled to file an application for post conviction relief to challenge a **habitual offender adjudication or sentence within very limited circumstances.** In most cases, you can only challenge a habitual offender adjudication or sentence in appeal.

### REQUIRED ATTACHMENTS

A copy of the **Louisiana Uniform Commitment Order** of conviction and sentence **must** be attached to the application (if it is available), or the application must allege that it is unavailable.

| | | | |
|---|---|---|---|
| Date of this Application: | 04 / 05 / 21 | Name of Applicant: | **Victor Galan** |
| DOC Number: | 732647 | Place of Confinement: | **LA State Penitentiary** |
| District Court Case Number: | **563468 Div. "B"** | Parish of Conviction: | **St. Tammany** |
| Name of Trial Judge: | Judge A. J. Hand | | |
| Offense(s) for which you were convicted: | | **Aggravated rape, La. R.S. 14:42** | |

**EXHIBIT B**

| Do any of the convictions involves a sex offense or a human trafficking related offense where the victim was a minor under the age of eighteen years (see La. R. S. 46:1842(1.1) and 46:1844(W)(2))? [Check One] | Yes [X] No [ ] |
|---|---|

| Date of Conviction: | **04 / 05 / 18** | Conviction by: [Check One] | Guilty Plea [ ]     Trial by Jury [ ] Trial by Judge [X] |
|---|---|---|---|
| Date of Sentencing: | **04 / 05 / 18** | Sentence | **Life without Benefits** |

| Name of Counsel who represented you at the time of trial, sentence and / or conviction: | **Ramiro Orozco** |
|---|---|

| Multiple Offender Proceeding: [Check One] | Yes [ ]     No [X] |
|---|---|

| If yes, answer both of the following questions: | |
|---|---|

| Result of Proceeding: [Check One] | Pled [ ]     Adjudicated to be a Multiple Offender [ ] Adjudicated No Bill [ ] |
|---|---|
| Sentence on Multiple Offender Bill: | |
| Name of Counsel who represented you on appeal: | **Lieu T. Vo Clark** |

| Appeal of conviction and sentence: [Check One] | Yes [X]     No [ ] | Appellate Case #: | **2018-KA-1481** |
|---|---|---|---|
| Appeal of Multiple Bill: [Check One] | Yes [ ]     No [ ] | Appellate Case #: | **May 14, 2019** |
| Writ to Louisiana Supreme Court: [Check One] | Yes [X]     No [ ] | Supreme Court Case #: | **2019-KO-1027** |
| Action by Supreme Court: [Check if Applicable] | Granted [ ]     Denied [X] | Date of Action | **January 22, 2020** |
| Rehearing to Supreme Court: [Check if Applicable] | Granted [ ]     Denied [ ] | Date of Action | |

## CLAIMS FOR RELIEF INSTRUCTIONS—READ CAREFULLY

**You must include** in this application **all allowable claims** relating to this conviction. If you do not, you may be **barred** from presenting additional claims at a later date. See La. C. Cr. P. Art. 930.4. You must **state facts** upon which your claims are based. Do not just set out conclusions.

Please refer to La. C. Cr. P. Art. 930.3 (Grounds), which reads:

"If the petitioner is in custody after sentence for conviction for an offense, relief shall be granted only on the following grounds:

(1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana;
(2) The court exceeded its jurisdiction;
(3) the conviction or sentence subjected him to double jeopardy;
(4) The limitations on the institution of prosecution had expired;
(5) The statute creating the offense for which he was convicted and sentenced is unconstitutional; or
(6) The conviction or sentence constitute the ex post facto application of law in violation of the constitution of the United States or the state of Louisiana.
(7) The results of DNA testing performed pursuant to an application granted under Article 926.1 proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted."

Using a separate sheet of paper, provide the following information as it relates to claims available under La. C. Cr. P. Art. 930.3.

For each claim:
(A) You must state your **claim**, the ground on which it is based under La. C. Cr. P. Art. 930.3, and the **facts** that support your claim.
(B) If there are witnesses who could testify in support of your claim, you must list their names and current

addresses. If you cannot do so, explain why.

(C) If you failed to raise this claim in the trial court prior to conviction or on appeal, you **must** explain why. This is your opportunity to state reasons for your failure before the court considers dismissing the application in accordance with La. C. Cr. P. Art. 930.4(F).

In the following space, provide a brief summary of the reasons why you are legally entitled to file a second or subsequent application. If you fail to justify your right to file a second or subsequent application in accordance with La. C. Cr. P. Arts. 930.4 and 930.8, your application may be automatically dismissed.

Wherefore, Applicant prays that the Court grant Applicant relief to which he / she may be entitled.

*04 / 05 / 20 21*
[ Month / Day / Year ]

_____Victor  Galan_____
[Signature of Applicant or Applicant's Attorney]

---

**AFFIDAVIT**

**STATE OF LOUISIANA**

**PARISH OF WEST FELICIANA**

I, **Victor Galan** , [Name of Applicant / Attorney], being first duly sworn says that he / she has read the application for post conviction relief and swears or affirms that all of the information therein is true and correct.

_____Victor  Galan_____
[Signature of Applicant or Applicant's Attorney]

SWORN TO AND SUBSCRIBED before me this _____ day of _____ 20_____.

_____
**NOTARY** or person authorized to administer oath

---

| Case Name: | **JUDGMENT**<br>[May be used by the Court in Lieu of or in addition to written reasons] | Case Number: |
|---|---|---|

Considering the foregoing Application for post conviction Relief, this Honorable Court hereby:

DENIES this application in accordance with La. C. Cr. P. Art.

926(E) [ ]     928 [ ]     929 [ ]     930.4 [ ]     or     930.8 [ ], or

ORDERS that the Applicant show cause in writing on or before the _____ day of _____, 20____ why the application should not be dismissed in accordance with La. C. Cr. P. Art.

926(E) [ ]     928 [ ]     929 [ ]     930.4 [ ]     or     930.8 [ ], or

ORDERS that the State be required to file a response to this application on or before the _____ day of _____, 20____.

Signed in _____, Louisiana, this _____ day of _____, 20____.

_____
**JUDGE**

PLR Application

OFFENDER'S REQUEST FOR LEGAL / INDIGENT MAIL

NAME: *Victor Galan*

NUMBER: *732647*

LOCATION: *Spr-1*

BALANCE IN YOUR DRAWING ACCOUNT: $ _____

LIST EACH ITEM TO BE MAILED
GIVE THE NAME AND COMPLETE ADDRESS OF EACH
PIECE TO BE MAILED:

*Clerk of Court, 22nd JDC*
name
*P.O. Box 1090*
address
*Covington, LA  70434*
city, state, zip code

*Warren Montgomery, District Attorney*
name
*701 N. Columbia St.*
address
*Covington, LA   70433*
city, state, zip code

_____
name
_____
address
_____
city, state, zip code

ANY DELIBERATE MISREPRESENTATION WILL RESULT
IN YOUR MAIL BEING RETURNED

*Victor Galan*                    *732647*
offender's signature and number

*C McQuarter*                    *04.05.2021*
classification officer              date

IN THE
22nd JUDICIAL DISTRICT COURT
PARISH OF ST. TAMMANY
STATE OF LOUISIANA

DOCKET NO: <u>563468  Div. "B"</u>

VICTOR GALAN
*Petitioner*

Versus

DARREL VANNOY, Warden
Louisiana State Prison
*Respondent*

MEMORANDUM IN SUPPORT OF APPLICATION FOR
POST CONVICTION RELIEF WITH REQUEST FOR
APPOINTMENT OF COUNSEL AND AN EVIDENTIARY HEARING

Respectfully submitted, *pro se*, this 5th day of April, 2021.

_Victor  Galan_____
Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

CRIMINAL POST CONVICTION PROCEEDING

# TABLE OF CONTENTS

page

COVER

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES............................................................................................ii

MEMORANDUM IN SUPPORT OF APPLICATION....................................................1

JURISDICTION AND VENUE.......................................................................................1

STATEMENT OF THE CASE.........................................................................................2

STATEMENT OF THE FACTS.......................................................................................3

ISSUES PRESENTED......................................................................................................4

STANDARD OF REVIEW..............................................................................................5

ARGUMENT....................................................................................................................6

    1...............................................................................................................................6

    2...............................................................................................................................7

    3.............................................................................................................................11

    4.............................................................................................................................14

    5.............................................................................................................................18

    6.............................................................................................................................20

    7.............................................................................................................................20

CONCLUSION...............................................................................................................21

CERTIFICATE OF SERVICE.......................................................................................22

APPENDICES

# TABLE OF AUTHORITIES

page

## Constitution

Louisiana Constitution, Article 1, § 2........................................................7, 14, 18, 21

Louisiana Constitution, Article 1, § 13........................................................7, 18, 21

Louisiana Constitution, Article 1, § 16........................................................7, 14, 21

Louisiana Constitution, Article 1, § 17........................................................18

Louisiana Constitution, Article 5, § 16........................................................1

United States Constitution, Amendment 5........................................................7, 14, 18, 21

United States Constitution, Amendment 6........................................................7, 13, 18-19, 21

United States Constitution, Amendment 14........................................................7, 14, 18, 21


## Code

La. Code Evid. Art. 801........................................................9

La. Code Evid. Art. 802........................................................9

La. Code Evid. Art. 803........................................................7-8

La. R.S. 14:42........................................................2

La. R.S. 14:89.1........................................................2

La.C.Cr.P. Art. 924........................................................1

La.C.Cr.P. Art. 925........................................................1


## Federal Cases

Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 (1985)........................................................12

Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431 (1971)........................................................12

Burge v. St. Tammany Parish, 187 F.3d 452 (5th Cir. 1999)........................................................16

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005)........................................................13

Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)........................................................3

Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)........................................................19

Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004)........................................................19

Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)........................................................3

Hernandez v. Thaler, 630 F.3d 420 (5th Cir. 2011)........................................................3

Johnson v. Quarterman, 479 F.3d 358 (5th Cir. 2007)........................................................3

Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)........................................................19

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995)........................................................5

Latiolais v. Whitley, 93 F.3d 205 (5th Cir. 1996)..................................................5

Lindstadt v. Keane, 239 F.3d 191 (2nd Cir. 2001)..............................................13

Loyd v. Whitley, 977 F.2d 149 (5th Cir. 1992)....................................................17

McNeil v. United States, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)..............3

Medina v. California, 505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)............19

Melancon v. Kaylo, 259 F.3d 401 (5th Cir. 2001)..................................................3

Mellon v. United States, 170 F.2d 583 (5th Cir. 1948)..........................................10

Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999)..............................................12, 17

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979)................................................21

Pavel v. Hollins, 261 F.3d 210 (2nd Cir. 2001)..................................................12

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)......5, 13

United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)............13

United States v. Kayode, 777 F.3d 719 (5th Cir. 2014)............................................3

United States v. Lueben, 812 F.2d 179 (5th Cir. 1987)..........................................12

United States v. Riddle, 103 F.3d 423 (5th Cir. 1997)..........................................12

State Cases

State v. Bennett, 345 So. 2d 1129 (La. 1977)....................................................19

State v. Chism, 591 So.2d 383 (La.App. 2 Cir. 1991)............................................17

State v. Foret, 628 So.2d 1116 (La.1993)..........................................................9

State v. Horn, 2016-0559, 251 So.3d 1069 (La. 2018)............................................19

State v. Kennedy, 803 So.2d 916 (La. 2001)......................................................17

State v. Laprime, 437 So.2d 1124 (La. 1983)......................................................17

State v. Lott, 535 So.2d 963 (La.App. 2 Cir. 1988)..............................................17

State v. Matthis, 07-0691 (La. 11/2/07), 970 So.2d 505............................................5

State v. Mitchell, 412 So.2d 1042 (La. 1982)......................................................6

State v. Ste. Marie, 801 So.2d 424 (La. App. 3 Cir. 2001)........................................9

State v. Tucker, 619 So.2d 1076 (La. App. 1 Cir. 1993)........................................8-9

State v. Victor Galan, 277 So.3d 365 (La. App. 1 Cir. 2019)....................................2-3

State v. Victor Galan, 291 So.3d 1042 (La. 1/22/20)..............................................2

State v. Washington, 491 So.2d 1337 (La. 1986)..................................................5

Other

Rehabilitation Act of 1973 and the
Americans with Disabilities Act..................................................................20

IN THE
22nd JUDICIAL DISTRICT COURT
PARISH OF ST. TAMMANY
STATE OF LOUISIANA


VICTOR GALAN

*Petitioner*

Docket No: <u>563468</u> Div. "B"

Date Filed:_____

versus

DARREL VANNOY, Warden
Louisiana State Prison

*Respondent*

_____

Clerk of Court


## MEMORANDUM IN SUPPORT OF APPLICATION FOR POST CONVICTION RELIEF WITH REQUEST FOR APPOINTMENT OF COUNSEL AND AN EVIDENTIARY HEARING


MAY IT PLEASE THE COURT:

NOW INTO COURT COMES Victor Galan, *pro se* Petitioner herein, who files the instant petition for Post Conviction Relief and Memorandum in Support, pursuant to La.C.Cr.P. Arts. 924, *et seq.* Petitioner respectfully seeks from this Honorable Court an order vacating the judgment of conviction and sentence imposed upon him by this Court.


### JURISDICTION AND VENUE

The District Courts have original jurisdiction over all civil and criminal matters, and exclusive original jurisdiction of felony cases pursuant to the Louisiana Constitution, Article 5, §§ 16 (A)(1) and 16 (A)(2).

Jurisdiction and venue of post conviction proceedings are conferred upon this Court by the Louisiana Code of Criminal Procedure, Articles 924-925.

## STATEMENT OF THE CASE

On June 25, 2015, Victor Galan, *pro se* Petitioner herein, was charged by Felony Bill of Information with 1 count of aggravated crime against nature, La. R.S. 14:89.1(A)(2)(b) with a person under the age of thirteen. (Appendix C). Petitioner was arraigned on this charge July 16, 2015, and pled not guilty. (Appendix F).

On May 02, 2017, a superseding Bill of Indictment was filed charging Petitioner with 1 count of aggravated rape, La. R.S. 14:42. (Docket No. 563468 Div. "B") (Appendix G). Petitioner was arraigned on this charge on May 16, 2017, and pled not guilty.

Petitioner went to a bench trial, Honorable August J. Hand, Judge Presiding, which started on April 02, 2018, and ended on April 05, 2018, at which time the trail court found Petitioner guilty as charged. Defense counsel moved for a new trial which was denied by the court. After waiving sentencing delays, Petitioner was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. (Appendix H).

Petitioner appealed his conviction and sentence to the Louisiana First Circuit Court of Appeal. On November 12, 2018, Lieu T. Vo Clark with the Louisiana Appellate Project filed a direct appeal brief on behalf of Petitioner. (Appendix D). On December 25, 2018, Petitioner filed a *pro se* Supplemental brief. (Appendix E). (Docket No. 2018-KA-1481).

On May 14, 2019 the First Circuit Court of Appeal affirmed Petitioner's conviction and sentence. (before McDonald, Crain, and Holdridge, JJ.). *State v. Victor Galan*, 277 So.3d 365 (La. App. 1 Cir. 2019). (Appendix B).

Petitioner then filed a *pro se* Application for Writ of Certiorari in the Louisiana Supreme Court on June 05, 2019. (Appendix I). Petitioner's writ application was denied on January 22, 2020. *State v. Victor Galan*, 291 So.3d 1042 (La. 1/22/20). (Appendix A).

This timely filed Application for Post Conviction Relief follows.

Petitioner states that he has remained in continued custody since his arrest, and is currently being held in custody in the Louisiana State Prison at Angola, Louisiana, Darrel Vannoy, Warden.

Further, Petitioner is a *pro se* litigant. Therefore, he asks that his efforts herein be liberally construed as he has made a good faith effort to follow form. *United States v. Kayode*, 777 F.3d 719, 741, n. 5[1] (5th Cir. 2014).


### STATEMENT OF THE FACTS


The Louisiana First Circuit Court of Appeal summarized the facts of the case on direct appeal in the following manner:

> The victim, E.B.R.M., is the biological daughter of the defendant, and in 2014 lived with the defendant, her mother (who was married to the defendant), and her two younger sisters (also children of the defendant and the victim's mother). At trial, E.B.R.M. testified that following her eleventh birthday, the defendant began touching her breasts and buttocks, then began masturbating on her and sodomizing her, sometimes while she was in bed with her sisters. The abuse continued over a six month period and stopped when E.B.R.M.'s mother reported the abuse to the police. The defendant denied raping or inappropriately touching E.B.R.M., claiming the daughters are illegal immigrants and were coerced into making these accusations against him to obtain a "U-visa," which is available to certain crime victims and their families.

*State v. Victor Galan*, 277 So.3d 365, 367-368 (La. App. 1 Cir. 2019).

---

1   [FN 5] See, e.g., *McNeil v. United States*, 508 U.S. 106, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) (acknowledging that the Supreme Court has "insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed") (citing *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and See also *Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) ("The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction.") *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007) (Briefs by *pro se* litigants are afforded liberal construction...."); *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001) (reasoning that the *pro se* habeas petitioner's argument that he should not be punished for the improper setting of the return date should be construed as a request for equitable tolling, despite his failure to "explicitly raise the issue of equitable tolling").

## ISSUES PRESENTED

1.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO RE-URGE MOTION FOR MISTRIAL WHEN TRIAL RESUMED AFTER 2-DAY STAY TO REVIEW LATE DISCLOSURE OF DISCOVERY DOCUMENTS BY THE STATE.

2.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO INADMISSIBLE HEARSAY AND CSAAS TESTIMONY BY EARNEISHA LOTT AND NURSE ANN TROY AT TRIAL.

3.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO SECURE EXPERT TESTIMONY TO AID DEFENSE AT TRIAL, AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

4.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT AND REQUIRE THE TRIAL COURT TO CONSIDER ISSUE OF IMPEACHED TESTIMONY, STANDING ALONE, BEING UNCONSTITUTIONALLY USED TO OBTAIN CONVICTION.

5.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO CONSULT PETITIONER ON HIS RIGHT TO A JURY TRIAL AND FORCED PETITIONER TO GO TO TRIAL WITH A JUDGE INSTEAD OF A JURY.

6.   PETITIONER'S TRIAL COUNSEL WAS MADE AWARE THAT PETITIONER HAD HEARING PROBLEMS AND USED A HEARING AID, AND COUNSEL FAILED TO MAKE ACCOMMODATIONS AT TRIAL.

7.   TRIAL COUNSEL FAILED TO ASK FOR A REPLACEMENT TRANSLATOR, EVEN THOUGH COUNSEL SPOKE SPANISH AND COULD NOT UNDERSTAND THE TRANSLATOR AT TRIAL.

## STANDARD OF REVIEW

The standard of review for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by the Louisiana Supreme Court in *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986), requires a defendant to show not only that his trial attorney's performance fell below an objective standard of reasonableness under prevailing professional norms, but also that counsel's inadequate performance prejudiced him to the extent that the trial was rendered unfair and the verdict suspect, *i.e.*, that counsel's errors undermined the proper functioning of the adversary process. *State v. Matthis*, 07-0691 (La. 11/2/07), 970 So.2d 505.

Further, the question of ineffective assistance of counsel is a cumulative one. It is improper to divide each issue up in an effort to "conquer" them. A reviewing court is required to review the totality of the circumstances and the cumulative effect of counsel's lapses. *Strickland v. Washington*, 466 U.S. 688, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (when reviewing counsel's effectiveness, court must look to "all the circumstances" of the trial.); *Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996) (Accumulation of errors is grounds for a new trial).

Additionally, a reviewing court must look at the case as a whole in order to review it for errors and omissions of counsel that would undermine confidence in the verdict, as well as to reassess the "prejudice" prong of the *Strickland* test because of the "reasonable probability of a reasonable doubt" standard set in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995).

ARGUMENT

1.    TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR
FAILING TO RE-URGE MOTION FOR MISTRIAL WHEN TRIAL RESUMED
AFTER 2-DAY STAY TO REVIEW LATE DISCLOSURE OF DISCOVERY
DOCUMENTS BY THE STATE.

Trial counsel clearly requested a mistrial, and it should have been granted due to
the prejudice to the defense because of the State's failure to disclose evidence until after
the State's witnesses had testified. (Appendix F). *State v. Mitchell*, 412 So.2d 1042 (La.
1982). Trial counsel failed to take writs to the appellate court in this important matter
concerning prejudice to Petitioner at his trial.

This denial of a mistrial 1) violated Petitioner's right to prepare a defense; 2)
precluded impeachment of the State's witnesses based on the belated disclosure; and 3)
allowed the State to get a second bite at the apple by either recalling the witnesses to
introduce the evidence, or cross-examination if the defense called the witnesses in its
case. There is also the fact that, in either case, the State had access to its witnesses and
could discuss their testimony before they got back on the stand.

Again, trial counsel objected to the prejudicial evidence and continued the motion
for mistrial. The judge again denied a mistrial, even though he acknowledged that the
defense was prejudiced. The judge stated that had this been a jury trial, a mistrial would
be granted immediately. (Appendix F, p. 305)

There is no difference in the prejudice to the Petitioner under the law in whether
there is a jury or a judge trial. If a mistrial would have been granted without question in
a jury trial, a mistrial should have been declared in this judge trial.

At the very least, the appellate court would have precluded the belated evidence
from trial, and there is a reasonable probability the appellate court would have ordered
the asked for mistrial.

Failure of trial counsel to take writs to the appellate court clearly prejudiced
Petitioner at trial. Petitioner has been denied his constitutional rights to due process, to

6

present a defense, and effective assistance of counsel, which is clear on the face of the record.

Further, trial counsel complained to the court that he was from out of state and did not have the resources, did not have time because he had a federal sentencing scheduled, and that this was his last case as an attorney and he was supposed to already have started his new job as the CEO of a construction company. In other words, it was far too inconvenient for trial counsel to actually do his job, it was his last case, and he needed to move on quickly. (Appendix F, p. 323).

Petitioner was deprived of his rights to due process, to present a defense, and effective assistance of counsel guaranteed him by both the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2, 13 and 16. Therefore, Petitioner is entitled to Post Conviction Relief.

2.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT TO INADMISSIBLE HEARSAY AND CSAAS TESTIMONY BY EARNEISHA LOTT AND NURSE ANN TROY AT TRIAL.

While statements for purposes of medical treatment and medical diagnosis in connection with treatment are exceptions to the hearsay rule, La. Code Evid. art. 803(4), when not working under the direction of a physician, such statements are not an exception to the hearsay rule. No physician testified at trial. There is no indication that either Earniesha Lott, or Nurse Ann Troy was working under the direction of a physician in this case, and their testimony as to what the alleged victim said, was inadmissible hearsay not objected to by Petitioner's trial counsel. It was also improper use of "delayed disclosure" in order to bolster the credibility of the alleged victim.

La. Code Evid. art. 803(4) provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

7

. . .

Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.

The 1999 Author's Notes regarding the Rule 803(4) exception to the hearsay rule state:

Without considering whether a statement by a child molestation victim to a therapist-certified social worker might qualify as a statement for "purposes of medical treatment and medical diagnosis in connection with treatment," the court in *State v. Tucker,* 619 So.2d 1076 (La. App. 1 Cir. 1993), held the admission of such testimony was inadmissible hearsay and was reversible error. The Authors agree with the result reached. The "statements for purposes of medical treatment and medical diagnosis in connection with treatment" should be given a narrow rather than expansive interpretation, and a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception.

La. Code Evid. 803(4), 1999 Author's Notes (8).

In *Tucker,* the victim's therapist/certified social worker testified that the victim had told her about sexual abuse by the defendant. She specifically stated what the child had told her during the therapy sessions. She also testified that the victim's conduct with the anatomically correct dolls indicated sexual abuse. The defendant denied all charges and objected to the introduction of the hearsay evidence regarding disclosures made to the therapist by the victim. The court found that without the hearsay testimony from the victim, the social worker could not have testified as to her conclusions. The court also found there was not enough evidence to sustain the defendant's conviction for molestation of a juvenile without reliance on the improperly admitted hearsay. It was the State's burden to prove beyond a reasonable doubt that the therapist's hearsay testimony did not contribute to the jury's finding of guilt, and the State did not meet that burden; therefore, the defendant's conviction was reversed, the sentence was vacated and the case was remanded for a new trial. . . .

However, as cited above, the 1999 Author's Notes to that

article clearly state that "a statement to a therapist social worker not working under the direction of a physician should not be considered as fitting within this exception." There is no evidence in this case that the social worker was working under the direction of a physician, Thus, Ms. Hayes' statements as to what the victims told her regarding the abuse should be inadmissible hearsay.

*State v. Ste. Marie*, 801 So.2d 424, 431-432 (La. App. 3 Cir. 2001), citing *State v. Tucker*, 619 So.2d 1076 (La. App. 1 Cir. 1993).

Clearly, neither Earniesha Lott, nor Nurse Ann Troy were working under the direction of a physician, and their reiteration of what the alleged victim told Earniesha Lott, (Appendix E), and Nurse Ann Troy, (Appendix G), is inadmissible hearsay prejudicial to Petitioner at his trial. La. C. Evid. Arts. 801(C) and 802.

Further, trial counsel should have objected to testimony regarding psychiatric phenomena called Child Sexual Abuse Accommodation Syndrome (CSAAS). The "delayed disclosure" and other CSAAS psychiatric phenomena testified to by Earniesha Lott, (Appendix E), and Nurse Troy, (Appendix G), only served to bolster the credibility of the alleged victim, in violation of *State v. Foret*, 628 So.2d 1116 (La.1993). The *Foret* Court found that opinions based on CSAAS were of dubious reliability, even by trained psychologists; it is a clinical opinion, not a scientific instrument, and it is not intended as a diagnostic devise. Rather, it **assumes** abuse in order to explain a child's reaction to it. Further, the *Foret* Court found the "known or potential rate of error" quoted in the literature to be far too high to meet the *Daubert* criteria: "While Dr. Faller might have been content with a 32% margin of error, we are not so comfortable, especially remembering that '[t]he integrity of the criminal trial process is too important to permit it to be compromised by the admission of dynamic speculations.'" *Id.* at 1126.

Additionally, credibility testimony has the effect of, "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony." *Foret*, at 1129. This also goes for witnesses other than the accusing witnesses, by bolstering their credibility before it is attacked and before they ever get on the stand.

In fact, on the last question asked on direct examination, the prosecutor point blank asked Earniesha Lott at trial:

> Q.    Has she ever given you any reason to think she's lying?
> A.    No.

(R.p. 244) (Appendix E).

Both Ms. Lott and Nurse Troy testified regarding the psychological phenomenon of "delayed disclosure," and neither of them is a doctor, a psychiatrist, or a psychologist. Indeed, there is no psychologists or psychiatrists that ever actually diagnosed the alleged victim as having any of the CSAAS psychological phenomena at any time. Moreover, since this was a judge trial, there was no reason to introduce this inadmissible testimony in order to "educate" a jury.

Ms. Lott and Nurse Troy's testimony was introduced at trial by the prosecutor solely to "doubly emphasize his evidence before the jury as against that of the accused." *Mellon v. United States*, 170 F.2d 583 (5th Cir. 1948).

The *Mellon* court also stated,

> We are of the opinion the trial court erred in permitting the witness Edgar to testify that on the day after the alleged offense he told his superior, Bennett, the details of the alleged bribe attempt, and thereafter to permit Bennett in his testimony to bolster Edgar's version of the incident, as reported to him.

(*Id.* at 585).

Ms. Lott and Nurse Troy's testimony only served to bolster the alleged victim's "version of the incident, as reported to him." Since the State's case relied entirely on the credibility of the complaining witness, this testimony was highly prejudicial to the Petitioner, as it impermissibly enhanced the alleged victim's credibility.

Further, the *Mellon* court held, "The general rule is that a witness may not be corroborated or have his testimony reinforced by proof that on previous occasions he has made the same statements as those made in his testimony." (*Id.* at 585-586).

Trial counsel failed to object to this irrelevant, immaterial, and highly prejudicial testimony when it was introduced, and further allowed its prejudicial impact at trial by not objecting when it was reiterated in closing arguments.

3.   TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR
     FAILING TO SECURE EXPERT TESTIMONY TO AID DEFENSE AT TRIAL,
     AND CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

Trial counsel filed a motion for funds to hire an expert for the defense, and the trial judge denied the motion. However, trial counsel failed to pursue the issue to the higher courts by making a writ application to the appellate court. Trial counsel's failure to ensure the defense had an expert to rebut the State's expert resulted in prejudice to the Petitioner at trial.

This prejudice is shown by the fact that the State introduced belated exculpatory evidence, and the fact that the defense had no expert to rebut the State's evidence. Further, the fact that trial counsel stated to the court that if he would have known of this evidence he would have been more adamant about securing an expert for the defense, and then still failed at this point to properly motion the court for funds for an expert, and take writs to the appellate court if necessary, shows ineffective assistance of counsel.

Petitioner contends that his trial counsel, Ramiro Orozco, was ineffective assistance of counsel at trial for failing to secure expert testimony to aid the defense. An expert would have given trial counsel the opportunity to fully develop and address all issues raised at trial concerning: 1) expert opinion on the issue of lack of injury or physical evidence; 2) expert opinion on belated discovery evidence; 3) inadmissible expert opinion on psychological evidence given at trial; and 4) expert opinion on other reasonable hypotheses of the incident.

Trial counsel, Mr. Orozco, told the court:

> I'm traveling, Your Honor. I don't have time to sit here - - unlike the
> State, Your Honor, I don't have the luxury of staff personnel having
> had this one case. I'm a private practice attorney from out of state
> coming and handling several cases. I have a federal sentencing on
> Thursday that I was expecting to be able to go to.

(Appendix F, p. 323).

11

Trial counsel further told the court:

> Mr. Orozco:      Your Honor, I have a federal sentencing at 10:00,
> I believe 9:00 or 10:00 a.m. on Thursday. I could be here by 1:00
> and that would probably give my associate and I more time to
> review and then at that point I don't have that issue pending and this
> is my last trial and court case that I'll be practicing.

> The Court:      What? Are you retiring?

> Mr. Orozco:      I'm not. I'm going to be a CEO construction - - I
> was supposed to be a CEO of a construction company on Thursday
> ay 11:00. Now it's getting pushed possibly later.

(Appendix F, p. 323).

An expert to testify for the defense at trial would have effectively rebutted the prejudicial assumptions erroneously elicited by the State through their expert. The State's theory of the case was only that — a theory. This theory should have been subjected to rebuttal, especially through the use of defense expert testimony, which is Petitioner's right that was neither utilized, nor honored by his trial counsel. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087 (1985), quoting *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431 (1971).

Where the prosecution experts were given leeway to testify, the Petitioner's expert would have been allowed to testify as well, had Petitioner's attorney called for one. See, *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997); *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001). And see, *United States v. Lueben*, 812 F.2d 179 (5th Cir. 1987), where the *Lueben* Court held it to be reversible error for the trial court to disallow a defendant's rights to due process, and to offer witnesses / rebuttal evidence. Clearly, Petitioner's counsel was ineffective assistance of counsel for failing to do so.

Petitioner asserts that it cannot be a "trial strategy" to completely disregard this area of defense, especially in light of the fact that expert testimony encompassed several areas of expertise throughout the trial as enumerated above. A "strategic" decision is a decision "that . . . is expected . . . to yield some benefit or avoid some harm to the defense." *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999).

Petitioner contends that the only harm avoided by his trial counsel's failure to utilize expert testimony was to the prosecution. The prosecution also received the benefit of prejudice to the Petitioner caused by his trial counsel's errors.

Under the Sixth Amendment, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Lindstadt v. Keane*, 239 F.3d 191, 200 (2nd Cir. 2001) (quoting *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. 2052).

An expert was essential to the defense in order to relate the Petitioner's version of events at trial as the more probable scenario. Viewing the evidence in light of both the State's theory versus the Petitioner's may have caused a reasonable finder of fact to believe that Petitioner's version of events was the most probable, and realistic version according to the facts and evidence. *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005).

Of course, an expert to further impeach the alleged victim's inconsistent story would have called into question her veracity, as well as effectively rebutting the State's experts. Plus, exposing a more logical scenario - a more reasonable hypothesis - to the judge would have undermined the State's theory, as well as the State's whole case-in-chief.

Obviously, expert testimony in this regard was a necessary defense, and trial counsel was completely inert regarding these critical issues. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

4.  TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO OBJECT AND REQUIRE THE TRIAL COURT TO CONSIDER ISSUE OF IMPEACHED TESTIMONY, STANDING ALONE, BEING UNCONSTITUTIONALLY USED TO OBTAIN CONVICTION.

Since this case received a judge only trial, the finder of fact in this case was a trained jurist. Therefore, considerations of constitutional due process and a fair trial were not honored by the judge in this case, and prejudiced Petitioner at his trial. United States Constitution, Amendments 5 and 14; Louisiana Constitution, Article 1, §§ 2 and 16.

While the credibility of a witness is a matter for the finder of fact, once impeached, that witness's testimony becomes suspect under the law and must be corroborated in order to be convincing evidence of guilt or innocence. This is especially true in a swearing contest, where the credibility of the witnesses on both sides is paramount to the outcome of the case.

This case was first reported on April 06, 2015 to the police who were told that Petitioner masturbated and ejaculated on the alleged victim's buttocks. (Appendix H). Between April 06, 2015 and April 15, 2015, the alleged victim was taken to a clinic for physical examination by nurse Ann Troy, and had video taken at the CAC by Jo Beth Rickels. (Appendix H, p. 161). Nurse Ann Troy admitted at trial that the alleged victim told her that;

> Q.   And actually when she spoke to you, she stated that there was anal touching but there was not penetration, correct?
> A.   It is correct that she did not give me the word in. She told me it was between her buttocks and it was wet.

(Appendix G).

As to CAC video, the alleged victim stated that she told the truth in the video.

> Q.   Was it accurate from what you told Jo Beth Rickels?
> A.   Yes.

(Appendix H, pp. 163-164).

The alleged victim then stated that as to the CAC video, "I told them everything." (Appendix H, p. 164).

The alleged victim testified that Petitioner held her mostly with one hand, but would sometimes use both if he moved her where he wanted her. She then stated, "Oh, I knew it was his penis because I could feel him moving with his hand." (Appendix H, p. 186). She testified that in her taped video interview she never mentioned being anally penetrated, (Appendix H, p. 187), and previously testified at trial that:

> Q.   What do you mean by that?
> A.   He masturbated.
> Q.   What was the icky?
> A.   Cum.
> Q.   I'm sorry. I couldn't hear you.
> A.   Cum.
> Q.   Would he ejaculate on you?
> A.   Yes.
> Q.   And where would he ejaculate?
> A.   On my butt.
> Q.   On your butt, you said?
> A.   Yes.

(Appendix H, p. 167).

\* \* \* \* \* \* \* \* \* \* \* \* \*

> Q.   What would he do?
> A.   He would do the same thing. Touch me with his hand.
>       Breast, and my butt. Touch me with his penis.

(Appendix H, p. 169).

This shows that the case was originally reported as Petitioner masturbating on the alleged victims buttocks. However, some 3 years later, the allegations were changed to include there was penetration of the alleged victim's anus. The State originally filed a Bill of Information charging aggravated crime against nature. (Appendix D). After the subsequent addition of penetration, the State filed a superseding Indictment charging aggravated rape. (Appendix C).

Petitioner contends that the alleged victim was coached into adding the penetration allegations, and that the change in alleged conduct is impeached by the fact that Ms. Earniesha Lott, who the alleged victim went to for counseling, "helped" the

alleged victim to write about the incidents and would "jot down" notes for her. (Appendix H, p. 174).

At trial, Ms. Lott testified that the new allegation of penetration was reported to her, and said the alleged victim's words were "put his thing in her butt," and explained that "thing" was his penis. (Appendix E, p. 242). Ms. Lott also testified that the sessions were not recorded:

> Q.    So there's no, nothing we can review to see if there was any suggestive      terminology used, correct?
> A.    When you say recorded, audio?
> Q.    Audio.
> A.    No. I don't have any audio.
> Q.    They were just personal notes?
> A.    Yes.
> Q.    And it was just you and her dialoging together?
> A.    Yes.
> Q.    Using a certain methodology process, correct?
> A.    Yes.

(Appendix E, p. 245).

Ms. Lott was working at the Hope House, but is now in private practice in St. Tammany Parish. (Appendix E, p. 237).

Prosecutors in St. Tammany Parish are known to do a "little brainwashing" to win a case. Lt. Hermann of the St. Tammany Parish Sheriff's Office told the story of one St. Tammany Parish prosecutor, Mr. Hale, doing just that. *Burge v. St. Tammany Parish*, 187 F.3d 452, 461 (5th Cir. 1999): "According to Lt. Hermann, when he asked Hale how he had gotten Glenda Frierson to lie on the witness stand, Hale told him, ' over a period of time there is a little brainwashing, you tell them the story of what happened, and what you need to win a case in court and they begin to believe it."

This would be consistent with the changed story shown in this case. Trial counsel should have objected and pointed to the irreconcilable contradictions and impeachment of the alleged victim's credibility, which should have included the argument that her testimony, standing alone, cannot sustain a conviction. Impeached testimony, as a

general rule, cannot stand alone to convict. *State v. Chism*, 591 So.2d 383, 386 (La.App. 2 Cir. 1991), citing *State v. Laprime*, 437 So.2d 1124 (La. 1983); *State v. Lott*, 535 So.2d 963 (La.App. 2 Cir. 1988).

The U.S. Fifth Circuit Court of Appeals recognizes the distinction between strategic judgment calls and plain omissions; *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992), and has further stated that the court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

Getting someone to believe a story is not the same thing as bringing supporting evidence to prove the truth of the story. Simply put, it does not boil down to what you can get the judge or jury to believe, unless that belief is based upon proof beyond a reasonable doubt.

The record shows that the trial testimony of the State's eyewitnesses is impeached testimony, therefore, it is clearly insufficient, standing alone, to sustain this conviction. The record also shows that Petitioner's trial counsel failed to raise the issue that impeached testimony, standing alone, is insufficient to uphold a conviction.

In *State v. Kennedy*, 803 So.2d 916 (La. 2001), in Justice Traylor's dissenting opinion, it is stated that the Louisiana Supreme Court has found that, "The victim's testimony, standing alone, can prove that the act occurred, . . ." but is qualified in FN9, "However, we have also ruled post-trial that impeached testimony of a witness, standing alone, cannot prove the offense."

In the instant case, the judge's decision to convict was based "primarily" on the issue of credibility, and the judge used impeached testimony of the alleged victim, standing alone, in order to convict without objection from trial counsel.

Petitioner was deprived of his right to the effective assistance of counsel guaranteed him by both the United States Constitution and the Louisiana Constitution.

Therefore, Petitioner is entitled to Post Conviction Relief.

5.    TRIAL COUNSEL WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR
      FAILING TO CONSULT PETITIONER ON HIS RIGHT TO A JURY TRIAL
      AND FORCED PETITIONER TO GO TO TRIAL WITH A JUDGE INSTEAD
      OF A JURY.

Petitioner contends that his trial counsel took away his choice to assert his right to

a jury trial, and told him that he had to go to a judge trial or else he would pick up his

stuff and go back home to Mississippi, and leave the Petitioner on his own. Therefore,

Petitioner was coerced into accepting a judge trial, and did not give a knowing and

intelligent waiver of his right to a jury trial. This violated Petitioner's rights under the

United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution,

Article 1, §§ 2, 13, and 17.

Petitioner's trial counsel simply told Petitioner what to do and when to do it, and

if Petitioner did not go along with this then his counsel would leave him to the wolves.

Petitioner did not make any decisions in his case, and was told by trial counsel that he

was incompetent to do so because of the language barrier, his defective hearing, and

Petitioner's ignorance of the law and court procedure (which trial counsel never

attempted to explained to him). Petitioner's trial counsel never explained any of his

rights to him, and only told him "This is what you must do, or I can not help you."

Petitioner was not given the option to decide anything. This is especially true concerning

his right to a jury trial.

It was not until trial counsel spoke to the judge at trial that Petitioner found out

that this trial was trial counsel's last case, as he was changing professions. This goes to

show why trial counsel would want to have a nice and quick judge trial, and refused to

take writs to the appellate court when that action became appropriate and nesessary.

The instant Petitioner does not read, write, or speak the English language. There

was a Spanish interpreter at trial, but the interpreter's translations were often incorrect or

not understandable, especially to a person with hearing problems. Even trial counsel complained about the interpreter, but did not bring the problem to the attention of the court, or otherwise attempt to get a competent interpreter.

Further, since trial counsel felt that Petitioner was incompetent to assist him in the defense, then trial counsel also rendered ineffective assistance of counsel for failing to inform the court that Petitioner was incompetent to aid in his own defense.

The Louisiana Supreme Court has made clear that "an accused's ability to assist in his defense" is a primary concern in a competency determination. *State v. Bennett*, 345 So. 2d 1129, 1138 (La. 1977). Such factors as whether the defendant is able "to recall and relate facts pertaining to his actions" and "whether he has the ability to make simple decisions in response to well-explained strategy" were set out by the Court as particularly important. *Id.*

The United States Supreme Court has also stated that "an inability to assist counsel can, in and of itself, constitute probative evidence of incompetence." *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 2580, 120 L. Ed. 2d 353 (1992).

> The Sixth Amendment guarantees the accused in a criminal proceeding the right to have "the Assistance of Counsel for his defence." U.S. Const. amend. VI. It "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." 422 U.S. at 819-20, 95 S.Ct. 2525 (footnote omitted). Implicit in this right is the accused's authority "to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983).

*State v. Horn*, 2016-0559, 251 So.3d 1069, 1073 (La. 2018); see also *Florida v. Nixon*, 543 U.S. 175, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004).

Petitioner's trial counsel was ineffective assistance of counsel for failing to give him a choice of whether to assert his right to a jury trial. Instead, Petitioner was coerced

into a judge trial, or else. Therefore, Petitioner did not give a knowing and intelligent waiver of his right to a jury trial. Further, trial counsel's failure to "consult" with Petitioner because of his "language barrier, hearing problem, and complete ignorance of the law and court procedure" so that he was incompetent to assist counsel in his defense, rather than counsel making all decisions about the defense, constitutes ineffective assistance of counsel, as well as informing the court.

6.   PETITIONER'S TRIAL COUNSEL WAS MADE AWARE THAT PETITIONER HAD HEARING PROBLEMS AND USED A HEARING AID, AND COUNSEL FAILED TO MAKE ACCOMMODATIONS AT TRIAL.

Along with the preceding argument, where counsel was aware of Petitioner's hearing problem and use of a hearing aid, but counsel only considered these problems to be a form of incompetence on Petitioner's part, failure to ask the court for accommodations is ineffective assistance of counsel. Had counsel asked for such accommodations to his hearing impaired client, the court would have done so in accordance with the Americans with Disabilities Act.

Discrimination in this area goes along with Disability Discrimination due to Petitioner's inability to speak, read, or understand the English language, in violation of federal law, (specifically the Rehabilitation Act of 1973 and the Americans with Disabilities Act)

Petitioner's trial counsel clearly rendered ineffective assistance of counsel regarding Petitioner's disabilities.

7.   TRIAL COUNSEL FAILED TO ASK FOR A REPLACEMENT TRANSLATOR, EVEN THOUGH COUNSEL SPOKE SPANISH AND COULD NOT UNDERSTAND THE TRANSLATOR AT TRIAL.

As previously stated, the instant Petitioner does not read, write, or speak the English language. There was a Spanish interpreter at trial, but the interpreter's

translations were often incorrect or not understandable, especially to a person with hearing problems. Even trial counsel complained about the interpreter, but did not bring the problem to the attention of the court, or otherwise attempt to get a competent interpreter.

Petitioner contends that this is itself an instance of ineffective assistance of counsel. "While this Court must look to the totality of the trial to assess counsel's performance, 'Sometimes a single error is so substantial that it alone causes the attorney's performance to fall below the Sixth Amendment standard.'" *Nero v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979)


## CONCLUSION

Wherefore, Petitioner avers that his trial counsel's actions and inactions deprived Petitioner of his rights to due process, to present a defense, and to effective assistance of counsel, as guaranteed by the United States Constitution, Amendments 5, 6 and 14, and the Louisiana Constitution, Article 1, §§ 2, 13, and 16.

Petitioner's conviction should be reversed and the charges dismissed with prejudice, or, at least reversed and remanded for a new trial.

Alternatively, Petitioner should be granted an evidentiary hearing, with discovery and appointment of counsel, to aid Petitioner to fairly, and properly present his claims.


Respectfully submitted, *pro se*, this 5 th day of April, 2021.


                                    Victor Galan
                                    Victor Galan #732647
                                    M.P. - Spruce 1
                                    LA State Prison
                                    Angola, LA 70712

AFFIDAVIT / CERTIFICATE OF SERVICE

I, Victor Galan, the aforementioned Petitioner, do hereby attest and affirm that the information contained herein is true to the best of my knowledge and belief. Further, that all allegations in the foregoing are those of Victor Galan.

Additionally, I hereby certify that a copy of the foregoing has been served, via United States Mail, postage prepaid, and properly addressed to the following:

Warren Montgomery, District Attorney
22nd Judicial District
701 N. Columbia St.
Covington, LA 70433

Done and signed this 5th day of April, 2021, at Angola Louisiana.

Victor Galan #732647
M.P. - Spruce 1
LA State Prison
Angola, LA 70712

IN THE
22nd JUDICIAL DISTRICT COURT
PARISH OF ST. TAMMANY
STATE OF LOUISIANA

VICTOR GALAN

     *Petitioner*

versus

DARREL VANNOY, Warden
Louisiana State Prison

     *Respondent*

Docket No: <u>563468</u> <u>Div. "B"</u>

Date Filed:_____

_____
Clerk of Court

APPENDICES

| Appendix A | 1/22/20 | La Supreme Court Denied Writs on Direct Appeal |
| Appendix B | 4/5/15 | Commitment Order and Court Minutes |
| Appendix C | 5/2/17 | Superseding Indictment |
| Appendix D | 6/25/15 | Original Bill of Information |
| Appendix E | | Record pages 236 - 246 |
| Appendix F | | Trial Transcript pages 265 - 327 |
| Appendix G | | Trial Transcript pages 345 - 346 |
| Appendix H | | Record pages 146 - 196 |

# The Supreme Court of the State of Louisiana

**STATE OF LOUISIANA**

No.2019-KO-01027

**VS.**

**VICTOR GALAN**

— — — — — —

IN RE: Victor Galan - Applicant Defendant; Applying For Writ Of Certiorari, Parish of St. Tammany, 22nd Judicial District Court Number(s) 563468, Court of Appeal, First Circuit, Number(s) 2018 KA 1481;

— — — — — —

**January 22, 2020**

Writ application denied.

SJC

BJJ

JLW

JDH

JTG

Crain, J., recused.

Supreme Court of Louisiana
January 22, 2020

Second Deputy    Clerk of Court
For the Court

APPENDIX
**A**

## State of Louisiana Uniform Commitment Order

Judicial District: 22ND JDC     Court Section: Division B

Parish of Commitment: ST. TAMMANY     Docket #: 563468

### A. DEFENDANT / CASE IDENTIFIERS

| Name of Defendant: VICTOR GALAN | | DOB: 07/03/1979 |
|---|---|---|
| SID NUMBER: 2896744 | RACE: H   SEX: M | |

### B. SENTENCE

Select: ☒ Original    ☐ Amended    ☐ Habitual

| | Charges: (Revised Statute & Offense)(2) | Number of Counts | Verdict Plea/NP | Modifiers(6) | Total Sentence Length(5) Yr/Month/Day | Amount of Time in DPS&C Custody (7) Yr/Month/Day | Amount of Time to be served without benefit, if applicable. (8) |
|---|---|---|---|---|---|---|---|
| 1 | 14:42 AGG RAPE | 1 | FOUND GUILTY | | LIFE IMPRISONED WITHOUT BENEFIT PROBATION, PAROLE OR SUSPENSION | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |

### C. SENTENCE/OFFENSE DATES (MM/DD/YYYY)
(For each of the above numerated convictions)

| | Offense Date (1) | Disposition Date | Sentence Date | Date sentenced as an Habitual Offender as Per R.S 15:529.1 | Date Original Sentence Vacated | Revocation Date |
|---|---|---|---|---|---|---|
| 1 | 11-1-14 | 4-5-18 | 4-5-18 | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |

### D. SENTENCE CONDITIONS:
( Check all that apply )

| __YES __NO | This sentence shall be concurrent with any or every sentence the offender is now serving (1) | |
|---|---|---|
| If no to D 1, then | Docket Number(s) / Charges | Parish(es), Judicial District(s) of Docket Numbers(s) |
| Concurrent with | | |
| Consecutive to | | |
| X | Under the provision of C.Cr.P. Art 880, defendant is given credit for time served | |
| | Under the provision of C.Cr.P. Art 890.1 this is a waiver of mandatory minimum sentence (excludes R.S. 12:2(B) & R.S. 15:541 et seq offenses) | |
| | This defendant is subject to a multiple bill/habitual offender proceeding, (as per R.S. 15:529.1) | |
| | This defendant is sentenced in accordance with R.S. 13:5401 to participate in Reentry Court. | |
| | The defendant is ordered to report to start serving his sentence on ___ (mm/dd/yyyy) | |
| | The Defendant is ordered to report to start serving a probation sentence upon the conclusion of his hard labor sentence (split sentence) | |
| | Under the provisions of C.Cr.P. Art 895 and R.S. 15:542, et Seq., the defendant shall comply with the Sex Offender Registration statutes. | |

### E. REFERRALS TO DPS&C:
(Check all that apply)

| Recommended for Substance Use Disorder Treatment Screening (1) |
|---|
| Recommended for Mental Health Evaluation (2) |
| Recommended for Intensive Incarceration (3) |
| Recommended for Immediate Screening for Eligibility for Transitional Work Program Assignment (4) |

Comments:
**DEFENDANT IS TO REGISTER AS A SEX OFFENDER**

### F. INVOLVED PARTIES

| Minute Clerk: SHERRI L. VIVIANO | Court Reporter: LAURA CHABRECK |
|---|---|
| Prosecutor: JOHN ALFORD | Defense Attorney: RAMIRO OROZCO |
| Address: 701 N. COLUMBIA STREET COVINGTON, LA. 70433 | Address: P O BOX 666 GULFPORT, MS 39502 |

The above sentence, handed down in Open Court, is the order of this Court and this shall be sufficient warrant for its execution.

Thus Done and Signed this 5TH day of APRIL , 20 158 .

Judge's Signature

Judge's Printed Name and Address:
AUGUST J. HAND
701 N. COLUMBIA STREET
COVINGTON, LA. 70433

A TRUE COPY

DY. CLERK 22nd JUD. DISTICOURT
ST. TAMMANY PARISH, LA
Sherri L. Viviano, Deputy Clerk

**APPENDIX B**

## CREDIT FOR DOC COMMITMENT

LOUISIANA LAW PROVIDES THAT AN INMATE SHALL RECEIVE CREDIT FOR TIME SPENT IN PHYSICAL CUSTODY FOR A SPECIFIC CHARGE FOR WHICH SENTENCE IS IMPOSED ?????WITH THE ORIGINAL DATE OF ARREST FOR THIS OFFENSE. OTHER ENTENTRIES SHOULD INCLUDE BOND DATES; DATES OF RE-ARREST AND BOND PERTAINING TO THIS CASE WHETHER IN YOUR JAIL OR ANOTHER FACILITY'S CUSTODY.

BOOKING INFORMATION FOR UNRELATED CHARGES IS NOT REQUIRED, HOWEVER IF LISTED MUST BE LABELED WITH REASON FOR ARREST. IF THIS CHARGE REMAINS UNDER BOND JAIL TIME ON UNRELATED CHARGES DOES NOT APPLY. IF THE BOND ON INSTANT OFFENSE IS RECALLED, INDICATE THE DATE; CHARGE REINSTATE, OR DATE OF HOLD FOR THE ?????OFFENSE. IF ARRESTED IN ANOTHER JURISDICTION, PLEASE INDICATE THE DATE DETAINER/HOLD WAS PLACED FOR ???? CHARGE AND WHERE SUBJECT WAS DETAINED.

DOC TIME AND PARISH TIME SHALL NOT BE SERVED CONCURRENT WITHOUT AN ORDER OF THE COURT. PLEASE INDICATE THE DATES CREDITED TOWARD PARISH SENTENCE AND THE DATE OF COMPLETION OTHERWISE. PLEASE SHOW DETAINER WITH THE HOUSING FACILITY AND NOTE ON HIS DOCUMENT.

| | | | | | |
|---|---|---|---|---|---|
| PARISH: ST TAMMANY | DOCKET: STM 563488 | | | DATE OF OFFENSE: 11/1/2014 | |
| STATE POLICE RAP SID: 2898744 | | | AFIS BOOKING #: 0 | | |
| COURT RECORD INMATE NAME: GALAN   VICTOR | | R/S H/M | DOB: 7/3/1979 | | |
| TRUE NAME ALIASES: | | | | | |
| SENTENCE DATE: 4/5/2018 | RELEASED TO PROBATION: | | PROB REVOCATION DATE: | | |

### CUSTODY DOCUMENTATION

| ARREST DATE: (IN) | CHARGE: | Counts | RELEASE DATE | RELEASED TO: | REASON | DAYS #VALUE! | ROW |
|---|---|---|---|---|---|---|---|
| | | | STILL REMAINS | STILL REMAINS | STILL REMAINS | | 1 |
| 04/07/15 | INDECENT BEHAVIOR W/ JUV, AGG CRIME AGST NATURE | 2 | | | | 0 | 2 |
| | | | | | | 0 | 3 |
| | | | | | | 0 | 4 |
| | | | | | | 0 | 5 |
| | | | | | | 0 | 6 |
| | | | | | | 0 | 7 |
| | | | | | | 0 | 8 |
| | | | | | | 0 | 9 |
| | | | | | | 0 | 10 |
| | | | | | | 0 | 11 |
| | | | | | | 0 | 12 |

SUBJECT SENTENCED ON MORE THAN ONE DOCKET: _____

SUBJECT HAS SERVED PARISH TIME. COMPLETION DATE, DOC TIME BEGAN: _____

SUBJECT OWES PARISH TIME. PLACE DETAINER: _____

SUBJECT HAS OPEN PENDING CHARGES. PLEASE DETAIN. _____

| | | |
|---|---|---|
| | | (985) 276-1073 CONTACT PHONE # |
| BY NEWELL | | |
| PARISH OFFICIAL: | | |

********* DEFINITION KEY *********

| ARREST DATE | CHARGE | RELEASE/TRANSFER DATE | RELEASED TO | REASON |
|---|---|---|---|---|
| BOOKING DATE | BOOKING OFFENSE | LEFT PHYSICAL CUSTODY | STREET | BONDED |
| RE-BOOKING DATE | BENCH WARRANT | BONDED OUT | OTHER FACILITY | CUSTODY |
| CHARGE ADDED | BOND RECALLED/P&P HOLD | TRANSFER TO OTHER FACILITY | PROB/PAROLE | TRANSFER |
| HOLD/DETAINER PLACED | YOUR DETAINER TO OTHER FACILITY | ESCAPED | HUNT CORR | CRT ORDER |
| | DETAINER RECEIVED | DETAINER/HOLD LIFTED | | ESCAPE |

SCANNED

# SUPERSEDING INDICTMENT
## DOCKET NUMBER 563468DIVISION B

**FILED**

MAY 0 2 2017

MELISSA R. HENRY - CLERK

Deputy_____

## STATE OF LOUISIANA
## Parish of St. Tammany

_____ Twenty-Second Judicial District Court _____ Term, 2017.

The Grand Jurors of the State of Louisiana, duly impaneled and sworn in and for the body of the Parish of St. Tammany, in the name and by the authority of the said State, upon their oath find and present that:

**VICTOR GALAN**  DOB: 07/03/79
SSN: XXXXX   SID#: 2896744   Arrest Date: 04/17/2015
83069 HIGHWAY 25, FOLSOM, LA 70437

On the date below, in the Parish of St. Tammany and within the jurisdiction of the Twenty-Second Judicial District Court of Louisiana, for the Parish of St. Tammany committed the offense(s) of:

COUNT 1
R.S. 14:42 A.(4) AGGRAVATED RAPE
**VICTOR GALAN, on or between November 1, 2014 and April 11, 2015**, did commit aggravated rape upon E. R. DOB: 9-26-2003, a person under the age of thirteen years.

Contrary to the form of the Statutes of the State of Louisiana, in such cases made and provided, and against the peace and dignity of the same.

District Attorney,
22nd Judicial District of Louisiana

---

## STATE OF LOUISIANA
### Versus

### VICTOR GALAN

### SUPERSEDING INDICTMENT FOR

<u>14:42 A.(4)Aggravated Rape</u>

A TRUE BILL

Foreperson of the Grand Jury

**Div. B**

SCANNED

85

APPENDIX
**C**

I hereby certify that the above and foregoing fingerprints on this bill are the fingerprints of the defendant, _____ and that they were placed thereon by said defendant this ___5th___ day of _April_ , _2018_ .

_____ S.T.P.S.O.

Thursday, April 5, 2018

COURT MET THIS DAY AND PURSUANT TO ADJOURNMENT, PRESENT

AND PRESIDING, HIS HONOR, AUGUST J. HAND, JUDGE DIVISION "B"; JOHN

ALFORD AND MARY SMITH, ASSISTANT DISTRICT ATTORNEYS;   RANDALL

C SMITH, SHERIFF AND MELISSA R HENRY, CLERK OF COURT (Robert Jones,

Bailiffs and Laura Chabreck, Court Reporter)

563468              STATE OF LOUISIANA

                    VS

                    VICTOR GALAN


The defendant being present in open Court attended by his Counsel, Ramiro

Orozco and Logan Luquette and this matter continued at this time with the Judge Trial.

Interpreters, Dolores Garcia and Andrea Freitas having been sworn as interpreters

to interpret for the defendant that speaks the Spanish language.

Evidence was offered, filed and introduced as a Proffer on behalf of the State with

the following items:

1    Audrey Hepburn Care Center Medical Reports from Anne Troy of Karla
     Galan with no Bates Stamp

2    Audrey Hepburn Care Center Medical Reports from Anne Troy of
     Fernanda Galan with no Bates Stamp

3    Audrey Hepburn Care Center Medical Reports from Anne Troy of Elisa
     Ramirez with no Bates Stamp

4    Audrey Hepburn Care Center Medical Reports from Anne Troy of Karla
     Galan, Fernanda Galan and Elisa Ramirez with Bates Stamp

Evidence was heard on behalf of the State with the following witness giving

testimony:

6    Nurse Ann Troy

Evidence was offered, filed and introduced on behalf of the State with the

following items:

    6      Curriculum Vitae of Anne Dolores Troy

    7      Audrey Hepburn Care Center Medical Reports from Anne Troy of Elisa

          Ramirez

Evidence was offered, filed and introduced on behalf of the Defense with the

following items:

    1      Drawing prepared by Fernanda Galan

Evidence was offered, filed and introduced as a Proffer on behalf of the State with

the following items:

    5      Three CDS of audio reports from Anne Troy of Elisa Ramirez, Karla

          Galan and Fernanda Galan

The State at this time rest their case at this time.

The Defense Counsel moved for Direct Verdict of Acquittal and which the Court

denied.

The Defense Counsel made their opening statements at this time.

Evidence was heard on behalf of the Defense with the following witness giving

testimony:

    1      Victor Galan

    2      Nancy Ramirez

The Defense rest their case at this time.

The State made closing statements and the case having been submitted to the

Court; whereupon, Court took a brief recess for deliberations at this time.

The defendant being present in open Court attended by his Counsel, Ramiro

Orozco and Logan Luquette and this matter continued at this time with the Judge Trial.

Court at this time having stated his reasons on the record and found the defendant

GUILTY AS CHARGED TO AGGRAVATED RAPE.

The Defense Counsel waived any delays of sentencing at this time.

Victim Impact Statements were made for the record.

The Defense Counsel moved for a Oral Motion for New Trial and submitted to the

Court; whereupon, Court denied said motion. The Defense Counsel will supplement the

record with a written motion within seven (7) days.

Court ordered following sentence be imposed:

VICTOR GALAN, being over 17 years of age and having BEEN FOUND GUILTY to unlawfully violated R.S. 14:42A(4) AGGRAVATED RAPE, Court sentences the defendant to serve a period of LIFE IMPRISONMENT to be served without benefit of probation, parole or suspension at hard labor with the Department of Public Safety and Corrections, State of Louisiana.

Further, Court ordered for the defendant to register as a sex offender and which the notification has been served to the defendant and which the defendant has signed Notice and filed in the record.

Court gave the defendant credit for time served concurrent with any and all other time he has served subsequent to his arrest on this charge.

Court at this time explained to the defendant the provisions and conditions stated in Article 895.1. Further, Court informed the defendant that |CHOICE, he, she| has a period of two (2) years in which to file any Application for Post-Conviction Relief.

The Defense Counsel made an Oral Motion for Appeal and Motion to Withdraw as Counsel and to Appoint Appellate Project to represent the defendant and which the Court granted said motions.  The Defense Counsel will supplement the record with written motions within seven (7) days.

SLV

JAIL

FILED
ST. TAMMANY PARISH
MALISE PRIETO
CLERK OF COURT

FELONY BILL OF INFORMATION

STATE OF LOUISIANA – PARISH OF ST TAMMANY

TWENTY-SECOND JUDICIAL DISTRICT

563468  JN 25 15

TO THE HONORABLE THE TWENTY-SECOND JUDICIAL DISTRICT COURT OF LOUISIANA, sitting in for the Parish of ST. TAMMANY, comes now into open Court the undersigned District Attorney of the Twenty-Second Judicial District of Louisiana, in the name and by the authority of said State, informs the said Honorable Court,

That the person(s) named and identified below, late of the Parish of ST. TAMMANY on or about the date below describe, in the Parish of ST. TAMMANY aforesaid and within the jurisdiction of the Twenty-Second Judicial District in and for the Parish of ST TAMMANY, State of Louisiana and contrary to the form of the Statutes of the State of Louisiana in such cases made and provided, and against the peace and dignity of the same did violate;

DEFENDANTS NAME AND DATE OF BIRTH

**VICTOR GALAN**

DOB: 07/03/79
DL:
Arrest Date: 04/11/2015

SSN: XXXXX          SID#: 2896744
83069 HIGHWAY 25, FOLSOM, LA 70437

COUNT 1
R.S. 14:89.1 A. (1) B. AGGRAVATED CRIME AGAINST NATURE
**VICTOR GALAN, on or between November 1, 2014 and April 11, 2015,** by engaging in any prohibited act enumerated in LSA R.S. 14:89.1 A (2) (b) with a person who is under thirteen years of age and who is known to the offender to be related to the offender, as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece, to wit: E. R., DOB 09-26-2003.

SEE SUPERSEDING BILL OF INDICTMENT FILED ON 5/2/2017

5/16/2017

WARREN MONTGOMERY
DISTRICT ATTORNEY
22ND JUDICIAL DISTRICT
STATE OF LOUISIANA

BY:

**Div. B**

**SCANNED**
JUN 26 2015

SCANNED
JUL 03 2017          40

APPENDIX
**D**

1    legal permit for residency, correct?

2    A.      (Interpreter) At this time, yes.

3            BY MR. OROZCO:

4                    That's all I have, Your Honor.

5            BY THE COURT:

6                    Mr. Alford.

7            BY MR. OROZCO:

8                    Your Honor, I do reserve the right

9               to recall her in my case in chief.

10           BY THE COURT:

11                   Yes, sir.  We'll keep her under

12              subpoena.

13           REDIRECT EXAMINATION BY MR. ALFORD:

14   Q.      Did your daughter Elisa ever apply for U visa?

15   A.      No.

16           BY THE WITNESS:

17                   (Interpreter) No.  Never.

18           EXAMINATION BY MR. ALFORD:

19   Q.      And did Elisa ever go to an attorney about a U

20   visa?

21   A.      (Interpreter) Never.  Never.

22           BY MR. ALFORD:

23                   No further questions, Judge.

24           BY THE COURT:

25                   She may step down.  She remains

26              under subpoena.

27           BY MS. SMITH:

28                   The State is going to call Earniesha

29              Lott.

30           BY THE CLERK:

31                   Raise your right hand.

32                   (EARNIESHA LOTT, after having been

**APPENDIX**
**E**

90
236

1          first duly sworn under oath, did testify

2          as follows:)

3          DIRECT EXAMINATION BY MS. SMITH:

4     Q.     Good afternoon.  Would you please state your

5     name for the record?

6     A.     Yes.  Earniesha Lott.

7     Q.     What do you do for a living?

8     A.     I'm a licensed professional counselor.

9     Q.     What kind of counseling do you do?

10    A.     I specialize in trauma and play therapy.

11    Q.     How long have you been a counselor?

12    A.     More than eight years.

13    Q.     Have you spent your entire counseling career

14    doing that type of counseling, trauma?

15    A.     Yes.

16    Q.     In April 2015, where were you working?

17    A.     The Children's Advocacy Center, Hope House.

18    Q.     What is Hope House?

19    A.     Hope House is a facility that completes

20    forensic interviews and offers counseling for

21    children who may have experienced some type of

22    trauma.

23    Q.     Do you still work at Hope House?

24    A.     No.

25    Q.     What do you do now?

26    A.     I have a private practice here in Covington.

27    Q.     Very good.  I want to direct your attention to

28    April 2015.  Sometime after that, did you have the

29    occasion to work with a girl named Elisa Ramirez?

30    A.     Yes, I did.

31    Q.     Do you recall roughly when you started working

32    with Elisa?

1  A.      Yes.   They, Elisa was brought in by her mother

2  on May 12th, 2015.

3  Q.      Do you know why Elisa began treating with you

4  at Hope House?

5  A.      Yes.   At that point, she had completed a

6  forensic interview at our center, and there had been

7  allegations of sexual abuse.

8  Q.      How old was Elisa when you began your sessions

9  with her?

10  A.      Elisa, I think it was 11.

11       BY MS. SMITH:

12                May I approach Your Honor.

13       BY THE COURT:

14                As long as you share.

15       BY MS. SMITH:

16                I just wanted -- she is not supposed

17            to have notes up here.  I wanted to grab

18            her notes.

19       BY THE COURT:

20                Sounds good.  If she needs to refer

21            back to them, do it the proper way.

22       EXAMINATION BY MS. SMITH:

23  Q.      How long did you work with Elisa?

24  A.      I have been working with Elisa from May of

25  2015 up until February of 2018.

26  Q.      Do you still work with her presently?

27  A.      No.  We ended our services in February.

28  Q.      In total, how many years did you spend with

29  her?

30  A.      Almost three years.

31  Q.      Initially was Elisa comfortable talking with

32  you about the abuse she endured?

1   A.      No, she was not.

2   Q.      Do you know how law enforcement became aware

3   of the abuse?

4   A.      The youngest sister alerted the mother that

5   something happened.  And the middle sister gave a

6   statement to the mother.  And to my knowledge, the

7   mother eventually spoke with Elisa and learned more

8   details about the occurrence.

9   Q.      Did Elisa ever express to you how she felt

10  about her sister disclosing the abuse to her mother?

11  A.      Yes, she did.

12  Q.      And what did she report those feelings to be?

13  A.      Elisa reported feeling betrayed and angry

14  because she did not want the information to come out.

15  She was fearful that her parents would begin to

16  fight.  And she didn't know what would happen.

17  Q.      Generally speaking, and to the extent that you

18  know, can you describe the degree to which Elisa is

19  comfortable talking about her emotions in front of

20  others?

21  A.      Elisa has, on multiple occasions, talked about

22  how difficult it is to express emotions.  It took a

23  very long time for her to gain enough rapport and to

24  begin to open up, even with me.  So it's not an easy

25  anything for her.

26  Q.      Do you recall how long it was before Elisa was

27  ready to talk about the abuse that she suffered?

28  A.      Yes.  So we began in May.  And I don't think

29  she was ready, it wasn't until November of 2015.  It

30  took a few months before she was comfortable.

31          BY MS. SMITH:

32                  Your Honor, I'm going to show her

1          what has been marked, previously been

2          admitted as State's Exhibit Number 5.   May

3          I approach?

4      BY THE COURT:

5              You may.

6      EXAMINATION BY MS. SMITH:

7   Q.     Do you recognize that?

8   A.     Yes, I do.

9   Q.     What is it?

10  A.     This is the trauma narrative that Elisa worked

11  on during her counseling with me.

12  Q.     What is a trauma narrative?

13  A.     Trauma narrative is a component of trauma

14  focused cognitive behavioral therapy.   TFCBT is what

15  it is referred to.   It's a method of treatment

16  designed to help children with post traumatic type

17  behaviors and help to process what they experience

18  and cope with their behaviors and emotions.

19  Q.     Can you describe what the process is like for

20  composing one of these?

21  A.     Sure.

22      BY MR. OROZCO:

23              Your Honor, I object.   She's not

24          been designated as an expert witness.

25          We're now getting in to expert testimony

26          as to processes.

27      BY MS. SMITH:

28              Your Honor, she went through this

29          process with Elisa.

30      BY THE COURT:

31              She can describe the process, but

32          she can't give opinion.

BY MS. SMITH:

        I wasn't asking her to.  I just
wanted to know what the process was.

BY THE COURT:

        I'll overrule for that question.

BY THE WITNESS:

        So this process that I completed
with Elisa begins with discussing coping
skills before we get in to the nature of
the work.  And then at that point, the
child, which was Elisa, she began to
complete chapters of the trauma narrative.

        She completed the first chapter.  It
was just about her.  And we progress to
the abuse and the occurrence, where she
writes out in details what happened.  And
sometimes, the children, or Elisa, was not
able to write.  She'd asked if I would
write her words for her.

EXAMINATION BY MS. SMITH:

Q.    Who composed Elisa's trauma narrative?

A.    She and I wrote it.  But all of it was her
worlds.

Q.    So you physically would sometimes help her
write it with a pen?

A.    Yes.

Q.    But the words were hers?

A.    Yes.

Q.    Did you influence Elisa at all in terms of the
substance or content of the trauma narrative?

A.    No.

Q.    Do you recall when Elisa completed the trauma

1   narrative?

2   A.      She completed the trauma narrative, I think it

3   was towards the end of 2016.  It took a while.

4   Q.      Did Elisa make any disclosures to you that she

5   never made before to anyone else?

6   A.      Yes.

7   Q.      Do you recall what disclosures those were?

8   A.      Yes.  January of 2016, while working on her

9   narrative, Elisa disclosed that her father, her words

10  were, "put his thing in her butt."  She also

11  explained that that thing was his penis.  And she

12  also disclosed that he had tried to penetrate her

13  vaginally.  And she stated that she pushed him off

14  and cried and screamed that she could not do it.

15  That she would get pregnant.

16  Q.      How do you know that this was the first time

17  she made this disclosure?

18  A.      She said it was the first time she told anyone

19  that.

20  Q.      What was Elisa's demeanor like when she made

21  this disclosure to you?

22  A.      It was very difficult for her.  She put her

23  head down and put her hands on her face.  I think she

24  even cried.  It was very, very hard for her to talk

25  about that.

26  Q.      From your observations, to what degree, if

27  any, is it difficult for Elisa to verbalize what

28  happened in these incidences?

29  A.      It has been very difficult.  From observations

30  and from what she stated, it has become a little bit

31  better over time.  But still remains a difficult

32  topic for her.

1  Q.     Did you ask Elisa why she had not disclosed

2  this information to anyone else?

3  A.     I don't think I asked her directly why.  But

4  somehow, it came up.  And she said that it was too

5  embarrassing to tell to anyone.  And she was afraid.

6  Very embarrassing.

7  Q.     Did you report this new information to law

8  enforcement?

9  A.     Yes, I did.

10  Q.     When did you report it?

11  A.     That same day.  I called the detective on the

12  case, Jeremy Hutchinson, I think it was.

13  Q.     When Elisa talks to you about her father not

14  being a part of her life, what kind of feelings does

15  she express?

16  A.     She predominantly expresses anger and

17  frustration, and being furious about it all.

18  However, there has been times when she was emotional,

19  and she cried as she spoke of not being able to have

20  her dad at her Quinceañera, and not being able to

21  have her father walk her down the aisle once she gets

22  married.  And she was emotional.  And had some

23  sadness there.

24  Q.     In your professional experience, to what

25  extent, if any, is that typical among children that

26  have suffered this kind of abuse?

27  A.     Of the hundreds of children I have served,

28  it's common to have mixed emotions about a parent or

29  someone they love that hurt them.

30  Q.     In the three years you spent treating Elisa,

31  has Elisa ever taken back any of the disclosures that

32  she made to you?

1   A.      Never.

2   Q.      Has she ever told you that she's lying?

3   A.      No.

4   Q.      Has she ever given you any reason to think

5   that she's lying?

6   A.      No.

7           BY MS. SMITH:

8                   Your Honor, the State tenders,

9           subject to redirect.

10          CROSS EXAMINATION BY MR. OROZCO:

11  Q.      Good afternoon, Ms. Lott.

12  A.      Good afternoon.

13  Q.      Ms. Lott, you are the only person that Elisa

14  felt comfortable disclosing these new memories to,

15  correct?

16  A.      I don't know if that's, I'm the only person

17  she feels comfortable with.  But that's what

18  happened.

19  Q.      You were the first, right?

20  A.      I was the first, to my knowledge.

21  Q.      This was after how many years of treatment?

22  A.      It wasn't even a full year yet.

23  Q.      And are you familiar with false memory

24  syndrome?

25  A.      I've heard of it.

26  Q.      You work in the field with hundreds of

27  children, correct?

28  A.      I do.

29  Q.      Can you give the Court a summary of what false

30  memory syndrome is?

31          BY MS. SMITH:

32                  Your Honor, I'm going to object.

1          She's not been proffered as an expert in

2     this field.

3   BY THE COURT:

4          I'm going to overrule.  I allowed

5     latitude for the State.  I'll do the same

6     for defense.

7   BY MR. OROZCO:

8          Yes, Your Honor.

9   EXAMINATION BY MR. OROZCO:

10  Q.    Is it possible these memories were fabricated

11  due to possible suggestions she may have gotten

12  during the therapy sessions?

13  A.    I didn't provide her with any suggestions.

14  But anything is possible.

15  Q.    Were your sessions recorded?

16  A.    No.

17  Q.    So there's no, nothing we can review to see if

18  there was any suggestive terminology used, correct?

19  A.    When you say recorded, audio?

20  Q.    Audio.

21  A.    No.  I don't have any audio.

22  Q.    They were just personal notes?

23  A.    Yes.

24  Q.    And it was just you and her dialoging

25  together?

26  A.    Yes.

27  Q.    Using a certain methodology process, correct?

28  A.    Yes.

29  Q.    And her, your initial meetings with her, she

30  was adamant that there was no penetration, correct?

31  A.    We didn't discuss that.

32  Q.    You never discussed whether there was any

1  penetration?

2  A.      No.

3  Q.      Sexual penetration?

4  A.      Initially, no.

5  Q.      During the initial months of treatment, there

6  was no discussion?

7  A.      Months, no.  My role is not to investigate,

8  but to help her process.

9  Q.      Because I'm looking over some of your progress

10  notes.  So you have no, other than what Elisa

11  disclosed to you, you have no personal knowledge of

12  any sexual assault; is that correct?

13  A.      No.

14          BY MR. OROZCO:

15                  That's all I have, Your Honor.

16          BY THE COURT:

17                  Redirect.

18          BY MS. SMITH:

19                  No, Your Honor.

20          BY THE COURT:

21                  Thank you, Ms. Lott.  You may step

22          down.  Do we need to keep Ms. Lott under

23          subpoena?

24          BY MR. OROZCO:

25                  No, Your Honor.

26          BY THE COURT:

27                  She's free to go.

28          BY MR. ALFORD:

29                  The State's next witness is not

30          available until tomorrow afternoon.  As we

31          previously discussed, the State has no

32          objection to calling some defense's out of

## P R O C E E D I N G S

1   (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD

2

3   IN OPEN COURT:)

4   THE COURT:

5           Good afternoon.  Have a seat, please.

6   I guess we should swear in our

7   interpreters.

8   MADAM CLERK:

9           Raise your right hands.

10  (AFTER HAVING BEEN FIRST DULY SWORN, THE

11  INTERPRETERS DID INTERPRET THE COURT PROCEEDINGS

12  FROM ENGLISH TO SPANISH FOR THE DEFENDANT)

13  THE COURT:

14          Thank you.

15  MS. GARCIA:

16          Good afternoon, Your Honor, Dolores

17  Garcia, Spanish interpreter.

18  MS. FRITAS:

19          Good afternoon, Your Honor, Andrea

20  Fritas, Spanish interpreter.

21  THE COURT:

22          Thank you.  Where are we, guys?

23  MR. OROZCO:

24          Your Honor, I have a motion to present

25  to the Court.

26  THE COURT:

27          Okay.

28  MR. OROZCO:

29          Your Honor, at this time we would ask

30  the Court to entertain a motion for a

31  mistrial, Your Honor.  The basis for the

32  motion, Your Honor, is prosecutory

APPENDIX
**F**

1   misconduct to which, Your Honor, we would
2   proffer that the District Attorney's
3   office willfully and purposely questioned
4   a witness that had already testified and
5   been released by the State in the same
6   room during the entire case in the trial
7   yesterday.
8       The DA's office willfully and
9   purposely met with the witnesses after the
10  adjournment of the case and after they had
11  released the witnesses in their case in
12  chief.  That the DA's office had Ms. Lott
13  with the witnesses after they had
14  testified but were still under subpoena
15  for the defendant.
16      That the DA's office systematically
17  provided untimely discovery on several
18  occasions, on to include the eve of the
19  trial on two occasions and during this
20  trial of yesterday after adjournment, Your
21  Honor.
22      That the DA's office has on several
23  occasions omitted key pages in discovery
24  to include the picture that was drawn by
25  the witness Fernando Galan.  They have
26  still to this -- at this moment have been
27  unable to provide me with a copy or the
28  Bates number of what they have provided
29  me.
30      Let's see.  That the DA's office is
31  that -- actions have tainted the witnesses
32  and provided opportunity to poison

1 testimony by allowing it -- confer and
2 discuss their testimony yesterday prior to
3 my being allowed to called them in my case
4 in chief, that the defendant is prejudice
5 in that he can no longer attack the
6 inconsistencies in their testimony based
7 on the discovery that we received at 4:40
8 by e-mail yesterday, Your Honor.
9 And in that discovery, Your Honor, the
10 one that was provided to me by e-mail had
11 a Bates number and that the hard copy that
12 was provided me today do not have those
13 Bates numbers. And, Your Honor, it's our
14 contention that those Bates numbers are --
15 they are numerically consistent and they
16 would have been marked prior to today,
17 Your Honor, if those documents were
18 provided to the Folsom Police Department,
19 not the sheriff's office, back in 2015,
20 Your Honor.
21 And the government's position in
22 chambers that they have provided me with a
23 picture of the bed that was drawn by the
24 witness was false, Your Honor, because
25 they have still not been able to show me
26 where it -- where they have in their
27 Bates' numbers or that they even have
28 Bates numbers, so our position being we
29 never had it.
30 Also, Your Honor, again, that we have
31 been -- that my client has been
32 prejudiced, Your Honor. We can no longer

1  attack the inconsistencies in the

2  testimony.  Your Honor, had we had that

3  picture we could have directly attacked

4  the inconsistencies in the case in chief

5  rather than allowing the witnesses to

6  possibly discuss it, go home, re-evaluate

7  their testimony and now us have to re-

8  attack it, Your Honor.

9      Your Honor, we believe that this late

10  discovery would have been helpful during

11  the cross-examination as it would have

12  shown the inconsistencies in the

13  testimony.  Your Honor, we believe that

14  the prejudice cannot be rehabilitated and

15  if the DA's actions have poisoned all

16  witnesses beyond any possible relief other

17  than a mistrial and that it should be

18  dismissed with prejudice, Your Honor.

19      The DA's office stated that they

20  provided a copy of the picture yet, again,

21  they cannot produce it.  The DA, again,

22  provided me the non-Bate stamped hard copy

23  today, yet the e-mail from yesterday at

24  4:40 showing that there were -- they were

25  Bate stamped and that recall of any

26  witness at this point, Your Honor, would

27  prejudice my client as it would give the

28  State an additional swing at the bat of

29  witnesses that are no longer available to

30  them because they have released them in

31  their case in chief.

32      Your Honor, the bell has been rung.

1    We are in the middle of trial and at this
2    point, Your Honor, we believe, and it's my
3    client's position, that we do not have a
4    fair trial.

5    THE COURT:
6        Thanks.  Mr. Alford?

7    MR. ALFORD:
8        First of all, articles addressing the,
9    I guess, talking to witnesses by the
10   state.  Article 615, Code of Ethics, makes
11   it abundantly clear, black letter law that
12   can be read by defense counsel, that it
13   does not apply to counsel on the case.  I
14   can talk to my witness, victims at any
15   time.

16       If they're in the middle of testimony,
17   obviously, I can't, but outside of that,
18   and that is when they are in the middle of
19   the testimony, not whether or not they
20   will be recalled at a later time, but
21   whether if they are in the middle of
22   testimony then and only then can I not
23   talk with them.

24       Then going into whether or not the
25   witnesses were discussing their own
26   testimony.  There is no evidence that they
27   were discussing their own testimony.  But
28   it is important to note for the record at
29   no point, and up and to this very second
30   as I speak, the defense has never
31   requested a motion for sequestration.

32       So because of that, the witnesses

1   could have sat in court yesterday and

2   heard the very testimony provided by each

3   other because there was no sequestration

4   order in place.  They would have been

5   allowed to sit in court, listen to their

6   sibling or their mother testify.

7           But even if there was a sequestration

8   order under the Code, as family members

9   they still would have been allowed to sit

10   in court to hear that testimony.  So there

11   are so many reasons --

12  THE COURT:

13          I think the mother could have.

14  MR. ALFORD:

15          And family members.

16  THE COURT:

17          I don't know if it extends that far.

18      It may.

19  MR. ALFORD:

20          That's --

21  THE COURT:

22          Go ahead.

23  MR. ALFORD:

24          That's what 615 says.

25  THE COURT:

26          Okay.

27  MR. ALFORD:

28          But there are many avenues in layers

29  of law that make abundantly clear that

30  nothing improper was done.  And there has

31  been nothing offered to the Court that

32  they even did discuss testimony.

1          If y'all have it I would certainly
2      like to see it.
3      MR. OROZCO:
4          Your Honor --
5      THE COURT:
6          Do y'all have it in your records?
7      MR. ALFORD:
8          Yes.
9      MR. OROZCO:
10         I'd ask for a Bates number, Your
11     Honor.
12     MR. ALFORD:
13         You asked for a Bates number.  I don't
14     have a Bates number.
15     MR. OROZCO:
16         Okay.  What picture is that?
17     MR. ALFORD:
18         This is the one from the CAC.
19     MS. SMITH:
20         The one you were asking the questions
21     about yesterday.
22     MR. ALFORD:
23         This is the one you were asking
24     questions about yesterday.  Are you saying
25     for the record you do not have it?
26     MR. OROZCO:
27         I didn't know this was the picture.  I
28     don't know if I have it, Your Honor,
29     because this is the first time I'm seeing
30     it.  The drawing that I received yesterday
31     and this drawing are different, Your
32     Honor.  So I don't know if I have it.

1  Going on to the discovery issue.
2  There are two different pictures that are
3  being discussed.  One drawn by Fernando in
4  the interview at the Child Advocacy Center
5  in Covington with JoBeth Rickels that she
6  draws on the video.
7  If you recall, defense counsel
8  questioned Fernando about that drawing
9  yesterday.  Is that drawing -- does it
10  reflect a room?  Is it supposed to be
11  where the bed is in the room?  I don't
12  know if Your Honor recalls that line of
13  questioning.  So defense counsel is asking
14  questions about that picture, so obviously
15  he had that picture.
16  MR. OROZCO:
17  Objection, Your Honor.
18  MR. ALFORD:
19  Whether or not he had it on a Bate
20  stamped copy or if he didn't see it so
21  clearly on the video, he had it.
22  THE COURT:
23  If somebody's got the drawing that was
24  accompanying the CAC interview, I've not
25  seen it.
26  MR. OROZCO:
27  Your Honor, I have not seen it yet.
28  They -- the only people who have would be
29  the government and they should have it.
30  If they gave it to me, they should be able
31  to produce it.
32  THE COURT:

1     MR. ALFORD:

2              I'm making the record clear there's

3         two different pictures so we can address

4         that.

5     THE COURT:

6              Okay.

7     MR. OROZCO:

8              And, Your Honor, this doesn't look

9         like, this is not what I received

10        yesterday so I wouldn't have known what

11        this was, Your Honor.

12    MR. ALFORD:

13             I'm not saying that's what you

14        received yesterday.  This is the one you

15        were cross-examining Fernando about

16        yesterday.

17    MR. OROZCO:

18             If I had that, Your Honor, I would

19        have entered that into evidence.  I was

20        going off what I was listening to on the

21        video, Your Honor.  I didn't see, I just

22        saw her drawing.

23             And, Your Honor, if you recall I did

24        ask for funds for an expert to review

25        these records because I am not an expert

26        in these records and I don't know what I

27        should have had or not had, and that's

28        what -- and, Your Honor, you denied that

29        but, Your Honor, this is what happened.

30        We have, I don't know what records are

31        still missing.

32    THE COURT:

1      All right.

2  MR. OROZCO:

3      I received more sets of discovery as

4      late as yesterday --

5  THE COURT:

6      All right.  Let's talk about it -- and

7      I'm not ruling on it, I'm just commenting.

8      This would appear because I recall that in

9      the CAC interview it was asked of Fernando

10     to write her name on the document.  It

11     would appear that there is a date

12     6/3/2015, which would be consistent with

13     the date of the interview if I'm correct.

14     So I'm just going to assume that this

15     is the CAC.  What's the new information

16     and how do we address that?

17  MR. ALFORD:

18     Judge, the second picture is what was

19     e-mailed to the defense last night.

20  THE COURT:

21     What's in this whole packet of new

22     information?

23  MR. OROZCO:

24     Your Honor, from my brief review today

25     it's the examinations of Fernando and the

26     younger daughter Carla by the CAC that's

27     similar to the one they did for Elisa.  So

28     in that discovery, Your Honor -- or in

29     that packet, Your Honor, you will see

30     inconsistent statements.

31  THE COURT:

32     And I don't, I'll tell you after

1   the -- I don't want to necessarily look at

2   this packet.  This is a bench trial.  This

3   is not in evidence so I don't know if I

4   should be looking at it.

5       I'm trying to get some argument from

6   counsel about what in here did -- of

7   course it's new by your statements, Mr.

8   OROZCO, but I need to know what is

9   prejudicial in here and I understand --

10   well, gee anything new could be

11   prejudicial, but I'm trying to determine,

12   do we go forward or not at this point.

13   MR. ALFORD:

14       And Judge, I haven't gotten to the

15   crux of the argument --

16   THE COURT:

17       Right.

18   MR. ALFORD:

19       -- as to this picture is concerned.

20   But Code of Criminal Procedure, Article

21   719, specifically says, upon written

22   motion of the defendant the court shall

23   order the district attorney to permit or

24   authorize the defendant to inspect copies,

25   photographs, or otherwise reproduce any

26   results or reports or copies thereof of

27   the physical and mental examination and

28   scientific tests or experiments made in

29   connection with or material to the

30   particular case that are in possession,

31   custody, or control or knowledge of the

32   District Attorney's office and tend to be

1    used at trial.

2         On the cover sheet it indicates that

3    these records were potentially e-mailed to

4    Folsom Police Department.  Regardless if

5    whether that happened or not, the District

6    Attorney's office did not have these

7    records in its possession until yesterday

8    afternoon.  And Ann Troy can testify as to

9    how that came about.  So they were not in

10   possession of the State and they were not,

11   and still are not, intended to be used at

12   trial.

13   THE COURT:

14        That may be but if they've had Brady

15        information in here --

16   MR. ALFORD:

17        Well, it's the State's position they

18        do not have Brady information.

19   THE COURT:

20        Well, I don't know that because I've

21        haven't looked at it.

22   MR. ALFORD:

23        But --

24   THE COURT:

25        And how do I answer that question in

26        the midst of trial is my problem without

27        them being in evidence since the I'm the

28        trier of fact.

29   MR. ALFORD:

30        Judge, I have no problem introducing

31        them as evidence and if you want to look

32        at the pictures and you can determine as

1      the trier of fact that the pictures aren't

2      the same, that they are different, and

3      weigh that in deliberating and reaching

4      your decision.  This is a Judge trial.

5           But also of importance is I don't

6      believe in review of the record, unless

7      I'm missing something, defense counsel

8      ever filed a motion for discovery.

9   MR. OROZCO:

10          Your Honor, if you look at your file

11     you actually issued an order we would file

12     a motion for discovery.

13  MR. ALFORD:

14          I can't find it in the record.

15  MR. OROZCO:

16          There's actually a response I have,

17     Your Honor, from the State to our motion.

18  MR. ALFORD:

19          And originally, the Public Defender's

20     office filed a motion for discovery.  But

21     I don't see a written motion where he ever

22     adopted those motions, nor written motion

23     where he ever filed for discovery.

24  MR. OROZCO:

25          Your Honor, if you look at the case, I

26     think that's one of the, the first motion

27     that I filed and then the government

28     actually answered my motion.

29  MR. ALFORD:

30          Judge, are four motions --

31  THE COURT:

32          I'm not --

1    MR. ALFORD:

2          -- provided by the District Attorney's

3    office.  I would ask defense counsel to

4    supply you --

5    THE COURT:

6          This is the State's answer to the

7    motion for discovery.

8    MR. ALFORD:

9          And Judge, those -- again, those were

10    the four motions filed by the DA's office,

11    but there is nothing in the record where

12    defense counsel ever filed for discovery.

13    MR. OROZCO:

14          Your Honor, I do recall filing that.

15    I remember having a hearing for Mr.

16    Peters, that it was open discovery and

17    everything would be --

18    THE COURT:

19          That is the normal -- at least the

20    normal process of the District Attorney's

21    office in this jurisdiction is open file

22    discovery.

23    MR. OROZCO:

24          Yes, Your Honor.

25    THE COURT:

26          And this answer by the State clearly

27    says that.

28    MR. ALFORD:

29          Right, that's the common practice.

30    THE COURT:

31          Right.  Do you see anything else in

32    there?

MADAM CLERK:

     No, sir.

THE COURT:

     Okay.

MR. ALFORD:

     I think also we are still in the middle of trial.  These witnesses are all still available.

THE COURT:

     How do we, Mr. Orozco, I mean how do I address looking at these records that are not in evidence from your perspective?

MR. OROZCO:

     Your Honor, as the trier of fact, because they haven't been introduced by the State they can't introduce them at this point, Your Honor.  I mean, I guess they could do it when Ms. Troy.

THE COURT:

     Right.

MR. OROZCO:

     They still have one witness left.  But Your Honor --

THE COURT:

     And I'm assuming they came from her.  I don't know.

MR. OROZCO:

     I don't know, Your Honor.

THE COURT:

     I just, I guess I'm reluctant to look at it.

MR. OROZCO:

1    This is the third time that I've been,
2  it's been trial by ambush on three
3  occasions, Your Honor.  I've been getting,
4  I was in this case for over a year and a
5  half, Your Honor, and I've gotten
6  discovery on the eve of two different
7  trial settings.  And I received a copy ten
8  days ago while -- from the State when I
9  was on vacation and then last night, Your
10 Honor.
11   Your Honor, I've never been in a
12 position -- had the witnesses been in the
13 courtroom, I would have asked for the rule
14 to be revoked, Your Honor.  But they were
15 sequestered outside the building, outside
16 my view, or purview, Your Honor.  And they
17 were sequestered together with the
18 counselor, Ms. Lott.  It wasn't just them,
19 Your Honor.
20   And I'm not saying that the government
21 doesn't have a right according to the
22 Louisiana Code to have them assist in the
23 trial, but, Your Honor, they don't have
24 the right to have them sit in a room and
25 go over each other's testimony before and
26 after they testify.
27 MR. ALFORD:
28   And we would just like -- to cite some
29 legal authority of that because there is
30   none.
31 MR. OROZCO:
32   It's just common practice, Your Honor.

1   THE COURT:

2           Well, I do note that there was no

3   original sequestration order requested.

4   And let's face it, this is a family and I

5   think I said it in chambers, this is a

6   family, if they were going to discuss or

7   plan testimony, they certainly had ample

8   opportunity over the last several years to

9   do so.

10  MR. OROZCO:

11          But they also had Ms. Lott, which is

12  not family.

13  THE COURT:

14          Well, Ms. Lott is not family but as

15  counsel, the child, apparently for several

16  years.  So again it would be, I guess any

17  plan to plot or plan, certainly had ample

18  opportunity before yesterday in the

19  ancillary room in the court, courthouse.

20          I'm really more concerned about the

21  late discovery than anything because to me

22  if it creates or changes the defense's

23  strategy of defense with new information

24  provided, I think it's problematic.

25          And that's why without having the

26  ability to read it, I need specifics as to

27  what in there effects your strategy.

28  MR. OROZCO:

29          Your Honor, it wouldn't change my

30  strategy per se, but it would have changed

31  the process.  I would have been more

32  adamant about having an expert designated

1   and the funds for an expert to go over

2   these records again, Your Honor.  Our

3   motion before the Court for those things

4   and at that time -- and everything to that

5   point was based on just the records we had

6   three sets of discovery ago.

7       This was just the initial

8   no-penetration interview, examination of

9   Ms. Ramirez.  Now, Your Honor, I'm getting

10  additional reports from two other

11  witnesses which, Your Honor, there's

12  handwriting analysis that could have been

13  done.

14      Clearly, these children did not -- at

15  8 or 7 and 9, did not write -- draw this,

16  from the bed -- the drawing of the bed

17  that was provided me or shown by counsel

18  right now, and the one provided in the

19  report yesterday, clearly she did not

20  create it, Your Honor.

21      So she was either assisted, coached,

22  manipulated.  Your Honor, our strategy

23  would have changed drastically.  We would

24  have been a lot more adamant about funds

25  for an expert because again, Your Honor,

26  as I stated when I made my motion, I'm not

27  an expert in medical examination or

28  forensic evidence.  I don't know how to

29  read that.

30      Had I had an expert to review this,

31  Your Honor, the inconsistencies could have

32  either been explained or impeached.  At

1    this point, Your Honor, again, I don't

2    have that.  We're in the middle of trial.

3    Witnesses have been called by the State.

4    They've been released by the State and now

5    to call those witnesses just opens up the

6    door for them to introduce evidence that

7    would -- they would not had the

8    opportunity to introduce, Your Honor.

9  THE COURT:

10       Well --

11 MR. OROZCO:

12       It wouldn't be fair for me to --

13 THE COURT:

14       -- the State's already indicated it

15       wouldn't even attempt to introduce this,

16       but you could potentially use it --

17 MR. OROZCO:

18       Oh, Your Honor, I wouldn't.  Yes, Your

19       Honor.

20 THE COURT:

21       You could still recall them for

22       impeachment purposes --

23 MR. OROZCO:

24       Yes, Your Honor.

25 THE COURT:

26       -- for your case in chief.

27 MR. OROZCO:

28       But then again, the State would have

29       an opportunity to rehabilitate any

30       testimony that, had they not been called,

31       which has never been provided.

32 MR. ALFORD:

1          We would have had that opportunity in

2          re-direct.

3   MR. OROZCO:

4          Not if they weren't called.

5   THE COURT:

6          If I understood the argument, and I'm

7          going to emphasize argument, one of the

8          things that was said was that there was a

9          drawing different than the one that's in

10         front of me that I believe is associated

11         with the CAC that depicts different

12         information.

13  MR. OROZCO:

14         Yes, Your Honor, and inconsistent with

15         testimony that was given.  Not only of the

16         bed, but of her, of Ms. Fernando's

17         observations on this, on the --

18  THE COURT:

19         Okay.

20  MR. OROZCO:

21         -- subsequent where she walked in,

22         Your Honor.  The testimony is different

23         than what's in writing, which would have

24         been at the time back in 2015 would have

25         refreshed her memory than the testimony

26         she gave today --

27  THE COURT:

28         And to be honest, if this was a jury

29         trial, I probably would have already

30         acknowledged the mistrial and just refer

31         it to a new jury and starting over.  Being

32         a bench trial I don't know how technically

1       we do that other than if I declare a

2       mistrial I recuse myself and you either

3       then do this in front of a different judge

4       and/or reinstate the rights of trial by

5       jury, which I think technically or

6       procedurally is incorrect.

7              Once the jury is waived you cannot re-

8       institute the right to trial by jury.  So

9       --

10  MR. ALFORD:

11             Well, Judge, I think it's important

12      that besides the legal authority that

13      we've cited, we're still in the middle of

14      trial.  He can still call these witnesses.

15  THE COURT:

16             Yeah, but the problem that he have,

17      John, honestly, is the late disclosure of

18      the discovery.  If there's anything in

19      there that would have been helpful in

20      their preparation for trial, would have

21      changed their strategy, they could have

22      used for impeachment purposes, it's kind

23      of, like, you know, it's kind of a little

24      late to be giving it to them now.

25             And I'm not saying that I would not, I

26      will state for the record, I'm not

27      claiming that there's prosecutory

28      misconduct by Mr. Alford from the

29      standpoint he had an obligation, he got

30      the information and disclosed it.

31             The problem is in the midst of a trial

32      the case law seems to indicate that the

1    discovery has got to be produced as an
2    ongoing obligation to the State.   It's got
3    to be produced in such a timely manner
4    that it affords the defense an opportunity
5    to prepare the strategy in the defense
6    knowing of the information, not "Well gee,
7    now you can recall the witnesses."   That's
8    what I'm having a problem with.
9         And I -- look, you know I've got to do
10   this as best I can.   I'm going to go in he
11   back a few minutes and look through some
12   more stuff and see.   I mean, do you all
13   have anything else to offer in way of
14   argument for me to consider?
15   MR. OROZCO:
16        Your Honor --
17   THE COURT:
18        I don't know where I am at this point.
19   MR. OROZCO:
20        Your Honor, based that it is a bench
21   trial it is on the lateness, at the time
22   of where we are in this trial, Your Honor,
23   I do not only believe you should declare a
24   mistrial, it should be dismissed with
25   prejudice, Your Honor.
26   THE COURT:
27        Well, I will tell you the likelihood
28   of me doing that is not good, but from the
29   standpoint that I think if that motion is
30   to be made it's to be made in front of
31   another judge and not me.
32   MR. ALFORD:

```
1                    Judge, it is important to note that he
2          is not able to cite a single prejudice
3          other than maybe he would have pushed
4          harder for an expert.
5     MR. OROZCO:
6                    No, Your Honor.
7     MR. ALFORD:
8                    There isn't a prejudice here.
9     THE COURT:
10                   But there was potentially impeachable
11         information in there that was not provided
12         to him until after the witness testified.
13    MR. OROZCO:
14                   Which would have been --
15    THE COURT:
16                   And you can say, well, you can recall
17         them and I get it, and it is a judge
18         trial, but --
19    MR. ALFORD:
20                   And, Judge, there's nothing
21         prohibiting from the State recalling them.
22    MR. OROZCO:
23                   Yes, there is.
24    MR. ALFORD:
25                   We can recall them now.
26    MR. OROZCO:
27                   No, they can't, Your Honor.
28    MR. ALFORD:
29                   We have not rested yet.
30    MR. OROZCO:
31                   They cannot recall a witness that
32         they've released, Your Honor.
```

1   MR. ALFORD:

2              Again, I would ask for some legal

3       authority on what defense counsel is

4       stating.

5   THE COURT:

6              All right.  I'm going to, unless y'all

7       have something else, I'm going to take a

8       few minutes and try to figure this one

9       out.  We'll come out and go from there.

10  MR. OROZCO:

11             Thank you, Judge.

12  THE BAILIFF:

13             All rise.

14  (OFF THE RECORD)

15  THE BAILIFF:

16             All rise.

17  THE COURT:

18             Have a seat, please.  Before the Court

19      is in motion for a mistrial on various

20      grounds raised by Mr. Orozco.  Let me at

21      the outset comment that the Court is not

22      considering anything done by the State is

23      prosecutorial misconduct.

24             The problem that I'm struggling with

25      is the late disclosure of discovery, which

26      apparently, at least according to

27      representations by defense counsel, was

28      records that should have been produced in

29      discovery and have been in the possession,

30      reportedly in the possession of Folsom PD,

31      which was the investigating agency for

32      some years.

1        I have not looked, and I want to make

2  sure that I point that out for the record,

3  I have not looked at the information but

4  this is a bench trial and I don't want to

5  review the information that's contained

6  therein because it would be the, I would

7  be reviewing information that is not

8  appropriately before the Court.

9        So that leaves me with the problem of

10  what do I do and I don't -- I'm not sure

11  what prejudicial effect that information

12  has to the defense.  It may have changed

13  strategies of the defense.  They've noted

14  that they may have retained an expert had

15  they have been aware of the records.  I

16  don't know if that's true or not.

17        That's something that I have no privy

18  to the information.  My thought, given the

19  late disclosure, is to declare a mistrial

20  with a stay of the proceedings and order

21  that either the State or the defense can

22  seek a writ.  I would want it done in

23  short order to see if the First Circuit

24  agrees with my thought of mistrial.

25  MR. ALFORD:

26        Judge, just before you issue a ruling,

27  have you had a chance to look at *State*

28  *versus Washington*, Louisiana Supreme

29  Court?

30  THE COURT:

31        Yes, I looked at it and there was some

32  records that, you know, medical records

1        that were --

2    MR. ALFORD:

3            Fact pattern --

4    THE COURT:

5            -- similar.

6    MR. ALFORD:

7            Very similar, where defense counsel

8        was given additional time to prepare --

9    THE COURT:

10           Yes.

11   MR. ALFORD:

12           -- and come back and ask for, we're in

13       a Judge trial.  There's nothing stopping

14       us from --

15   THE COURT:

16           We could recess --

17   MR. ALFORD:

18           Day, weeks, months.

19   THE COURT:

20           -- this for months if we had to.  The

21       problem there is I believe Mr. Orozco may

22       or may not be available for defense

23       counsel in the coming months.  So I'd

24       rather do something in short order rather

25       than a long-term fix.  I don't know.

26   MR. ALFORD:

27           Well, Judge --

28   THE COURT:

29           I'm struggling with this one,

30       honestly.

31   MR. ALFORD:

32           -- if you follow the case law, if they

1    need more time to prepare, they've can be

2    given more time.  But the fact that Mr.

3    Orozco may be moving should not be --

4  THE COURT:

5         You know, that's not really the moment

6    of why the ruling would be what it is,

7    it's a matter of affording the defense

8    ample opportunity in its strategy to

9    prepare its case just in overall fairness

10    having all the information that the State

11    has, not in the midst of trial providing

12    it to them, which then may, and I know the

13    case law speaks to the prejudice and

14    that's where I don't know that I'm on

15    solid ground or not, that the defense has

16    demonstrated a sufficient prejudice by way

17    of the records.  And again, me not seeing

18    the records doesn't help my decision.  I'm

19    shooting in the dark here.

20  MR. OROZCO:

21         Your Honor, we would argue that this

22    case is distinguishable from this one

23    because it was three pages, we're looking

24    at almost 40, possibly 40 pages --

25  THE COURT:

26         I mean, in my mind --

27  MR. OROZCO:

28         -- pre-testimony.

29  THE COURT:

30         In my mind, I could continue with the

31    trial and hear the testimony and then

32    segregate the prior testimony with the new

```
 1    testimony, but I cannot opine as to the
 2    defense's strategy.  They've said certain
 3    things on the record here that I think if
 4    I went forward it may end in reversible
 5    error.
 6         It may or it may not and I think that
 7    the best strategy is to allow counsel to
 8    seek from the First Circuit an opinion,
 9    review of my opinion to declare the
10    mistrial rather than just, look, we could
11    probably get a response even by tomorrow
12    perhaps on the writ and continue.  If they
13    say, no, no mistrial, continue.  Great.
14    We continue on.  If --
15  MR. ALFORD:
16         Judge, I just think that a mistrial is
17    an extreme decision that is unnecessary.
18    If defense counsel needs more time --
19  THE COURT:
20         And look, John, I'm not saying it's
21    not, it is a significant issue for the
22    Court to rule in that matter for a
23    mistrial.  The problem I have here is the
24    late disclosure of discovery.  That's not
25    my fault, that's not the defense's fault.
26    That's the State's fault.
27  MR. ALFORD:
28         Correct.
29  THE COURT:
30         And so I've got to look at just the
31    level playing field here and that's all
32    I'm doing.  I'm not throwing anybody under
```

1    the bus.  I'm just looking at what we got

2    here and what do I do with it.  And I

3    figure, hey, I think it should be a

4    mistrial and a do-over.  If the First

5    Circuit agrees, great.  We do it over.

6         If it's no, Judge, you're wrong,

7    continue on, I'm here.  I'm here until the

8    cows come home.  We get it done.  So I

9    think you all can brief what needs to be

10   briefed to the First Circuit and they can

11   either agree or disagree with me.

12        And you all can set forth and ever

13   proffer the records I haven't seen for

14   their review.  And that way they have a

15   better opinion as to what those records

16   include or are not.  And so I don't know

17   how I can be fair to both sides to do what

18   I'm saying, honestly.

19   MR. ALFORD:

20        I understand, Judge, and I mean no

21   disrespect but you're saying that you

22   don't believe defense has articulated a

23   significant reason why we can't go

24   forward.  But at the same time it seems

25   like you're leaning towards mistrial.

26   THE COURT:

27        Well, because what they have said is

28   that they would have changed their

29   strategy by way of hiring experts --

30   MR. ALFORD:

31        Which the reason the expert, well,

32   first of all, this is not the victim that

293

```
 1          these records belong to.  These are the
 2          sister.  They requested an expert to
 3          review records they had as to the victim
 4          of a rape case and it was denied by the
 5          court.  I can't imagine that the court
 6          would grant an expert based off a witness
 7          to a case who was not violated based off
 8          her own testimony.
 9                So if the court would have not granted
10          an expert to determine whether or not
11          there should have been physical findings
12          of abuse, I can't imagine Your Honor would
13          grant an expert on this.  This is
14          incredibly onerous given what these two
15          girls have had to testify to.
16     THE COURT:
17                And, look, I don't disagree with that
18          statement.
19     MR. ALFORD:
20                And I understand State turning it over
21          late.  Well, then they can't articulate a
22          significant prejudice other than we
23          haven't had time to review, the remedy is
24          to give them that time, not a mistrial.
25     MR. OROZCO:
26                Your Honor, I object to -- that's not
27          my argument, Your Honor.  My argument was
28          that, Your Honor, there was a late
29          production several months ago which at
30          that point we asked for a continuance to
31          review the records.  Then there was
32          another supplement ten days ago.
```

1      And then yesterday after the witnesses
2      testified we were given evidence which we
3      would've used and here is the prejudice,
4      Your Honor.  We would have used the
5      evidence that I briefly reviewed to
6      directly impeach not only the, Fernando,
7      the witness, but the actual victim, Elisa.
8          So, Your Honor, there is prejudice,
9      Your Honor, because those witnesses
10     testified.  We would have impeached them
11     on cross-examination.  They would have the
12     opportunity to try to rehabilitate.  Now,
13     Your Honor, the only relief left to me is
14     to call those witnesses in direct
15     testimony, where I can't lead, I can't do
16     anything but --
17  THE COURT:
18          No, they would still be adverse
19     witnesses and you would be, they would
20     certainly be subject to your cross-
21     examination.
22  MR. ALFORD:
23          Judge, it's up to the discretion of
24     the Court to state to, Your Honor, the
25     State can still recall in our case in
26     chief Fernando and I'm happy to do so.
27     And if the defense needs more time to
28     repair further cross, I will state for the
29     record I will call Fernando again in my
30     case in chief and we can hash this out.
31  MR. OROZCO:
32          Your Honor, we have someone out of

1   Baton Rouge whether they can recall her
2   now.  We don't -- from my experience in
3   Mississippi we, again, Your Honor, I am
4   here Pro hac vice.

5   THE COURT:
6        No, I do believe the State is free or
7   able to recall witnesses, particularly in
8   rebuttal more or less, but they have not
9   rested as of yet.  Certainly you can call
10  them and again, this is a weird animal.
11  I'm working in a vacuum here because I
12  look at a bunch of cases and I don't think
13  any of them squarely hit on point.

14       Most of the cases talk about late
15  disclosed discovery.  It may, again, it
16  may lead to reversible error.  I don't
17  want to do this thing twice.  That's my
18  only thought.  Whether the defense has
19  articulated well enough the prejudice that
20  they feel they've suffered because of the
21  late disclosure I, they've alluded to the
22  fact of hiring an expert.  I could
23  certainly, I could break the trial for
24  months for an expert.

25  MR. ALFORD:
26       And I would just ask what kind of
27  expert?  She doesn't disclose.  She, in
28  fact, says "I was not touched by my
29  father."  Are we hiring a picture expert?

30  THE COURT:
31       I don't know because I haven't seen --

32  MR. ALFORD:

296

```
 1                   There is no experts.
 2      THE COURT:
 3                   -- the records.
 4      MR. ALFORD:
 5                   There is no expert they can hire.
 6      THE COURT:
 7                   And again, the only reason we're
 8              having this discussion is because of the
 9              late disclosure.
10      MR. ALFORD:
11                   And I understand that and I accept
12              responsibility for that but just because
13              they say, what expert?  I would ask that
14              you ask them what expert?  She doesn't
15              disclose she was abused.  We're talking
16              about a picture and it's clear for the
17              record that she's describing different
18              events that these pictures are drawn
19              about.  So what expert are we talking
20              about?
21      THE COURT:
22                   I mean, I'll take that as just
23              argument because I've not had the ability
24              of the witness to testify whether it's a
25              different event or not.
26      MR. ALFORD:
27                   And if it's --
28      THE COURT:
29                   If it's the same event, then there's a
30              problem.
31      MR. ALFORD:
32                   And if it's, you know, so egregious
```

1   and they're at a disadvantage, I don't

2   understand why they wouldn't agree to

3   introducing this so Your Honor could see

4   it.  I think it's obvious that when they

5   don't want to introduce it so you could

6   see, then maybe there's not a problem

7   there.

8   MR. OROZCO:

9       No, Your Honor.  Again, I'm tired of

10   the State speaking for me.  Your Honor,

11   the reason I've not introduced this to the

12   Court is because if the Court does not

13   grant the motion for a mistrial, I'm going

14   to file a motion to suppress, Your Honor.

15   And I'm going to ask that the testimony of

16   the witnesses who've already testified, my

17   client's been prejudiced to be omitted,

18   Your Honor, which is a mistrial.

19       Because we can't unring what has

20   already been testified to, Your Honor.

21   And again, the case provided by the State

22   is pre-testimony three pages of a medical

23   record.  Your Honor, we're talking about

24   over 60 pages in two different disclosures

25   of information which I had less than 10

26   days to read.

27   THE COURT:

28       Well, let me ask this of you before we

29   go the extra route.  I mean, is any more

30   time going to change anything we are

31   expecting?

32   MR. OROZCO:

No, Your Honor, not at this point because, again, our position is the witnesses have already testified and the prejudice has already taken place, Your Honor. The witnesses have been tainted.

Again, Your Honor, in the totality of the circumstances, not just the late disclosure, if you take the sequestration of witnesses, we don't know what happened in there, Your Honor. There has been so many prosecutorial errors by the State in this case, Your Honor, that we are arguing.

And at this point there is nothing that we can do -- that the Court can do other than to declare a mistrial and this set -- reset and start over. And Your Honor --

THE COURT:

I'm very much on the fence I've got to tell you all.

MR. OROZCO:

And with respect to briefing it to the First Circuit, Your Honor, again, I'm here Pro hac vice. It would take more than a day, Your Honor. I'd have to end up getting co-counsel to do this and to prepare it properly and to do that. So I would need, and my client has been incarcerated, in three days or a week, Your Honor it will be three years.

At the end of the day, Your Honor, I

1  received discovery that was paramount to
2  witnesses who have already testified.  I
3  received discovery after their testimony.

4  THE COURT:
5      Well, they are free to be recalled
6  again by either you or cross.

7  MR. OROZCO:
8      Out of prejudice, yeah.

9  THE COURT:
10     Well, I don't know that I agree with
11  that.  And I asked the question earlier.
12  What was the change in trial strategy with
13  the information and I think you indicated
14  none other than a potential of the expert.

15  MR. OROZCO:
16     Well, not only the expert, Your Honor,
17  but I would have direct impeachment
18  information that I would have used against
19  two of the witnesses.

20  THE COURT:
21     Which you can still do.

22  MR. OROZCO:
23     They've gone home.  They've processed.
24  They've had time to think.  It would have
25  been in the moment, Your Honor, wouldn't
26  have surprised them with this, Your Honor.
27  Your Honor, if we were to recall them at a
28  later date, Your Honor, again I don't have
29  any faith in the State not interfering
30  with the testimony at this point based on
31  what I've seen in this courtroom with them
32  being, during the breaks speaking with

1          their client in the hallway and then

2          catching them in the witness room

3          yesterday.

4                  Your Honor, the only option we have at

5          this point is a mistrial, Your Honor, so I

6          can properly defend my client's rights.

7          And, Your Honor, the backdoor, last

8          minute, I asked the State during the break

9          if they had a picture, a Bate number for

10         the picture that was drawn by the witness,

11         Mr. Alford said he did not have them Bate

12         numbered yet.

13                 When the judge came in he was

14         flaunting the picture in front of me, Your

15         Honor.  He didn't show it or disclose it

16         to me earlier when I asked him.

17    MR. ALFORD:

18                 You asked for --

19    THE COURT:

20                 It's a different picture?

21    MR. OROZCO:

22                 Yes, Your Honor.

23    THE COURT:

24                 Than this one?  You don't have a Bate

25         stamped one.  Is there a Bates stamped one

26         somewhere?

27    MR. OROZCO:

28                 I don't know, Your Honor.

29    MR. ALFORD:

30                 Not for those.

31    THE COURT:

32                 Not this picture?

1  MR. ALFORD:

2           Correct.

3  THE COURT:

4           But the picture of the new information

5           has Bate stamps on it?

6  MR. ALFORD:

7           I gave him a copy of the Bates stamp

8           this morning.  He signed for it.

9  MR. OROZCO:

10          No, Your Honor.

11  MR. ALFORD:

12          This afternoon.

13  MR. OROZCO:

14          Yes, Your Honor.

15  MR. ALFORD:

16          Mary gave you a copy of her records in

17          the back --

18  MR. OROZCO:

19          Correct.

20  MR. ALFORD:

21          -- out of a courtesy.

22  MR. OROZCO:

23          Correct.

24  MR. ALFORD:

25          And they weren't Bates Stamped.

26  MR. OROZCO:

27          And the copy she gave me, Your Honor,

28          none of them had Bates stamps.  The ones

29          Mr. Alford e-mailed me yesterday were all

30          Bates stamped.

31  THE COURT:

32          Who Bates stamped it?

1    MR. OROZCO:

2        I don't know, Your Honor.

3    THE COURT:

4        Folsom PD?

5    MR. ALFORD:

6        I don't understand what he is saying

7    right now, but I gave you a copy of the

8    Bates stamp when you asked for a Bates

9    stamp copies.

10   MR. OROZCO:

11       Correct.

12   MR. ALFORD:

13       It's the same record.

14   MS. SMITH:

15       You had it yesterday though.  You had

16   it yesterday on the e-mail.

17   MR. OROZCO:

18       No, it was e-mailed yesterday.  I

19   didn't have it until today.  I didn't have

20   it until, I'm from out of state, Your

21   Honor.  I don't have the access of staff

22   and personnel like the government does.

23   MS. SMITH:

24       The code doesn't require us to give

25   you a copy which we did provide it through

26   e-mail.

27   MR. OROZCO:

28       Correct.  But it is a different copy

29   from the copy you e-mailed which I

30   received after hours, Your Honor, after

31   court had adjourned.  I'm traveling, Your

32   Honor.  I don't have time to sit here --

1    unlike the State, Your Honor, I don't have

2    the luxury of staff personnel having had

3    this one case.  I'm a private practice

4    attorney from out of state coming and

5    handling several cases.  I have a federal

6    sentencing on Thursday that I was

7    expecting to be able to go to.

8    THE COURT:

9        All right.  Give me a minute, please.

10   And I would guess Mr. Orozco that the

11   biggest prejudice you claim is the fact

12   that you were unable to under direct exam,

13   well, under direct examination by the

14   State and your cross examination of the

15   witnesses as to the records you have now

16   received.

17   MR. OROZCO:

18       Yes, Your Honor.

19   THE COURT:

20       Do you need more time to look through

21   that?

22   MR. OROZCO:

23       Your Honor, it's not that I need more

24   time to look at it, Your Honor.  We did

25   that last time, the untimely discovery.

26   This is the third --

27   THE COURT:

28       I got it.  But I'm not going to where

29   you want me to go.  I'll be honest with

30   you.  I'm not going to the prosecutory

31   misconduct.  I'm simply trying to get past

32   the point of this late disclosure in

1      discovery and the prejudicial effect it

2      has been on your case. If you need more

3      time to look at it I would say let's come

4      back in the morning and we'll continue.

5  MR. OROZCO:

6      Your Honor, in the case --

7  THE COURT:

8      Unless you can demonstrate a greater

9      prejudice other than, because it is a

10     bench trial. If this was a jury trial

11     I'll blatantly tell you I would dismiss

12     the jury or at least I would declare the

13     mistrial and let First Circuit review it.

14     Being a bench trial I'd hope I would

15     be able to fairly judge the additional

16     testimony of the witnesses to determine if

17     they were either coached or created a

18     story earlier versus what these new

19     records may disclose. Since I haven't had

20     the benefit of looking at them, unless you

21     can articulate more, my thought is if you

22     need more time to review them, let's come

23     back in the morning and continue.

24  MR. OROZCO:

25     Your Honor --

26  THE COURT:

27     But if you're able to continue today,

28     let's maybe continue today. And if I'm

29     wrong, then it'll be reversed at an

30     appellate level if in fact a finding of

31     guilty is made.

32  MR. OROZCO:

1      Your Honor, based on two hours of
2      review that I've had of those files, Your
3      Honor, I would be, I would re-introduce my
4      motion for an expert, Your Honor, to go
5      through a forensic expert --
6  THE COURT:
7      Then you have to articulate what the
8      expert would be reviewing and what
9      information you wish to find absent I'm
10     not seeing the records again: I don't
11     know what you're looking for and it's easy
12     to say "Well, I will get an expert", if it
13     were, like some of the cases talk about,
14     well, the strategy of putting the
15     defendant on the stand, I wouldn't have
16     done it had I known there was a rap sheet
17     that was not disclosed to me until after
18     he took the stand and started to testify
19     in front of a jury.
20  MR. OROZCO:
21     Your Honor, these are go to again,
22     what I tried to allude yesterday with Ms.
23     Lott as to the theories of the
24     examination, of protocols that were used,
25     the false memories that we were trying to
26     argue, Your Honor.  Your Honor, when we
27     first had the pre-trial conference, we
28     only had one copy, not the three
29     additional disclosure.
30     We had those initial report discovery,
31     Your Honor.  There was three supplemental
32     disclosure or untimely disclosures that

1    were made.  And, Your Honor --

2    THE COURT:

3         The prior ones I get.

4    MR. OROZCO:

5         Right, in good faith --

6    THE COURT:

7         But this is the one and only one I'm

8    concerned about here today is the new --

9    however many pages it is, 40 pages, give

10   or take?

11   MR. OROZCO:

12        I believe it's 44.

13   THE COURT:

14        What in that 40 pages is problematic?

15   If you need time to review it, let's

16   review it, give you time to review it.  If

17   there's something specific in there --

18   MR. OROZCO:

19        Yes, Your Honor.  And again, Your

20   Honor --

21   THE COURT:

22        -- I need to know specifically what it

23   is that is changing your strategy in the

24   case.

25   MR. OROZCO:

26        Your Honor, again, it would go to the

27   my layman, layperson's ability as a

28   lawyer, I don't understand these records

29   and I would need an expert that guides me

30   through these records and make sure that

31   everything was done properly, Your Honor.

32        At this point, I have three sets of

1     medical reports made at the beginning of

2     this case and the last timing disclosure

3     of the --

4  THE COURT:

5        And you talking about the medical

6     reports as it relates to the victim or

7     Fernando --

8  MR. OROZCO:

9        Now --

10  THE COURT:

11        -- the witness.

12  MR. OROZCO:

13        I mean, these evidence, this evidence

14     is now, it went from one forensic

15     evaluation in which the forensic

16     evaluations have been inconclusive on the

17     vaginal area and the anus area were

18     normal.

19        Now I'm getting three reports and in

20     the daughter's report that you don't have,

21     Your Honor, there are statements made of

22     inconsistent of what the testimony was as

23     to what they saw at the time, Your Honor.

24     And, Your Honor, that is based on less

25     than two hours review, Your Honor.

26        In the case that the government

27     presented, they got one day to review the

28     four pages, Your Honor.  And I understand

29     four pages of medical record review,

30     that's one thing.  I have, since the

31     initial disclosure, I've had over 90 pages

32     of discovery.  And had I had those

```
 1              initially, when I made my argument for an
 2              expert, I think I could have provided a
 3              much more zealous and concrete argument.
 4     THE COURT:
 5              Well, is there and I'll ask the State,
 6              is there something in those records that
 7              now there is testimony from the expert
 8              that alleges that there is evidence of
 9              penetration?
10     MR. ALFORD:
11              No, Your Honor.
12     THE COURT:
13              No?
14     MR. ALFORD:
15              What was turned it over last night was
16              a medical records of Carla Galan and
17              Fernando Galan.  The state has never
18              intended nor will it call Carla Galan.
19     THE COURT:
20              Right.
21     MR. ALFORD:
22              Fernando Galan testified.  She has
23              maintained from the beginning she was
24              never victimized by her father.  So that's
25              why I called your attention, what would a
26              forensic expert say what Carla, Fernando
27              has already said and that was she was not
28              violated.
29     MR. OROZCO:
30              And, Your Honor, the government is --
31     MR. ALFORD:
32              One second, Your Honor.  One second.
```

1      For the record, the records relating to
2      Fernando are only 21 pages long.  It is
3      not -- half of the records are related to
4      Carla.  The other half are related to
5      Fernando.
6  THE COURT:
7      Were the other original records
8      related to the victim originally produced,
9      as part of the original discovery.
10 MR. ALFORD:
11     Yes, Your Honor, for Elisa Ramirez.
12 MR. OROZCO:
13     No.
14 THE COURT:
15     You're saying no, you didn't get
16     Elisa's --
17 MR. OROZCO:
18     That was the untimely one that was
19     given --
20 THE COURT:
21     But you had those before we commenced
22     trial?
23 MR. OROZCO:
24     Yes, Your Honor.  But what was given
25     to me today, Bates stamp page --
26 THE COURT:
27     Which are victim statements.  A
28     witness statement, not victim statements?
29 MR. ALFORD:
30     Correct.
31 MR. OROZCO:
32     295 states that she saw his private

1                was in her butt, penetration, Your Honor.

2     MR. ALFORD:

3                And that's exactly what she testified

4                to yesterday.  And, in fact, she was cross

5                examined on that.  Mr. Orozco said "You

6                could see penis in the butt while under

7                the sheets?"

8     MR. OROZCO:

9                Yes, Your Honor.

10    MR. ALFORD:

11               She said "Yes."

12    MR. OROZCO:

13               Your Honor, that was in the bed under

14               the sheets.  This is stating that she

15               walked in and that the father was having

16               sex and that he untied, this was a

17               additional, the second one, Your Honor,

18               stating that there was penetration.  Not

19               under the sheets, not in the bed.

20               This was when she walked into the room

21               saying there was penetration.  It's on

22               page Bates stamp 295, which the government

23               has misstated to the Court.

24    MR. ALFORD:

25               And, Judge, that was the second

26               incident.  She also testified she opened

27               the door when they were cleaning the

28               house, they were in the parent's room.

29               She opened the door.  Elisa's pants were

30               down and her father was buckling her belt.

31               That was her testimony.

32    MR. OROZCO:

1               Yes, Your Honor.  But in her statement

2          she said she saw --

3     THE COURT:

4               But I think there's --

5     MR. OROZCO:

6               -- his private was in her butt.  And

7          again, now we're getting into the

8          evidence, Your Honor.

9     THE COURT:

10              Right.  And I think the best way I

11         would, again, I have waited and other than

12         the claim surprise, which I understand,

13         and if you need more time to review the

14         information, I'll be more than willing to

15         grant additional time.  I've to solicit in

16         a way what prejudice you would have with

17         the new information and I'm really not

18         hearing other than, I just didn't have the

19         opportunity on direct examination to

20         properly cross examine the witness.

21              The witness is still available to

22         testify and I would certainly have to

23         consider inconsistencies in her testimony

24         if you can point them out to me.  I know

25         this has been an argument but if she again

26         takes the stand and her statements are

27         contrary to each other, I'm going to have

28         to weigh that.

29    MR. OROZCO:

30              Yes, Your Honor, but the only way to

31         fairly allow my client -- or to judge my

32         client on that would be to allow me to

312

1          cross-examine her.

2     THE COURT:

3               Oh, you can call her.  She's an

4          adverse witness to you.  You can cross

5          examine her, lead her in your examination.

6     MR. OROZCO:

7               Yes, Your Honor.

8     THE COURT:

9               I have no problem.  Do you disagree

10          with that Mr. Alford?

11     MR. ALFORD:

12               I have no problem with that.

13     MR. OROZCO:

14               Yes, Your Honor.  But then the State

15          has a second swing at the bat on their

16          cross examination, which they wouldn't

17          have had during my cross-exam.  They would

18          have the rehabilitation.

19               Your Honor, they have now had time to

20          process this, my entire argument.  If I

21          make that argument now, I'm not catching

22          them by surprise where I would have caught

23          them by surprise before, Your Honor.  Just

24          like yesterday with our expert witnesses,

25          Your Honor and started questioning them

26          about, I caught them by surprise, Your

27          Honor.

28               And again, Your Honor, this wasn't an

29          isolated one-time incident.  This is the

30          third time, Your Honor.

31     THE COURT:

32               I'm not going to get on that

313

1  historical controversy.  I'm going to give

2  the defense wishes time to prepare, give

3  them further time.  You tell me when you'd

4  be ready for proceed, otherwise, my

5  thought is let's continue on and deny the

6  motion for mistrial.

7  And it's a close one I'll have to say.

8  It's a close one.  But I just -- I've

9  heard enough in the defense's argument

10  that leads me to the conclusion that it's

11  reversible error.

12  MR. OROZCO:

13  Your Honor, then at this time we make

14  a motion to suppress this evidence for

15  untimeliness, Your Honor, as prejudice to

16  my client.  In that point, Your Honor, we

17  would -- we are now prejudice because we

18  are in effect keeping their expert,

19  forcing them to omit their next expert

20  testify, we need the expert to testify.

21  And the evidence that we were going to

22  present is in her medical report, Your

23  Honor.

24  THE COURT:

25  And on what basis is it going to be

26  suppressed?

27  MR. OROZCO:

28  Your Honor, we suppress it as we

29  haven't had time to review it, Your Honor.

30  THE COURT:

31  That's what I'm saying.  Do you need a

32  break and we'll reconvene tomorrow or

1      Friday and you can do your thing on

2      Thursday in Federal Court?  I'll give you

3      as much time as you need, Mr. Orozco --

4  MR. OROZCO:

5          I understand.

6  THE COUNT:

7          -- because, look, I'm with you.  I do

8      not like the fact that we're sitting here

9      because it's been three hours -- two hours

10     now talking about late discovery from the

11     State.  I get it.  I do not like trial by

12     ambush and I, I've almost exhausted the

13     discussion to the point where I don't know

14     what else to do other than what I'm

15     proposing we do, give you more time to

16     prepare if it helps.

17  MR. OROZCO:

18         Yes, sir, but as the court knows, my

19     scheduling, Your Honor, I mean I'm willing

20     to --

21  THE COURT:

22         I got you.

23  MR. OROZCO:

24         I understand that --

25  THE COURT:

26         So I mean we could reconvene in the

27     morning if that will assist you in any

28     way.

29  MR. OROZCO:

30         That gives me less than --

31  THE COURT:

32         Well, it's not that much information.

1         I can't imagine it's 40 pages long.  I

2         imagine most of it is superfluous to our

3         discussion.  Not having seen it, but

4         medical reports have a lot of things in

5         them that typically that don't really need

6         a whole lot of digesting to determine

7         whether they're relevant or not.

8     MR. OROZCO:

9         Then, Your Honor --

10    THE COURT:

11        I imagine the drawings are the ones

12        that are from your commentary that's the

13        most important which following the

14        question of her testimony of Fernando.

15    MR. OROZCO:

16        Yes, Your Honor, that's based on, like

17        I said, less than an hour reviewing --

18    THE COURT:

19        And that's what I'm saying.  You want

20        more time, that's a easy one.  I'll give

21        you more time.  And if you can articulate

22        -- if you want to come back in the

23        morning, great, I'm here.

24    MR. OROZCO:

25        Yes, Your Honor, I mean I --

26    THE COURT:

27        We can do that and then you can

28        articulate if you have more specific

29        grounds upon which you can move this

30        matter for mistrial.  You can re-urge your

31        mistrial.

32    MR. OROZCO:

1          And Your Honor, at this time I also

2     want to renew my motion for fundings for

3     an expert, Your Honor, forensic expert.

4   THE COURT:

5          Well, I mean I have to know more

6     specifics about that.  You're going to

7     have to set forth the specificity what

8     exactly they're going to be opining to.

9   MR. OROZCO:

10          Yes, Your Honor.

11   THE COURT:

12          I just, I can't go with a blanket

13     statement "I would have gotten an expert"

14     without the specifics and that's fair, I

15     think.

16   MR. OROZCO:

17          And again, Your Honor, I mean, I'd

18     have to sit down with an expert and have

19     them review the record and find out what

20     the costs are going to be because, Your

21     Honor, I'm being asked to --

22   THE COURT:

23          The only thing that I've asked, I

24     think by way of solicitation from both of

25     you, is what has changed in the story by

26     way of the medical examination, by way of

27     what was said about evidence of

28     penetration versus lack thereof, and if

29     there -- the State has already indicated

30     if you disagree that there is none other

31     than the victim's statement, or witness

32     statement, that there was penetration.

1          That hasn't changed from what you

2          previously said to some degree.

3     MR. OROZCO:

4          Well, initially, Your Honor, when we

5          first filed all the motions there wasn't a

6          penetration and then now amended --

7     THE COURT:

8          They amended the charge?

9     MR. OROZCO:

10         Yes, Your Honor, to include now

11         penetration.  And at that point in

12         discovery, like I said, Bates -- when I --

13    THE COURT:

14         I got it.

15    MR. OROZCO:

16         -- motion for expert to now, things

17         have changed several times, Your Honor.

18    THE COURT:

19         And that's why I would love to give

20         you the luxury of whatever time you need,

21         whether it be an hour or we could come

22         back in the morning.  It's 4:00 now.

23    MR. OROZCO:

24         So if you could -- if you wish -- I'll

25         leave it at your discretion.  You tell me

26         what you when you want to reconvene, if

27         you want to take a recess.

28    MR. OROZCO:

29         Your Honor, we would take a recess to

30         the morning to allow my associate and I to

31         review this overnight and at that point --

32    THE COURT:

318

1        And look, let me make it clear.  If

2   you disagree with the fact that I am

3   denying a mistrial, take a writ.  Ask for

4   an expedited hearing on it.  That's your

5   call.  I have no dog in that hunt.  I do

6   not take ownership or am I offended by the

7   First Circuit telling me I'm wrong.

8   MR. OROZCO:

9        No, Your Honor.

10  THE COURT:

11       I just really, I try to do the best I

12  can in every case.

13  MR. OROZCO:

14       Your Honor, we have no issue with the

15  Court, Your Honor.  The Court has been

16  very accommodating and amicable in this

17  case, Your Honor.  So we do not have any

18  issue with the Court, Your Honor.

19  THE COURT:

20       All right.

21  MR. OROZCO:

22       But with the State it's a whole

23  different story.

24  THE COURT:

25       You all can argue that fight another

26  day.

27  MR. OROZCO:

28       Yes, Your Honor.

29  THE COURT:

30       So what's your wish?

31  MR. OROZCO:

32       Your Honor, if would could reconvene

1          at 9:00.

2     THE COURT:

3               At least you'll have some time to

4          better digest the information.

5     MR. OROZCO:

6               Yes, Your Honor.

7     THE COURT:

8               And I agree with that.  So let's just

9          pick up again at 9:00.  Can you have your

10         witness here at 9:00, John?

11    MR. ALFORD:

12              I can find out.

13    THE COURT:

14              Well, talk to her and tell her where

15         all of this came from.  You'll talk to her

16         and tell her what we've got going on and

17         if there's a problem with that, you need

18         to pretty much -- is she out here?   Why

19         don't you go and go talk to her right now

20         and find out.

21    MR. ALFORD:

22              Thank you, Judge.

23    THE COURT:

24              If we need to convene earlier than

25         9:00, if that helps her, I'm willing to do

26         it, okay.

27    MR. ALFORD:

28              Yes, Your Honor.

29    THE COURT:

30              Where you staying at Mr. Orozco?

31    MR. OROZCO:

32              We got a hotel for the night.

1    THE COURT:

2                You're at a local hotel?

3    MR. OROZCO:

4                Just -- Your Honor, we got one tonight

5        because we were anticipating possibly a

6        verdict coming tomorrow.

7    THE COURT:

8                Right.

9    MR. OROZCO:

10               So I wanted to be available and have

11       somewhere to go rather than going to the

12       public library.

13   THE COURT:

14               I'm with you, okay.

15   MR. OROZCO:

16               Can I have a moment to confer with my

17       client?

18   THE COURT:

19               Sure.

20   MR. OROZCO:

21               Your Honor, at this time we'd also ask

22       the Court to, we would bring forward a

23       motion to sequester.

24   THE COURT:

25               Okay.  And I know it's in midstream

26       here, but of course the Court would, as

27       customary, grant the sequestration.

28   MR. OROZCO:

29               And admonish the State not to have

30       discussions --

31   THE COURT:

32               I would ask that the State advise to

1      its witnesses what that sequestration
2      order means if they're not present.
3   MR. ALFORD:
4           Understood, Your Honor.
5   THE COURT:
6           That's fair.
7   MR. ALFORD:
8           So, I talked to Nurse Troy.  Nurse
9      Troy is a professor at Holy Cross College
10     and she has class meeting with students
11     starting at 6:30 a.m. through 2:00
12     tomorrow.  She said she can be here at
13     3:00 tomorrow and be here at 1:00 on
14     Thursday.
15         And obviously, I understand that this
16     is the State's fault and I agree with
17     giving defense counsel more time.  Now we
18     do not plan on introducing these records
19     through Nurse Troy.  The plan is still the
20     same for the State as I believe it's
21     understood by defense counsel to proceed
22     with Nurse Troy only on the records that
23     were previously provided defense on the
24     victim Elisa Ramirez.
25         I don't if that changes defense
26     counsel in their willingness to go forward
27     now, but I do not intend on using the new
28     records turned over.
29  THE COURT:
30          Okay.
31  MR. OROZCO:
32          Your Honor, I can't go forward today.

1        I need a chance to review the records.  I
2        don't know if I'll use these.
3    THE COURT:
4            All right.  So the question is, do we
5        reconvene at 3:00 tomorrow or 1:00 on
6        Thursday?  I know you had indicated you
7        had somewhere to be.
8    MR. OROZCO:
9            Your Honor, I have a federal
10       sentencing at 10:00, I believe 9:00 or
11       10:00 a.m. on Thursday.  I could be here
12       by 1:00 and that would probably give my
13       associate and I more time to review and
14       then at that point I don't have that issue
15       pending and this is my last trial and
16       court case that I'll be practicing.
17   THE COURT:
18           What?  Are you retiring?
19   MR. OROZCO:
20           I'm not.  I'm going to be a CEO
21       construction -- I was supposed to be a CEO
22       of a construction company on Thursday at
23       11:00.  Now it's getting pushed possibly
24       later.
25   THE COURT:
26           Okay.  So 1:00 Thursday?  It is what
27       it is.
28   MR. OROZCO:
29           Yes, Your Honor.
30   MR. ALFORD:
31           Thank you, Judge.
32   MR. OROZCO:

1          And Your Honor, my hearing is set
2     between 9 and 10.  I anticipate it will
3     only take me about 45 minutes.
4     THE COURT:
5          I will give you the luxury of being
6     late if need be --
7     MR. OROZCO:
8          I appreciate that.
9     THE COURT:
10          -- on Thursday.  We'll see you all at
11     1:00 on Thursday.
12     MR. OROZCO:
13          Yes, Your Honor.
14     THE COURT:
15          And we'll go from there.  Thank you
16     all.
17     MR. OROZCO:
18          Your Honor?
19     THE COURT:
20          Yes?
21     MR. OROZCO:
22          I'm sorry.  I'm here tomorrow morning.
23     Can we still have the hearing tomorrow
24     morning at 9:00, Your Honor, just in case
25     we want to renew our motion if we find
26     something, can we still have the hearing
27     tomorrow, Your Honor, just not the trial,
28     the motions hearing?  Just in case I want
29     to throw, I'm here.
30     THE COURT:
31          I have no problem with that.  I'll be
32     here anyway, so.

```
 1        MR. ALFORD:

 2                 I have no problem with that.

 3        THE COURT:

 4                 Okay.

 5        MR. OROZCO:

 6                 So 9:00?

 7        THE COURT:

 8                 Yeah, that's fine.  Okay.  Just for

 9            that --

10        MR. OROZCO:

11                 And if I have any issues I will e-mail

12            your clerk and we can just --

13        MS. MIGHTON:

14                 No.

15        MR. OROZCO:

16                 No?

17        MS. MIGHTON:

18                 No, I'm going out of town tomorrow.

19        THE COURT:

20                 Yeah, she's not going to be here --

21        MS. MIGHTON:

22                 I'm sorry.

23        THE COURT:

24                 -- for the rest of the week.

25        MR. OROZCO:

26                 Your Honor, is there anyone I can

27            call, you know, if we don't need to have a

28            hearing?

29        THE COURT:

30                 That lady.  Well, I don't know if you

31            can e-mail her.

32        MADAM CLERK:
```

```
 1                    We don't have email.  You can call me.

 2    THE COURT:

 3                    You can call her at 8:30 in the

 4            morning and tell her --

 5    MR. OROZCO:

 6                    If we don't need a hearing or

 7            something?

 8    THE COURT:

 9                    Right.  There's no way --

10    MR. OROZCO:

11                    If I just call and say, we don't need

12            a hearing.

13    THE COURT:

14                    I won't be, well the problem is I have

15            to let my interpreters know.  Let's just

16            wait on 1:00 Thursday.

17    MR. OROZCO:

18                    Yes, Your Honor.

19    THE COURT:

20                    And either it's going to get

21            completely derailed or we can continue on.

22            So, all right.  Thank you all for your

23            time.

24    THE BAILIFF:

25                    All rise.

26                    * * * * * * * * * * * *

27    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED)

28

29

30

31

32
```

1      <u>REPORTER'S CERTIFICATE</u>

2            This certificate is valid only for a transcript

3      accompanied by my original signature and original

4      required seal on this page.

5            I, Laura Chabreck, Official Court Reporter in and

6      for the State of Louisiana, employed as an official

7      or deputy official court reporter by The 22nd Judicial

8      District Court for the State of Louisiana, as the

9      officer before whom this testimony was taken, do

10     hereby certify that this testimony was reported by me

11     in the stenomask reporting method, was prepared and

12     transcribed by me, or under my direction or

13     supervision, and is a true and correct transcript to

14     the best of my ability and understanding, that the

15     transcript has been prepared in compliance with

16     transcript format guidelines required by Statute or

17     by Rules of the Board or by the Supreme Court of

18     Louisiana, and that I am not related to Counsel or to

19     the parties herein, nor am I otherwise interested in

20     the outcome of this matter.

21                           _Laura Chabreck_

22                           Laura Chabreck, CCR

23                           Certificate No. 22013

24

25            <u>CERTIFICATE OF FILING</u>

26            I hereby certify that the foregoing transcript

27     has been submitted to the Clerk of Court's Office for

28     filing into the record on the _____ day of

29     _____, 2018.

30                           _Laura Chabreck_

31                           Laura Chabreck, CCR

32                           Certificate No. 22013

1      MR. ALFORD:

2              I have no further questions.   Thank

3          you.

4    CROSS EXAMINATION BY MR. OROZCO:

5    Q    Good afternoon, Nurse Troy.

6    A    Good afternoon, sir.

7    Q    You examined all three children, correct?

8    A    That's correct.

9    Q    And when you examined Elisa that was the first

10        time you had met her, correct?

11   A    That is correct.

12   Q    And how long was your examination for?

13   A    We try to give two hours per child.  When we have

14        three children come in it can be longer than

15        that.  And when the is a language issue in terms

16        of depending on what the parent needs in

17        translation, it can take up the whole day.

18   Q    And you examined her from head to toe you said;

19        is that correct?

20   A    Yes, sir.

21   Q    And in your examination you found no bruising --

22   A    Correct.

23   Q    -- on any part of the body?  Arms, legs, vaginal

24        area, anal area?

25   A    Correct.

26   Q    You found no scarring at the anal opening?

27   A    As I expected, yes, sir, none.

28   Q    And actually when she spoke to you, she stated

29        that there was anal touching but there was not

30        penetration, correct?

31   A    It is correct that she did not give me the word,

32        in.  She told me it was between her buttocks and

APPENDIX
G

345

| | | |
|---|---|---|
| 1 | | it was wet. |
| 2 | Q | And you also did anal swabs and other tests, |
| 3 | | correct? |
| 4 | A | That is correct. |
| 5 | Q | What were the results of those exams? |
| 6 | A | They were negative. |
| 7 | Q | They were all negative.  And you also examined |
| 8 | | the anus, correct? |
| 9 | A | That is correct. |
| 10 | Q | And you found nothing wrong with the anus? |
| 11 | A | As expected, nothing wrong. |
| 12 | Q | Now if I was to tell you that a person could -- |
| 13 | | let's say a child is penetrated 9 to 12 times |
| 14 | | over a four-month period, is it your testimony |
| 15 | | still that there would be no signs or symptoms of |
| 16 | | penetration? |
| 17 | A | Absolutely, sir.  And I wouldn't have believed it |
| 18 | | myself before I started working at the Care |
| 19 | | Center and going through the training and |
| 20 | | reviewing national photographs.  It is within 24 |
| 21 | | hours.  We have pictures in our ER of kids with |
| 22 | | bruising in our ER.  They come to us the next day |
| 23 | | and there's no signs of anything.  Kids heal very |
| 24 | | quickly in that area so even something as |
| 25 | | demonstrative as a bruise can be gone within that |
| 26 | | period of time. |
| 27 | Q | And while is anus is -- I'm not a doctor or nurse |
| 28 | | practitioner but I'm relying on your expert |
| 29 | | detail.  If a person is being forcibly raped in |
| 30 | | that the anus is constricted, is it still your |
| 31 | | testimony there would be no scarring, tearing, |
| 32 | | nothing? |

Original _____   Copy __✓____
Volume ___2___ of __2__
Total # of Items: ___|___
( __|__ env. _____ + ___ PSI)

2018 K A 1481

Volume No. 2 of 2

RECEIVED
CLERK'S OFFICE
OCT 1 6 2018
COURT OF APPEAL
FIRST CIRCUIT

**STATE OF LOUISIANA**
PLAINTIFF/APPELLEE

**VERSUS #563468 "B"**

**VICTOR GALAN**
DEFENDANT/APPELLANT

COURT OF APPEAL FIRST CIRCUIT
Filed
OCT 1 8 2018

_Rodd Noguin_
CLERK

TWENTY-SECOND (22ND) JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY

THE HONORABLE
AUGUST J. HAND, JUDGE

WARREN L. MONTGOMERY, #09578
C/O MATTHEW CAPLAN, #31650
DISTRICT ATTORNEY
701 N. COLUMBIA ST.
COVINGTON LA  70433
(985)809-8383   FAX (985) 809-8396

COUNSEL FOR PLAINTIFF/APPELLEE

LIEU T. VO CLARK, #24687
APPELLATE ATTORNEY
P.O. BOX 465
MANDEVILLE, LA 70470
(985) 231-7364

COUNSEL FOR DEFENDANT/APPELLANT

**RETURNABLE TO COURT OF APPEAL, FIRST CIRCUIT**
**ON OR BEFORE**

**OCTOBER 17, 2018**

2018 K A 1481

| APPENDIX |
| **H** |

1      TWENTY-SECOND JUDICIAL DISTRICT COURT

2          PARISH OF ST. TAMMANY

3           STATE OF LOUISIANA

**FILED**

**JUN 1 5 2018**

MELISSA B. HENRY
S/BARRY T. BACON, SR.
DEPUTY

4

5    STATE OF LOUISIANA

6

7    VERSUS                          NO. 563468

8    VICTOR GALAN

9

10

11   * * * * * * * * * * * * * * * * * * * * * * * *

12

13

14       TRANSCRIPT OF PROCEEDINGS taken before the
Honorable August J. Hand, Judge Presiding, Division
15   "B", Twenty-Second Judicial District Court, Parish of
St. Tammany, State of Louisiana, on **Monday, April 2,**
16   **2018**, in Covington, Louisiana.

17

**COPY**

18   APPEARANCES:

19

20       JOHN ALFORD, ESQ.
         MARY SMITH, ESQ.
21       (ASSISTANT DISTRICT ATTORNEYS)

22       RAMIRO OROZCO, ESQ.
         LOGAN LUQUETTE, ESQ.
23       (ATTORNEYS FOR VICTOR GALAN)

24

25

26

27

28

29   REPORTED BY:

30       Kathleen A. Wells, RPR, CCR
         Official Court Reporter
31       Certificate No. 91023

32

1

<u>**I N D E X**</u>                              PAGE

2

OPENING STATEMENT

3          Ms. Smith ----------------------------------    4

4   WITNESSES

5     OFFICER JAMES BEACH
           Direct Examination by Mr. Alford --------    8
6          Cross Examination by Mr. Orozco ---------   13

7     ELISA RAMIREZ
           Direct Examination by Mr. Alford --------   15
8          Cross Examination by Mr. Orozco ---------   32
           Redirect Examination by Mr. Alford ------   49
9
      FERNANDA RAMIREZ
10         Direct Examination by Ms. Smith ---------   51
           Cross Examination by Mr. Orozco ---------   63
11         Redirect Examination by Mr. Alford ------   76

12    NANCY RAMIREZ
           Direct Examination by Mr. Alford --------   78
13         Cross Examination by Mr. Orozco ---------   87
           Redirect Examination by Mr. Alford ------   90
14
      EARNIESHA LOTT
15         Direct Examination by Ms. Smith ---------   91
           Cross Examination by Mr. Orozco ---------   98
16
      SIKANDAR MEHR
17         Direct Examination by Mr. Orozco --------  105
           Cross Examination by Mr. Alford ---------  110
18         Redirect Examination by Mr. Orozco ------  113

19

20

21

22

23   REPORTER'S CERTIFICATE  ------------------------  117

24

25

26

27

28

29

30

31

32

1    **P R O C E E D I N G S**

2    BY THE COURT:

3            This is the matter of the State of

4    Louisiana versus Victor Galan, Docket

5    563463.  Counsel, make your appearances.

6    BY MR. ALFORD:

7            John Alford and Mary Smith on behalf

8    of the State.  State is ready for trial.

9    BY MR. OROZCO:

10           Remy Orozco and Logan Luquette

11   present on behalf of the defendant, Victor

12   Galan.  We are ready.

13   BY THE INTERPRETER:

14           Good morning, Your Honor.  Dolores

15   Garcia, Spanish interpreter.

16   BY THE INTERPRETER:

17           Reyna Croft, Spanish interpreter.

18   BY THE COURT:

19           I was going to ask that the

20   interpreters be sworn by the clerk for

21   today's proceeding.

22           (At this time, DOLORES GARCIA and

23   REYNA CROFT were sworn in as the

24   interpreters.

25   BY MR. ALFORD:

26           Judge, I think we have already

27   covered the colloquy that the defendant

28   wanted to waive his right and proceed as a

29   judge trial.  The State has agreed, just

30   out of an abundance of caution, if we

31   could get the defendant to state again

32   that he wants to proceed as a judge trial.

1    BY MR. OROZCO:

2            Your Honor, do you want me to

3        proffer that?

4    BY THE COURT:

5            If you don't mind.

6    BY MR. OROZCO:

7            Your Honor, I informed my client of

8        his options to go with a bench trial or a

9        jury trial.  At the last hearing we had,

10       he agreed to have a bench trial.  At this

11       point, he still wants to go forward with a

12       bench trial.

13   BY THE COURT:

14           Mr. Galan, is that correct?  You

15       wish to proceed by a bench trial, waiving

16       your right to trial by jury.

17   BY THE WITNESS:

18           I agree to continue.

19   BY THE COURT:

20           Thank you.

21   BY MR. ALFORD:

22           Thank you.

23   BY THE COURT:

24           Counsel, do you wish to make opening

25       statements in this matter.

26   BY MS. SMITH:

27           Yes, Your Honor.

28   BY THE COURT:

29           Proceed.

30   BY MS. SMITH:

31           Your Honor, we are here today

32       because of some very horrific choices that

4

1    Victor Galan made to violate and to rape

2    his 11-year-old daughter, Elisa Ramirez.

3         This case is about betrayal; the

4    betrayal that Elisa experienced when she

5    was repeatedly sodomized by the father,

6    the person who was supposed to protect

7    her.  And the feeling of betrayal that she

8    had when her sister, eight-year-old

9    Fernanda Galan, bravely spoke up to report

10   the abuse that she witnessed with her own

11   eyes.

12        Elisa was not the first to report

13   this abuse.  It was Fernanda, the child

14   who was closest to her father, the child

15   that idolized her father.  She was the one

16   who spoke up.

17        You will hear today from Officer

18   James Beach of the Folsom Police

19   Department.  He will testify about the

20   beginning of the investigation, how it

21   began on April 6th, 2015, when Elisa's

22   mother Nancy came to the police department

23   with Elisa to report the abuse that she

24   had learned about the night before.

25        You will also hear Mr. Audrey

26   Hepburn Care Center nurse practitioner

27   Anne Troy, who will testify about the

28   forensic exam that she performed on Elisa.

29   She will tell you that Elisa initially

30   disclosed the abuse she had suffered at

31   the hands of Victor, that she maintained

32   the abuse only involved touching of the

1   breast and butt, and Victor's touching of

2   his penis to her anus.

3       Hope House counselor Earniesha Lott

4   will also testify she's treated with the

5   now 14-year-old Elisa for the past three

6   years.  She is going to testify that,

7   about Elisa's disclosures for the first

8   time of anal penetration.  That disclosure

9   was made on January 26, 2016.

10      She will also talk about the mixed

11  emotions that Elisa has had over the last

12  three years.  About, you know, the absence

13  of her father in her life.

14      Nancy Ramirez, who as I said is

15  Elisa's mother, is Elisa's mother, will

16  also testify about the shock she

17  experienced on April 5th, 2015, when she

18  learned about the abuse that had been

19  going on in her home under her nose this

20  whole time.  And she will also tell you

21  about her decision to immediately report

22  that abuse to law enforcement, despite her

23  ongoing reluctance to have her girls come

24  in and testify, and her concerns that this

25  family tragedy could end in her own

26  deportation.

27      You will also hear from very brave

28  now 11-year-old Fernanda Galan.  She will

29  detail the abuse that she witnessed.  She

30  will describe one incident in which she

31  woke up sleeping next to her sister Elisa.

32  And she woke to the bed shaking.  When she

6

1   peeked under the covers, she saw her

2   father's penis, and her sister's underwear

3   pulled down in the back.

4       She will also tell you about another

5   incident when she walked in on Elisa bent

6   over a bed with Victor standing behind

7   her.  His pants were down, and Elisa's

8   underwear was pulled down in the back.  A

9   horrific scene for an eight year old to

10  witness.

11      Elisa herself will also get on the

12  stand to testify about the months of

13  sexual abuse that she experienced at the

14  hands of Victor Galan.  She will tell you

15  about how the abuse started with just his

16  touching of her breasts and her butt while

17  she was sleeping next to her sisters in

18  bed, sometime after her 11th birthday.

19  But that the abuse quickly escalated to

20  anal sex and to a failed attempt at

21  vaginal intercourse.

22      Elisa will tell you that most of

23  these instances occurred when she was home

24  alone with Victor, while nobody else was

25  around.  But that sometimes, he would

26  abuse her while her sisters were home as

27  well.

28      Although Elisa will tell us that

29  she's thankful now that her sister spoke

30  up, she'll testify that she initially felt

31  betrayed by her sister.  And that she did

32  not speak up for herself for fear of

1       causing problems in her parents' already

2       turbulent marriage.

3               Your Honor, we are confident that

4       when you hear all of the evidence in this

5       case, when you walk with Elisa through the

6       horrors that she experienced, that you

7       will return the only verdict that is just.

8       That you will find Victor Galan guilty of

9       first degree rape.  Thank you.

10  BY THE COURT:

11              Mr. Orozco, you wish to make an

12      opening statement?

13  BY MR. OROZCO:

14              Your Honor, we'll reserve our

15      statement for opening of our case in

16      chief.

17  BY THE COURT:

18              Thank you, sir.

19  BY MR. ALFORD:

20              State calls Officer James Beach.

21  BY THE COURT:

22              Mr. Beach, come forward please.

23              (OFFICER JAMES BEACH, after having

24      been first duly sworn under oath, did

25      testify as follows:)

26  DIRECT EXAMINATION BY MR. ALFORD:

27  Q.  Please state your name for the record?

28  A.  Officer James Beach.

29  Q.  And how are you employed?

30  A.  By the Folsom Police Department.

31  Q.  Were you so employed back in April of 2015?

32  A.  Yes, sir.

1  Q.     And on that day, did you have the opportunity

2  to get a report of sexual abuse against Victor Galan?

3  A.     Yes.

4  Q.     And what was your role in that investigation?

5  A.     I was, just showed up for work.  And the

6  complainant, I think that was Nancy Ramirez and her

7  daughter, came up to the police department.  And she

8  said she needed to talk to me.  So we went inside to

9  talk.  And that's when she explained what was going

10 on.

11 Q.     And what was the nature of what was going on?

12 A.     We went inside the office, and she stated that

13 her husband, I think she said, was molesting her

14 daughter.

15 Q.     Okay.  And what did you elect to do when you

16 were told of this allegation?

17 A.     I got statements from her.  The daughter was

18 actually there.  And she said she didn't mind if she

19 wrote the reports up.  So I got statements from them.

20 I notified my chief and my sergeant, and they came

21 by.  And from there, it went on.  Until we decided we

22 have enough probable cause to go pick him up.

23         BY MR. ALFORD:

24                  Showing defense counsel State's

25         Exhibits 1 and 2.

26         BY MR. OROZCO:

27                  No objection, Your Honor.

28         EXAMINATION BY MR. ALFORD:

29 Q.     Officer, I'm showing you Exhibits 1 and 2.

30 First, State's Exhibit 1.  Do you recognize State's

31 Exhibit 1?

32 A.     Yes, sir.

1  Q.      What is State's Exhibit 1?

2  A.      This is the statement that Nancy gave that

3  night.

4  Q.      And she wrote out that statement in front of

5  you?

6  A.      Yes, sir.

7  Q.      She gave it to you on her free will?

8  A.      Yes, sir.

9  Q.      Did you tell her what to put in that

10  statement?

11  A.      No, sir.

12  Q.      And when she was done, she gave it to you to

13  log in to evidence?

14  A.      Yes, sir.

15  Q.      And what was Nancy's relationship with the

16  alleged perpetrator, Victor Galan?

17  A.      Husband.

18  Q.      Okay.  And you said that the daughter provided

19  you a statement; is that correct?

20  A.      Yes, sir.

21  Q.      Is that State's Exhibit 2?

22  A.      Yes, sir.

23  Q.      And what is the daughter's name?

24  A.      Elisa Ramirez.

25  Q.      And same thing.  She wrote that statement in

26  front of you?

27  A.      Yes, sir.

28  Q.      You didn't tell her what to say or force her

29  to say anything?

30  A.      Just told her to write what happened.

31  Q.      And they did that?

32  A.      Yes, sir.

10

1   Q.     And State's Exhibit 2 was given to you after

2   she finished her statement to log in to evidence?

3   A.     Yes, sir.

4   Q.     You did that with both Exhibits 1 and 2?

5   A.     Yes, sir.

6          BY MR. ALFORD:

7                   I would like to offer, file, and

8              introduce State's Exhibits 1 and 2.

9          BY MR. OROZCO:

10                  No objection.

11         BY THE COURT:

12                  Let it be entered.

13         EXAMINATION BY MR. ALFORD:

14  Q.     Now Officer, Nancy walked in on her own

15  volition to report this?

16  A.     Yes, sir.

17  Q.     This was not an investigation that was begun

18  by DCFS?

19  A.     No.

20  Q.     Okay.  So she wasn't escorted in by any other

21  agency or law enforcement?

22  A.     No, sir.  Not to my knowledge.

23  Q.     Now, after getting the statements from Nancy

24  and daughter Elisa, what did you elect to do next in

25  your investigation?

26  A.     Like I said, I notified my chief and my

27  sergeant.  And they came to the police department.

28  And basically looked over the statements.  And

29  decided that we had enough probable cause to go pick

30  him up.

31  Q.     And did y'all do that?

32  A.     Yes.

1  Q.      Was Victor Galan placed under arrest?

2  A.      Yes, sir, he was.

3  Q.      And the person you placed under arrest, do you

4  see him in the courtroom today?

5  A.      Yes.  Sitting right over there (indicating).

6  Q.      And describe what he is wearing please?

7  A.      Striped shirt.

8          BY MR. ALFORD:

9                  Let the record reflect in court

10             identification of Victor Galan.

11         BY THE COURT:

12                 Noted.

13         EXAMINATION BY MR. ALFORD:

14  Q.      Did you collect any other evidence associated

15  with this case?

16  A.      No, sir.

17  Q.      Do you know where they were living, the

18  family, when they made this report?

19  A.      It was, it's a house on the left, right before

20  you get to Spencer's Feed.  It's 83, I think, 069,

21  Highway 25.

22  Q.      And did you go to that house?

23  A.      Yes, sir.

24  Q.      Why did you go to the house?

25  A.      To pick up Victor, to arrest him.

26  Q.      Okay.  And is that the home where you were

27  told that the instances of sexual abuse took place?

28  A.      I'm not sure.

29  Q.      Did you learn that's where they were living?

30  A.      Yes.  That's where Nancy said Victor was going

31  to be.

32  Q.      And did Nancy tell you they were living

12

158

1  together at that address?

2  A.      Yes, sir.

3  Q.      And that's in Folsom?

4  A.      Yes, sir.

5  Q.      That's in St. Tammany Parish?

6  A.      Yes, sir.

7          BY MR. ALFORD:

8                  No further questions.

9          BY THE COURT:

10                 Cross.

11         BY MR. OROZCO:

12                 Just briefly, Your Honor.

13         CROSS EXAMINATION BY MR. OROZCO:

14  Q.     Officer Beach, who else was present when these

15  statements were prepared?

16  A.     The statements themselves?  Me, Nancy, and her

17  daughter Elisa at first.  When I notified the chief

18  and my sergeant, they showed up, too.

19  Q.     Was there at any time a need or use of an

20  interpreter?

21  A.     Yes, sir.  Yes.  We were concerned that he

22  wouldn't understand what was going on.  I mean, when

23  we brought him to the station, we would tell him

24  things, like, "Do you want some water?  Have a seat."

25  And he knew enough to sit down and say, "Yes, I want

26  some water.  We didn't know if -- we were concerned

27  about him understanding his rights.  So we had a

28  Spanish rights form that we had him read and fill

29  out.

30         A lot of, I didn't really question him.  My

31  sergeant questioned him.  And he seemed like he

32  couldn't understand all the questions.  So we got, we

13

1   have a reserve officer that is fluent in Spanish.  So

2   we called him on the phone.  And my sergeant and

3   Victor and the interpreter went, spoke back and

4   forth.

5   Q.     Was there the use of an interpreter at any

6   time with Nancy Ramirez, when she was preparing her

7   statement?

8   A.     No.  She was pretty fluent in English.

9   Q.     And Elisa didn't need an interpreter either,

10  correct?

11  A.     No.

12  Q.     So when Nancy and Elisa came in to give

13  statements, the only person that was present was

14  yourself, Nancy, and Elisa, correct?

15  A.     Initially, correct.

16      BY MR. OROZCO:

17              No further questions, Your Honor.

18      BY THE COURT:

19              Any redirect?

20      BY MR. ALFORD:

21              No redirect.

22      BY THE COURT:

23              Thank you, Officer Beach.

24      BY MR. ALFORD:

25              Judge, I would ask that Officer

26          Beach be relieved of his subpoena

27          obligations.

28      BY MR. OROZCO:

29              No objection.

30      BY THE COURT:

31              Thank you, sir.  Have a good day.

32      BY MR. ALFORD:

1        State calls Ms. Elisa Ramirez.

2        (ELISA RAMIREZ, after having been

3    first duly sworn under oath, did testify

4    as follows:)

5    BY MR. ALFORD:

6        Before I get started, based off of

7    previous discussions with defense counsel,

8    I would like to offer a stipulation that

9    if Jo Beck Rickels with the Child Advocacy

10   Center were called to testify, she would

11   testify that she took the video statements

12   of both Elisa Ramirez and her sister

13   Fernanda Galan, all in compliance with

14   Revised Statute 15:440.5.

15   BY MR. OROZCO:

16       Your Honor, at this point we have no

17   objection to the introduction.  We will,

18   based on the testimony at that time, we

19   will make proper objections with respect

20   to the content.

21   BY THE COURT:

22       That's fine.  And I'll accept the

23   stipulation.

24   BY MR. ALFORD:

25       So I will offer, file, introduce

26   State's Exhibits 3 and 4; 3 being the CAC

27   statement of Elisa Ramirez.

28   BY THE COURT:

29       All right.

30   BY MR. ALFORD:

31       State's Exhibit 4 being the CAC

32   statement of Fernanda Galan.

1      BY THE COURT:

2             All right.  Both admitted.

3      DIRECT EXAMINATION BY MR. ALFORD:

4   Q.   Please state your name for the record?

5   A.   Elisa Beranica (spelled phonetically) Ramirez

6   Martinez.

7      BY THE COURT:

8             I know.  You are very soft spoken.

9         And they have a microphone right there.

10         If yu you could use that, it might help.

11      EXAMINATION BY MR. ALFORD:

12   Q.   Talk loud enough for everybody to hear.

13   A.   Elisa Beranica (spelled phonetically) Ramirez

14   Martinez.

15   Q.   And how old are you?

16   A.   I'm 14.

17   Q.   And where do you live?

18   A.   Folsom.

19   Q.   Okay.  Where do you go to school?

20   A.   Covington High School.

21   Q.   What grade are you in?

22   A.   Ninth grade.

23   Q.   Tell the judge a little bit about your family.

24   How many siblings do you have?

25   A.   I have two sisters.  They both go to Folsom

26   Elementary.

27   Q.   What are their names, and how old are they?

28   A.   Fernanda is about 12.  No.  11 or 10.  I'm

29   sorry.  I don't remember the date exactly.  And Carla

30   is about eight to 10 years old.  Something like that.

31   I'm sorry.  I'm not good with numbers.

32   Q.   You are the oldest?

16

```
 1   A.      Yes.

 2   Q.      And who is your mother?

 3   A.      Nancy Ramirez.

 4   Q.      Okay.   And who is your father?

 5   A.      Victor Galan.

 6   Q.      And Victor Galan is your biological father?

 7   A.      Yes.

 8   Q.      Do you see Victor Galan in the courtroom

 9   today?

10   A.      Yes.

11   Q.      Can you point him out and describe what he is

12   wearing for the judge?

13   A.      (Witness complies.)  He is right there.  He is

14   wearing black and white.

15           BY MR. ALFORD:

16                   Let the record reflect in court

17              identification of the defendant.

18           BY THE COURT:

19                   Noted.

20           EXAMINATION BY MR. ALFORD:

21   Q.      You know where you are here today, right,

22   Elisa?

23   A.      Yes, ma'am.  I mean yes, sir.

24   Q.      Now, whenever this investigation started off,

25   do you remember going to the CAC to provide a

26   videotaped statement?

27   A.      Yes, sir.

28   Q.      And you reviewed that statement recently,

29   correct?

30   A.      Yes.

31   Q.      Was it accurate from what you told Jo Beth

32   Rickels?
```

1   A.      Yes.

2           BY MR. ALFORD:

3                   Judge, at this time, I would like to

4           publish the CAC video provided by Elisa to

5           Your Honor.

6           BY MR. OROZCO:

7                   No objection.

8           BY THE COURT:

9                   Let it be admitted.

10                  (AT THIS TIME, STATE'S EXHIBIT 3 WAS

11          PLAYED.)

12          EXAMINATION BY MR. ALFORD:

13  Q.      Now, Elisa, is everything you said on that

14  video the truth?

15  A.      Yes.

16  Q.      Did you make any of it up?

17  A.      No.

18  Q.      Did anybody tell you what to say?

19  A.      No.

20  Q.      Your mom didn't tell you what to say?

21  A.      No.  I didn't even know we were going to go

22  to --

23          BY THE COURT:

24                  Can you -- I know, if you could use

25          that microphone, that might help, please.

26          EXAMINATION BY MR. ALFORD:

27  Q.      What were you saying Elisa?

28  A.      I said no, I did not make any of that up.  I

29  did not know exactly what we were going to go do,

30  because I didn't understand what was happening.  But

31  when we got there, they told me that we were going to

32  talk about what happened, and I told hem everything.

1  Q.      Okay.  Now, you describe the abuse started

2  after you turned 11?

3  A.      Yes, sir.

4  Q.      What is your birth date?

5  A.      September 26th, 2003.

6  Q.      And it happened after you turned 11?

7  A.      Yes, sir.

8  Q.      And how do you know that it happened after you

9  turned 11?  Like why do you remember the time period?

10 A.      Because it was after my aunt moved out, and I

11 just had gotten my period after I turned 11.

12 Q.      You said your aunt.  Which aunt?

13 A.      Karen.

14 Q.      Karen?

15 A.      Karen.

16 Q.      And how long did your aunt live with you all?

17 A.   ·  I'm not one hundred percent sure about the

18 time period.  But I'm assuming at least like a month

19 or more.

20 Q.      And so, your aunt moved around, moved out

21 around the same time period you turned 11 and started

22 your period; is that right?

23 A.      Yes.

24 Q.      Do you remember the first time something

25 happened?

26 A.      Yes.

27 Q.      And describe for the judge what happened on

28 the very first time?

29 A.      My dad and my mom had an argument.  I don't

30 remember what it was about.  But my mom wanted to

31 sleep alone in my sister's room.  And me and my

32 sisters were going to sleep in their room, with my

1   father.  When ever we went in there, we just watched

2   a couple movies.  And one of the movies ended, he

3   told me come sit by, like come lay by him, and in

4   between my sisters.  And I fell asleep.

5        And I woke up to him touching me.  And it, I

6   remember trying to think of ways to leave.  But I

7   didn't.  It took a while because I was scared.  But I

8   ended up going to the bathroom.  And then I went in

9   the bed with my mom.  I didn't tell her anything.

10  Q.      You said touching you.  Where was he touching

11  you?  How was he touching you?

12  A.      On my breast and my butt.

13  Q.      Say that -- you have to speak up.

14  A.      On my breast and my butt.

15  Q.      And your sisters were in the bed at that time?

16  A.      Yes.

17  Q.      And was this, where were you all living at

18  this time period?

19  A.      We were living in the same house we are living

20  in now.  By Spencer's Feed.  Well, it's now Core's

21  Feed.

22  Q.      Now, that's the first time.  Did it progress

23  in to something else?

24  A.      Yes.

25  Q.      And when was that?

26  A.      I'm not one hundred percent sure.  But a few

27  weeks after that, he started touching me with his

28  private.

29  Q.      Okay.  Now, on the video, you describe he

30  would put his penis on your butt, and there would be

31  movement.  What do you mean by that?

32  A.      He raped me with his penis.

1    Q.     Where would he put his penis?

2    A.     In my butt.

3    Q.     And I know this is tough and embarrassing, but

4    you have to speak up?

5    A.     In my butt.

6    Q.     Okay.  And is that what you are describing on

7    the video with the movement?

8    A.     Yes.

9    Q.     Okay.  Obviously you were a few years younger

10   back then.  You also, in the video, described it

11   would be icky.  Did you know how to say what icky

12   meant back then?

13   A.     Un-huh (negative response).  No.

14   Q.     Do you know now?

15   A.     Yeah.

16   Q.     What do you mean by that?

17   A.     He masturbated.

18   Q.     What was the icky?

19   A.     Cum.

20   Q.     I'm sorry.  I couldn't hear you.

21   A.     Cum.

22   Q.     Would he ejaculate on you?

23   A.     Yes.

24   Q.     And where would he ejaculate?

25   A.     On my butt.

26   Q.     On your butt, you said?

27   A.     Yes.

28   Q.     And again, I know this is awful.  But you have

29   to try to speak up.  Everybody in the room has to

30   hear you.

31   A.     Okay.

32   Q.     Now, how often would that happen once the anal

21

1 | rape started happening?

2 | A.      I don't know.  But it happened every week.

3 | Q.      Okay.  You are not sure exactly how many

4 | times?

5 | A.      No.  I didn't count.

6 | Q.      Okay.  But you're saying you think it would

7 | happen almost --

8 | A.      Yes.

9 | Q.      -- at least once a week?

10 | A.      I'm sure of that.

11 | Q.      Okay.  Now, describe to the judge, you know,

12 | when would it happen usually?  Were people home, or

13 | when would it happen?

14 | A.      It would happen either if we were, like, on

15 | break.  It would happen when my mom was at work,

16 | because she would get up at 4 to go work with the

17 | neighbor.  They would make cream cheese.  If not, it

18 | would happen when I got home from school.  Because I

19 | would get home before my sisters.  I got let out at

20 | 2:42.  And my sisters would get out an hour later,

21 | I'm pretty sure.  So it would happen as soon as I got

22 | home from school.

23 | Q.      So you would take the bus home by yourself

24 | from school?

25 | A.      Yes.

26 | Q.      And would your mother be there when you got

27 | home from school?

28 | A.      No.  She would be at work.

29 | Q.      So it would be just Victor Galan, your father,

30 | that was at home?

31 | A.      Yes.

32 | Q.      And what would happen when you got home from

1   school?

2   A.      I tried to hide a few times behind the truck.

3   He had a Nissan truck.  And I would try to hide

4   behind it.  Or we have, like, brick poles in our

5   driveway when you pull in.  I would hide behind

6   those.

7   Q.      So you were scared to go home to your own

8   father?

9   A.      Yes.

10  Q.      Why were you scared?

11  A.      Because he did that.

12  Q.      Obviously, you didn't want that to happen?

13  A.      No.

14  Q.      You said on the tape you had your own room,

15  but that also your sisters were in the bed a lot.

16  Tell the judge what do you mean by that.

17  A.      When it started happening, I was really

18  scared.  So I just went to my sister's room.  Or I

19  would sleep with them.

20  Q.      So after it started happening, you would go

21  sleep with them?

22  A.      Yes.

23  Q.      But did that stop your father from doing

24  something to you?

25  A.      No.

26  Q.      What would he do?

27  A.      He would do the same thing.  Touch me with his

28  hand.  Breast, and my butt.  Touch me with his penis.

29  Q.      And do you know if any of your sisters ever

30  saw any of these?

31  A.      Fernanda did.

32  Q.      How do you know Fernanda?

23

1  A.      One time, she woke up.  She hit him.  And I

2  hit him.  And he hit us back.

3  Q.      At times, would you fight back and try to stop

4  him from doing this?

5  A.      Yes.  I would try to push him off.  Try to

6  hold the covers.  He was really strong.  And I was

7  little.  And I couldn't push him off.

8  Q.      So he would overpower you on many occasions?

9  A.      Yes.

10 Q.      Now, did you ever tell Fernanda what was

11 happening, or she just knew because she saw?

12 A.      She knew.

13 Q.      And was there any other times Fernanda saw?

14 A.      Only when I would be like in bed, like,

15 sleeping with them.

16 Q.      And was there a time that she walked in, in

17 the middle of your father doing something to you?

18 A.      Possibly.  I'm not one hundred percent sure.

19 Q.      Okay.  Now, while this is going on, did your

20 father say anything to you?

21 A.      No.

22 Q.      Did he ever tell you not to tell?

23 A.      He told me not to tell whenever -- because I'm

24 Catholic, and we go to confession.  And that's when

25 we tell the priest.  And it didn't have to be our

26 sins.  It could be anything.  That's the only time.

27 Q.      Would you speak up a little bit?

28 A.      That was the only time he told me not to tell

29 a priest.

30 Q.      What did he say to you?

31 A.      I'm not one hundred percent word for word,

32 because it happened a while ago.  I don't remember

1  the conversation.  I just remember he told me not no

2  tell because, I don't know why.

3  Q.     Not to tell your priest?

4  A.     Yes.

5  Q.     And did he know you were going to confession?

6  A.     Yes.

7  Q.     Was that something you all would do often,

8  based off you being Catholic?

9  A.     Yes.  Like I said, my mom made an effort to

10  bring us to church and bring us to Bible study.  When

11  we were little, she couldn't, because we were young.

12  Once we started getting a little older, we started

13  going to Bible study.  Mass.  It was a daily thing.

14  Every Wednesday we go to Bible study.

15  Q.     And your father knew this?

16  A.     Yes.

17  Q.     Okay.  Did you tell anybody, any adults that

18  this was happening?

19  A.     No.

20  Q.     Who first told somebody?

21  A.     Carla.  We were at the dinner table.  And I

22  remember Carla saying, because my mom told us my dad

23  was going to watch over us while she was at work in

24  the breaks.  And Carla said, "I don't want Dad to

25  watch over us because Elisa cries when he tickles

26  her."

27  Q.     And what was your mom's reaction?

28  A.     She was worried.  She knew something was up,

29  but she didn't really understand.  So later that

30  night, she took Fernanda to the store.  And Fernanda

31  ended up crying and telling her everything.

32         BY MR. OROZCO:

1              Objection, Your Honor calls for

2          speculation.  She wasn't present at the

3          time Fernanda told her mother.

4      BY THE COURT:

5              I'm going to sustain that objection.

6      EXAMINATION BY MR. ALFORD:

7  Q.     But to your knowledge, Fernanda told your

8  mother?

9  A.     Yes.  Because Fernanda came home and told me

10 what happened.

11 Q.     Okay.  And then did your mother talk to you?

12 A.     Yes.  My mom, once I went to sleep, my mom

13 went to my room.  And she laid with me that night.

14 And she started telling me like, you know, "If

15 anything is wrong, you can tell me."  Stuff like

16 that.  And I ended up admitting everything.

17 Q.     Okay.  Now, how did it make you feel when your

18 sisters told your mom what was going on?

19 A.     I was worried because the reason I didn't want

20 to tell is, like I said, my mom and my dad would have

21 fights.  It wasn't always physical.  But it would,

22 like, sometimes get to that extent.  And I was

23 worried that if I told my mom, or any other adult, my

24 mom found out, she would ask him about it.  I didn't

25 know how she would take care of this situation.  I

26 was scared they would get in another fight, and it

27 would get worse.

28 Q.     So you were willing just to endure the abuse

29 to keep peace in the home?

30 A.     I was a really quiet child.  And I still am.

31 I don't like talking about my problems.  I don't open

32 up to people.  I usually keep it to myself.  So yes.

1   Q.      Elisa, has this been an easy process since

2   your sisters told your mom?

3   A.      No.  There's been a lot of, I don't know how

4   to explain it.  But it's not good.  Like it's not

5   been, it's been good because it's about, like,

6   hopefully it's over.  But I had to go to counseling

7   for years.  Talk about it.  Watch the videos.  Write

8   stuff about it.  I have to go through this whole

9   process.  And it keeps just coming back up.  And I

10  was really sad for a while.  And it took a lot to get

11  out of that state.

12  Q.      You mentioned counseling.  You have been going

13  to counseling since you all notified the police?

14  A.      Yes.

15  Q.      And who has been your counselor the whole

16  time?

17  A.      Ms. Earniesha.

18          BY MR. ALFORD:

19                  Showing defense counsel State's

20          Exhibit 5.

21          BY MR. OROZCO:

22                  Your Honor, we would object to this

23          as redacted.  We don't know what is being

24          redacted.

25          BY THE COURT:

26                  I have not seen it, so I don't

27          really know.

28          BY MR. ALFORD:

29                  Judge, we can cover the redactions

30          through her testimony.

31          BY THE COURT:

32                  Okay.  First, I guess, she's got to

```
 1                identify it.  I don't know what it is.

 2                Let's see if we can get beyond the

 3                objection.

 4          EXAMINATION BY MR. ALFORD:

 5    Q.       Showing you State's Exhibit 5, and just flip

 6    through it.  And I have a few questions for you.

 7    A.       When I wrote this --

 8    Q.       Hold on one second.  I need you to look

 9    through this.  Now, State's Exhibit 5, is that your

10    writing?

11    A.       Yes.

12    Q.       You wrote all of that?

13    A.       Yes, sir.

14    Q.       And what was the reason you were writing this?

15    A.       I didn't, I wasn't the only one to write this.

16    Because I didn't really like to talk about this or

17    anything like that.  So Ms. Earniesha, I would tell

18    her, and she would like jot down notes.  But I did

19    write most of this myself.

20    Q.       And the redactions, the black marks on the

21    front page, who made those marks?

22    A.       I made those marks.  At first, I told her

23    everything.  But I had friends and people in my life

24    that I don't talk to anymore.  Like ex-boyfriends.

25    Because when I was, whenever I wrote this, I was in

26    the sixth grade.  And I had a boyfriend named Terry.

27    And Jordan.  It says Jordan right here.  I didn't

28    fully scratch it out.  And that's all it is.

29                The other parts, I used to still see my father

30    as my dad.  But I have no respect for him anymore.

31    So on some of these, I would scratch out his name as

32    Dad, and I would put Victor.
```

28

1   Q.     But you made all those changes?

2   A.     Yes.  I made all those changes.  No one but

3   me.

4          BY MR. ALFORD:

5               I would like to offer, file, and

6          introduce State's Exhibit 5.

7          BY MR. OROZCO:

8               Your Honor, we renew our objection.

9          It's not a complete and accurate

10         presentation of the evidence.

11         BY THE COURT:

12              I'm going to admit the documentation

13         in to evidence, subject to

14         cross-examination as to the redactions by

15         counsel.

16         BY MR. OROZCO:

17              Yes, sir.

18         BY THE COURT:

19              Thank you.

20         EXAMINATION BY MR. ALFORD:

21  Q.     Now, there's different chapters for State's

22  Exhibit 5.  Do you describe in one of the chapters

23  the sexual abuse perpetrated on you by your father?

24  A.     Yes.

25  Q.     Is that in Chapter Three?

26  A.     I believe so.  All of this, the first chapter

27  is mainly about me and my friends and my family.

28  This chapter.  Yes.  It started the first time Victor

29  did that to me.

30  Q.     Can you read Chapter Three to the judge

31  please?

32  A.     Yes, sir.

1        (Reading) It all started in sixth grade.   I
2    was 11 years old the first time --
3        And there's where I scratched out Dad, and I
4    put Victor abused me.
5        (Reading) Everyone was home.  We lived in
6    Folsom in the same house I lived in now.  My parents
7    had had an argument.  My mom told me and my sisters
8    to go to sleep with Victor.  And she slept in my
9    sister's room.  Me, Victor, and my sisters were all
10   in the bed watching a scary movie.  When the movie
11   was over, we turned off the lights.  And I was
12   sleeping.  I woke up in the middle of the night, and
13   he was touching my butt.  I tried to move, and he
14   said, "It's okay.  Don't move."
15       (Reading) I'm not sure how long it lasted but
16   it seemed like a long time.  I was planning how to
17   get out, and I felt violated and mad.  I wanted to
18   punch him.  I told him I had to go to the bathroom,
19   so I took a really long time.  I went to where my mom
20   was sleeping, and I got in bed.
21       (Reading) I didn't tell anything because I
22   thought they would get in to a fight.  He continued
23   abusing me.  He would usually do it when it was just
24   me and him at home.  But sometimes my sisters and my
25   cousin would be there.
26       (Reading) I remember feeling scared, and I
27   hated going home after school.  I would sometimes
28   hide behind the brick entrance of the driveway.  And
29   one time, I was hiding in his truck.  And he found
30   me.  He made me come inside, and he abused me.  And
31   stopped once my sisters got home.
32       (Reading) He would touch my butt and my

1   breast.  He even put his thing in my butt.  He did

2   this more than once.  And sometimes, my sisters and

3   cousin would be there.  I felt disturbed,

4   embarrassed, nervous, paranoid, and weirded out.  I

5   was terrified.  I would cry, but I didn't want to

6   tell because I was scared my parents would fight.

7        (Reading) One time, Fernanda woke up and saw

8   him touching my butt.  She hit him, and I hit him,

9   too.  Hit him too.  He hit us back.  Victor would

10  tell me not to tell anyone one time.  He tried to put

11  his thing in my vagina, but I was able to get off.

12  Get him off.  This was the last time he abused me.

13       (Reading) My mom found out because Carla and

14  Fernanda told.  It all happened at dinner.  Carla was

15  upset because Victor was going to watch after us.

16  She started crying.  And she told my mom, "Elisa

17  cries when Dad tickles her."

18       (Reading) My mom brought my sister Fernanda to

19  the store, and Fernanda told her.  I was mad.  I felt

20  betrayed.  The next day, we went and reported it.

21  Q.      Is everything you wrote in State's Exhibit 5,

22  is that true?

23  A.      Yes.

24  Q.      Now you said he would but his thing inside

25  your butt?

26  A.      Yes.

27  Q.      And what do you mean by that?

28  A.      He put his penis inside my butt.

29  Q.      And this happened on several occasions?

30  A.      Yes.

31  Q.      Did he ever put his penis in your vagina?

32  A.      No.  The one time he tried, it was -- I was

1  underneath him.  And I was able to leave the room.

2  And went really fast underneath him.  And I ran.

3  Q.     Now, Elisa, the man sitting over there, is

4  that the individual that anally raped you on numerous

5  occasions?

6  A.     Yes.  He did.

7  Q.     Are you telling the judge the truth today?

8  A.     Yes.

9  Q.     Would you make all this up just because your

10  father would hit your mom, and they would get in

11  arguments?

12  A.     No.

13  Q.     Do you wish this hadn't happened to you?

14  A.     Yes.

15  Q.     But everything you said today is the truth?

16  A.     Yes.

17        BY MR. ALFORD:

18                   I have no further questions, Your

19           Honor.

20        BY MR. OROZCO:

21                   May I proceed, Your Honor?

22        BY THE COURT:

23                   Yes, sir.

24        CROSS EXAMINATION BY MR. OROZCO:

25  Q.     Elisa, my name is Ramiro Orozco, your father's

26  attorney.  So I'm going to be asking you some

27  questions.  We just watched a video of you reporting

28  the crime.  Right?

29        BY MR. OROZCO:

30                   Do you want to take a break, Your

31           Honor?

32        BY THE COURT:

1          Do you need a couple minutes just to

2      compose yourself?

3      BY THE WITNESS:

4          (Witness nods head affirmatively).

5      BY THE COURT:

6          Let's take a few minutes break.

7      Five minutes.

8          (At this time a short break was

9      taken.)

10      BY THE COURT:

11          You all can be seated.  You good to

12      go?

13      BY THE WITNESS:

14          (Witness nods head affirmatively).

15      BY THE COURT:

16          Mr. Orozco.

17      EXAMINATION BY MR. OROZCO:

18  Q.    Ms. Ramirez, you recorded this video on April

19  15, 2015, correct?

20  A.    I'm pretty sure.  I don't know the exact date.

21  Q.    That was the date on the video?

22  A.    Okay.

23  Q.    You reported this, or you and your family

24  reported this to the Folsom Police Department on

25  April 6th, 2015, correct?

26  A.    Uh-huh (affirmative response).

27  Q.    I'm sorry.  You have to say yes or no?

28  A.    Yes.

29  Q.    Between April 6 and April 15, who did you

30  speak with?

31  A.    I don't know their names.

32  Q.    Okay.  How many people did you speak with?

1  A.      That was a while ago.  But I believe at least

2  four people.

3  Q.      Okay.  Who were those four people?

4  A.      I don't know their names.  I never asked.

5  Q.      Okay.  Do you remember where they worked?

6  A.      They work at the Folsom Police Department.

7  Q.      And then you were taken to a clinic, and you

8  were evaluated?

9  A.      Yes.

10  Q.      They did a physical examination of you?

11  A.      Yes.

12  Q.      How many days after you reported it to the

13  police was that done?

14  A.      I'm sorry.  That happened a couple years ago,

15  and I don't know number for number.

16  Q.      Okay.  But you remember everything else that

17  you testified to today?

18  A.      How can I forget everything that happened to

19  me?  But I'm supposed to remember numbers and dates.

20  Q.      I'm just trying to figure out when this was

21  reported, and how many times it happened?

22  A.      Sorry, but I was 11.  And I don't remember

23  what day it happened, what exact time it happened.

24  What exact number of days after it happened.

25  Q.      Okay.  When you were physically examined by

26  the doctor, or the nurse, was that within a week of

27  you reporting it to the police?

28  A.      I'm not one hundred percent sure, so I cannot

29  answer your question.

30  Q.      Actually, a lot of your testimony has been

31  you're not one hundred percent sure, isn't it?

32  A.      I can't remember day for day.  I'm sorry.

1  Q.    You were evaluated within one week of

2  reporting it to the police, correct?

3        BY MR. ALFORD:

4              Objection.  Asked and answered.

5        BY MR. OROZCO:

6              It was not answered.

7        BY THE COURT:

8              It wasn't.  Overruled.

9        BY THE WITNESS:

10             Yes.

11       EXAMINATION BY MR. OROZCO:

12 Q.    And this physical examination was of your

13 body, correct?

14 A.    Yes.

15 Q.    And during that examination, you were

16 examined, your anus was examined, correct?

17 A.    Yes.

18 Q.    And your testimony today, you say you were

19 anally penetrated at least once a week, correct?

20 A.    I didn't say once a week.  I said he violated

21 me at least once a week.  I didn't say he penetrated

22 me every single time.

23 Q.    How many times are you anally penetrated?

24 A.    I didn't count how many times my dad raped me.

25 Q.    Was it more than 10?

26 A.    I did not count.  But possibly, yes.

27 Q.    Was it more than 15?

28 A.    I don't know.  I don't want to say yes or no

29 because I don't remember each time my dad raped me.

30 Q.    Your father, he penetrated you with his penis

31 in your anus, correct?

32 A.    Yes.

1  Q.      This happened multiple times, correct?

2  A.      Yes.

3  Q.      And this happened within six months of you

4  reporting it to the police, correct?

5  A.      Six to nine.  Something around that time.

6  Q.      Well, Your birthday is in September, correct?

7  A.      Yes.

8  Q.      And you guys reported it in April, correct?

9  A.      Yes.

10  Q.      You said it started about a month after your

11  birthday, correct?

12  A.      Yes.

13  Q.      So that would make six months?

14  A.      Correct.

15  Q.      So within a six month period, you were anally

16  penetrated more than to 10 to 15 times, correct?

17  A.      Yes.

18  Q.      Now, prior to making this video, did you meet

19  with any counselors?

20  A.      I don't believe so.  I talked to people, asked

21  me what happened.  Asking me questions.  But I don't

22  think I went to counseling around that time.

23  Q.      Did anyone tell you what to say?

24  A.      No.

25  Q.      Okay.  You stated that when your father was on

26  top of you, that he told you it's okay.  Don't move.

27  Correct?

28  A.      Yes.

29  Q.      Now, did he say that in English or Spanish?

30  A.      He said that in Spanish.  He does not talk

31  English.

32  Q.      All right.  Can you use the exact words, and

1  we will use the interpreter, that he said to you in
2  Spanish?
3                    (At this time, the witness complies
4             and speaks Spanish.)
5        BY MR. OROZCO:
6                    And Your Honor, just for the record,
7             "It's okay.  Don't move."
8        BY THE COURT:
9                    I thought the interpreter was going
10            to repeat it.
11       BY MR. OROZCO:
12                   I thought so, too, Your Honor.
13       BY THE COURT:
14                   But she had not.
15       EXAMINATION BY MR. OROZCO:
16  Q.      Prior to you alleging this all happened, who
17  lived in the house?
18  A.      It was, like, at the time it happened?
19  Q.      No.  Before.
20  A.      It was me, my mother, my two sisters, my
21  father, my uncle, his son, and my aunt.
22  Q.      And how many bedrooms is this?
23  A.      Three bedrooms.
24  Q.      Okay.  So where would your aunt and uncle
25  sleep?
26  A.      In my father and mother's room.
27  Q.      So in your father and mother's room, you had,
28  was your mom, Victor, your aunt, and your uncle?
29  A.      No.  My aunt and her family slept in that room
30  because they had nowhere else to sleep.  But my mom
31  and my dad, I don't remember exactly the sleeping
32  arrangements because I'm not a very open person.

1  Usually I stay in my room, and I don't really hang

2  out with my family that much.

3           But I was in my room, and my sisters and my

4  cousins, we would sometimes have sleep overs in my

5  room.  But I know for a fact that my aunt, my uncle,

6  and my cousin were staying in my mom and dad's room.

7  But my parents were not in that room.

8  Q.     Okay.  Why would your dad sleep with you in

9  your room?

10 A.     My dad slept with me in my room?

11 Q.     That's what you stated.  I'm asking why your

12 dad slept in your room?

13 A.     When?

14 Q.     I don't know.  That was your testimony.  I

15 wrote it down.  You said your father would sleep in

16 your room?

17 A.     Oh, I know what you're talking about.

18 Sometimes it would be me, my dad, and my sisters.

19 But that was before the rape happened.  Because he

20 was still my father.  I see no wrong in why I can't

21 sleep with my parents.

22 Q.     So your mom and your dad didn't sleep

23 together?

24 A.     Yes.  Most of the time they did.  Except when

25 they would have arguments.  And even when they would

26 have arguments, they would still sleep together

27 sometimes.

28 Q.     And you guys were eating dinner when this all

29 happened, when your sister told everybody, correct?

30 A.     Yes.

31 Q.     Did your father eat dinner with your guys?

32 A.     Sometimes he would finish before us.

1  Sometimes he wouldn't be home, or he would working

2  outside on a car.

3  Q.    Isn't it true that sometimes -- well, your

4  father started eating by himself because your mother

5  wouldn't let him eat with you guys?

6  A.    No.  That is not true.  My dad would come home

7  from work either later, or we would have to eat

8  before him because we had to go to CCD.  My mom never

9  forbid my dad from seeing us.  It was always my dad

10  who, you now, was late or something.

11  Q.    You mentioned CCD.  What is that?

12  A.    It's Bible study.  Every Wednesday.

13  Q.    It is actually catechism, isn't it.

14  A.    Well, catechism.  I didn't know the word for

15  it.

16  Q.    So you can do your First Communion, correct?

17  A.    Yes.

18  Q.    Now, you hadn't done your First Communion when

19  you were 11, correct?

20  A.    No.

21  Q.    Yet, you went to confession?

22  A.    That's what my dad believed.  And yes, we

23  still went to confession.  Because during Bible

24  study, the kids, they bring them to confession.  No

25  matter what grade you're in, if it's around the

26  holiday, all the kids go.

27  Q.    So you went to confession before you completed

28  catechism?

29  A.    Yes.  There's nothing wrong with that.

30  Q.    And you said when your father would assault

31  you, that you were sleeping object your side,

32  correct?

1   A.      Yes.

2   Q.      How was he touching you?

3   A.      What do you mean?

4   Q.      How would he touch you?

5   A.      He would grab my breast and my butt.

6   Q.      From behind?  If you were on your side and he

7   was on his side, how would he touch you?

8   A.      He would go like this (indicating).  I would

9   be on my --

10  Q.      How?  I actually would like to see because --

11  I mean, was he using both hands, one hand?

12  A.      One hand.  Most of the times.  Sometimes both.

13  Q.      Okay.  And how would he use both hands?

14  A.      He would put one underneath me and one above

15  me.

16  Q.      But then, you would end up somehow on your

17  stomach, correct?

18  A.      Yes.  That was whenever I was standing up, and

19  he would bend me over the bed to anally penetrate me.

20  Q.      Okay.  And how, I mean, he would -- did he

21  have his clothes on?

22  A.      I couldn't see what he -- he would always have

23  a shirt on.  I know that for a fact.  But I don't

24  know if he had boxers on or not because he would hold

25  he down.  I never got to see.

26  Q.      So you never really saw his penis, did you?

27  A.      No.  I never looked because he always had me

28  down.

29  Q.      You don't know if it was his penis that was

30  penetrating you?

31  A.      Oh, I knew it was his penis because I could

32  feel him moving with his hand.

40

1  Q.      So he was moving his hand or his penis?

2  A.      He would hold it, and he would do it.

3  Q.      And you could see this?

4  A.      I could feel it.

5  Q.      You could feel him holding his penis with his

6  hand?

7  A.      I could feel him going inside of me.

8  Q.      With his penis?  But not -- or with an object,

9  correct?  It could have been his hand or --

10  A.      It could not have been an object.

11  Q.      Could have been his finger?

12  A.      No.

13  Q.      You're sure of that?

14  A.      Yes.

15  Q.      Because you saw it?

16  A.      No.

17  Q.      Okay.  Now, in the video, you never mentioned

18  being anally penetrated, did you?

19  A.      No.  Because I was little.  And I didn't know

20  what, how to say it.  And because it's embarrassing

21  to have your dad do that to you, to have to tell the

22  whole staff that your father raped you.  To me,

23  that's embarrassing.

24  Q.      You were told to tell the truth in that video,

25  correct?

26  A.      But I did not know how to say it.  I did not

27  know how to explain it.  I said it was moving, and

28  that's as best I could do.

29  Q.      You didn't tell the truth in the video, did

30  you?

31  A.      I told tell the truth, just not word for word

32  what happened because I did not know.

1  Q.    You did not say -- they asked you if he

2  touched you inside, and you said no in the video.

3  A.    I said it was moving.

4  Q.    In the video, you didn't -- you said that you

5  were not penetrated?

6        BY MR. ALFORD:

7              Objection.

8        BY THE WITNESS:

9              I did not say that.

10       BY MR. ALFORD:

11             Mischaracterization of the evidence.

12       BY THE COURT:

13             Sustain the objection.   Court has

14          reviewed the video.

15       BY MR. OROZCO:

16             Yes, Your Honor.

17       EXAMINATION BY MR. OROZCO:

18  Q.    You stated that your aunt moved out, correct?

19  A.    Yes.

20  Q.    How did you feel when they moved out?

21  A.    I wasn't sad or anything.   They moved out.

22  They found a house.   We would still visit them.   It

23  wasn't a major change except for the fact that my

24  family gets to have their own home.

25  Q.    You stated that your father, or Victor, would

26  hit your mom?

27  A.    Yes.

28  Q.    Isn't it true that your mom would also hit

29  Victor?

30  A.    When she was fighting back, yes.

31  Q.    Isn't it true that most of the fights your mom

32  and your father had, it was your mom hitting your

1  father?

2  A.     No.

3  Q.     In the video, you stated both sisters told

4  your mom?

5  A.     Yes.

6  Q.     But you stated only one sister actually saw,

7  correct?

8  A.     Yes.

9  Q.     How did your -- do you know how your other

10  sister found out?

11  A.     Because I would cry.  Because she was right

12  there in the bed with us.  She would hear when we

13  would cry.  Like I stated, she would say, "Be quiet.

14  Let her sleep."  Carla did not know exactly what was

15  happening, but she knew something was wrong.  And

16  that's why she told my mom, "Elisa cries when Daddy

17  tickles her."  Because she did not understand what

18  happened.

19  Q.     Now, you all want to work with your mom the

20  next day after this incident you guys told us about?

21  A.     Yes.

22         BY MR. OROZCO:

23                 Court's indulgence, Your Honor?

24         BY THE COURT:

25                 Yes, sir.

26         EXAMINATION BY MR. OROZCO:

27  Q.     Now, you wrote your statement in four

28  chapters, correct?

29  A.     I believe so.  Yes.

30  Q.     Were they all written at the same time?

31  A.     Whenever I went to counseling, I did not like

32  talking about this a lot.  So when we would write it,

43

189

1   it was not every single time I went.  Sometimes we

2   would take a break and talk about my feelings and how

3   I'm dealing with it.  It wasn't every single time.

4   But we would still write it.  It is not mandatory

5   that I have to write about what my father did to me

6   each time I go there.

7   Q.     Okay.  So who came up with the idea to write?

8   A.     It's the process, supposedly I believe so.

9   Because I didn't say let's write it.  They just told

10  me.  So part of the process is to write a book about

11  what happened to you.  And at the end of the process,

12  it should help you -- I don't know what they said.

13  But supposedly, it was supposed to help me with it.

14  Q.     So this wasn't written all at one time, was

15  it?

16  A.     It was, no.

17  Q.     It was written a piece here, and maybe the

18  next -- did you go weekly, monthly?  What, how did

19  you go to counseling?

20  A.     At first, I'm pretty sure it was weekly.

21  Towards the end of me going there, it was like once a

22  month or something like that.

23  Q.     So over the course of -- and when did this,

24  when did you start writing this after your counseling

25  began?

26  A.   :  I'm pretty sure, we started writing it at the

27  beginning.  Like not even a month.  Probably a month

28  or something like that, we started writing or at

29  least talking about it.  And she would jot down

30  notes.

31  Q.     Did you write, when you wrote this, did you

32  write this from your mind or from her notes?

1    A.      No.   I wrote it from my mind.   She would say,

2    "Okay.   Let's start."   And she would tell me what the

3    chapter is.   Like for example, this one, me, myself,

4    and I.   That is about me and stuff I like to do.

5    Friends.   Where I go to.   How old am I.

6    Q.      So the counselor would tell you what to write

7    in these statements?

8    A.      She would tell me what the chapter would be

9    about.

10   Q.      Okay.   And then, you would just start writing?

11   A.      Yes.

12   Q.      And then, so, you, did you write one chapter

13   all at one time?   Or did you write it there at the

14   clinic, or did you take it home and write it?

15   A.      The only time I took it home and write it was

16   the last chapter, which I'm pretty sure is Chapter

17   Four.   Where I, like, tell, like, how I am now.

18   That's the only one I took home.   But as for that, if

19   I didn't finish, next time I came, we would work on

20   it.

21   Q.      Okay.   And when did you write Chapter Four?

22   A.      Chapter Four, I don't know the exact date.

23   Q.      Was it six months ago, a year ago?   How long

24   ago?

25   A.      I don't know.   I just know that I have been

26   going there for at least two years.

27   Q.      So it's been about three years now, hasn't it?

28   A.      Three years, I guess, yes.

29   Q.      So, I mean, did you write it before six months

30   ago?   Before New Years?

31   A.      We were working on it about six months ago,

32   yes.   Probably.   Because we always worked on it.

1   Q.      Did you finish Chapter Four before New Years?

2   A.      This New Years?

3   Q.      Yes.

4   A.      Yes.

5   Q.      Did you finish it before Thanksgiving?

6   A.      I don't know.  I'm not, I don't remember

7   exactly when I finished.  We did it, and we would

8   talk about it.

9   Q.      Well, I'm just trying to figure out when you

10  wrote these so I can know when these were written.

11  A.      Isn't -- I have a question.

12  Q.      I'm the one that asks the questions.

13  A.      Okay.

14  Q.      I just want to know when these were written?

15          BY THE COURT:

16                  Just take a minute to think about

17              it.  Just take a minute.

18          BY THE WITNESS:

19                  It was two years after the incident.

20              Because I wrote it here.

21          EXAMINATION BY MR. OROZCO:

22  Q.      In Chapter Four?

23  A.      Yes.  It says, where is it.  It's been two

24  years after the incident.

25  Q.      Okay.  So you finished this about a year ago,

26  correct?

27  A.      Pretty sure, yes.

28  Q.      Okay.  In the video, you stated that the last

29  time your father touched you was the Sunday before

30  the Monday you reported it.  Correct?

31  A.      Pretty sure, yes.

32  Q.      I'm sorry?

1  A.     Yes.

2  Q.     And on that occasion, do you remember or

3  recall whether he penetrated you or not?

4  A.     I don't -- I'm pretty sure.  I don't know

5  exactly if he did or not.  Sorry.  I don't think

6  about if the last time that my dad did that, if it

7  was.

8  Q.     Well, you clearly thought about it a lot over

9  the last few years.  You wrote a book.

10  A.     I'm sorry.  But I don't like thinking about

11  what happened.  And I told you this from the

12  beginning.  I only talked about it and everything

13  because it's part of the process of healing.  But I

14  don't understand how I can heal when it's been three

15  years and I'm still sitting here at this court,

16  trying to deal with it, trying to get this man who

17  raped me in jail.

18         Because I don't think I deserve this.  It's

19  not fair.  It's been three years.  And I'm still

20  dealing with this.  I have gone to counseling.  I

21  have talked to multiple people about what has

22  happened.  I have talked to -- I have done everything

23  y'all have asked me to do.  And yet, you are sitting

24  here, trying to tell me that, oh, well what day is

25  this?  I'm sorry.  I'm not worried about what day it

26  was.  I don't like --

27  Q.     Let's talk about what people have asked you to

28  do.  What have people asked you to do?

29  A.     To tell them what happened.  To go over and

30  over the same thing.  So I'm sorry if I tried to

31  forgive -- I mean forget everything that has

32  happened.  I don't remember the exact dates.  I don't

1  remember the exact times my dad raped me.  I'm sorry.

2  I didn't realize that, oh, if you are raped, you have

3  to remember exact day you were raped.  Exact number

4  of times you were raped.

5  Q.     Well, you just said you want to put your dad

6  in prison?

7  A.     I don't want him by me.  I don't care where

8  happens.  I don't want him anywhere near me.

9  Q.     So you will say anything you have to, to keep

10  him from being near you?

11  A.     No.  Because I -- why would that matter?  If I

12  wanted him out my life, there's a million ways I

13  could do it.

14  Q.     Like what?

15  A.     He's an immigrant.  I could call ICE on him.

16  Q.     You are an immigrant, aren't you?

17  A.     Yes.

18  Q.     You are illegal, aren't you?

19  A.     Yeah.  I'm not going to lie about it.

20  Q.     Have you talked to an attorney about this?

21  A.     I don't know.

22  Q.     Have you gone with your mom to an attorney's

23  office?

24  A.     No.  Because we have been sitting here dealing

25  with this.

26  Q.     Today.  But in the last three years, have you

27  and your mom gone and talked to an immigration

28  attorney?

29  A.     We haven't had enough money to get one.

30  Q.     So your mom didn't go with Rosie to an

31  attorney?

32  A.     I don't know.  I don't talk to my mom about

48

1   this stuff.  Like I said, I'm a closed person, and I

2   don't talk to people about anything.

3   Q.     So are you afraid about getting deported?

4   A.     I mean, yeah.  I don't want to get deported.

5   Because if I go back, I mean, where am I going to go?

6   We don't have a job.  We don't have money.  What am I

7   supposed to do?  I'm 14.  I can't live with --

8   Q.     So would you do anything to stay in this

9   country?

10  A.     If it came down to me getting deported, I

11  can't fight it.  I'm 14.  Like I said, what am I

12  supposed to do?

13         BY MR. OROZCO:

14                   One moment, Your Honor.  At this

15               time, we tender the witness with the right

16               to reserve to call her during our case in

17               chief.

18         BY THE COURT:

19                   Okay.  Mr. Alford, you can redirect.

20         BY MR. ALFORD:

21                   Very brief.

22         REDIRECT EXAMINATION BY MR. ALFORD:

23  Q.     In the three years and the countless people

24  you had to tell and talk to about this, has anyone

25  ever told you what to say?

26  A.     No.

27  Q.     Now, unfortunately, the defense attorney

28  badgered you about percentage --

29         BY MR. OROZCO:

30                   Objection to the characterization of

31               my questioning.

32         BY THE COURT:

1    I agree.

2    EXAMINATION BY MR. ALFORD:

3 Q.    You were asked a lot about percentages and

4 whether or not you were positive.  Are you a hundred

5 percent positive that this man right here anally

6 penetrated you on multiple occasions?

7 A.    Yes.

8 Q.    And while you didn't see this man's penis, are

9 you sure it was his penis that went inside of your

10 butt?

11 A.    He was only the person in that room.  And I

12 remember you holding me down.  I remember your hands

13 holding me down.  So yes.  He's the one that did it.

14 Q.    Both hands holding you down?

15 A.    Yes.

16 Q.    While he put his penis inside of you?

17 A.    Sometimes it was one while he was doing it.

18 Other times it was two to like get me where he wanted

19 me.  I didn't ever see him while he was doing it.

20 But I saw him before he did it.  I saw it when he

21 pulled me into the house, trying to get me to go in

22 the room, whenever I got home from school and was

23 hiding behind his truck.

24    BY MR. ALFORD:

25         Thank you, Elisa.  I have no further

26       questions.

27    BY THE COURT:

28         You can step down.  Leave that

29       there, please.  Thank you.

30    BY MS. SMITH:

31         Your Honor, the State calls Fernanda

32       Galan.

50

196